**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Norfolk Division**

TIMOTHY SCOTT CARAMILLO,
ADMINISTRATOR OF THE ESTATE OF
REGINA MARIE HONEYCUTT, Deceased,

        Plaintiff,

v.                          Case No. _____

CORRECT CARE SOLUTIONS, LLC, now      **JURY TRIAL DEMANDED**
conducting business as WELLPATH LLC,

    Serve at:

    Corporate Creations Network Inc.
    6802 Paragon Place #410
    Richmond, Virginia 23230

DALE MORENO, MD,

    Serve at:

    74 Wood Cove Court
    Mineral, VA  23117

SUSAN D. ANDERSON, NP,

    Serve at:

    54 Burtis St
    Portsmouth, VA 23702

AZURADEE LINDSEY, LPN,

    Serve at:

    3740 Wayne Cir
    Norfolk, VA 23513

NIDA NOFTZ, LPN,

    Serve at:

    1233 Placid Way
    Chesapeake, VA 23320

TIMOTHY WRIGHT, LPN,

>	Serve at:

>	130 Majestic Dr
>	Suffolk, VA 23434

MELISSA PEPPENHORST, LPC,

>	Serve at:

>	2625 Loudoun St
>	Virginia Beach, VA 23456

JEISKALY BODDEN, LPN,

>	Serve at:

>	7828 Lisa Dr Apt 201
>	Norfolk, VA 23518

JAMES ROBINSON, LPN,

>	Address unknown at this time.

OLGA V. BARTON, RN,

>	Serve at:

>	1117 Michaelwood Dr
>	Virginia Beach, VA 23452

HAMPTON ROADS REGIONAL JAIL AUTHORITY,

>	Serve:

>	David A. Hackworth, Superintendent
>	Hampton Roads Regional Jail
>	2690 Elmhurst Lane
>	Portsmouth, VA  23701

DAVID A. HACKWORTH,

>	Serve at:

>	Hampton Roads Regional Jail

2690 Elmhurst Lane
Portsmouth, VA 23701

JOSEPH P. BARON,

ISUREAL (Deputy, Norfolk Sheriff's Office in or about
September and October 2018),

CANIFF (Deputy, Norfolk Sheriff's Office in or about
September and October 2018), and

DUDLEY (Deputy, Norfolk Sheriff's Office in or about
September and October 2018),

Serve the foregoing at:

Norfolk Sheriff's Office
811 E. City Hall Avenue
Norfolk, VA 23510

Defendants.

# **COMPLAINT**

COMES NOW Plaintiff Timothy Scott Caramillo, Administrator of the Estate of Regina Marie Honeycutt, Deceased, by counsel, and moves this Court for judgment against the Defendants Correct Care Solutions, LLC, now conducting business as Wellpath LLC (referred to herein as "CCS"); Dale Moreno, MD; Susan D. Anderson, NP; Azuradee Lindsey, LPN; Nida Noftz, LPN; Timothy Wright, LPN; Melissa Peppenhorst, LPC; Jeiskaly Bodden, LPN; James Robinson, LPN; Olga V. Barton, RN (the foregoing are collectively referred to hereinafter as the "CCS Defendants"); Hampton Roads Regional Jail Authority (the "Regional Jail Authority"); David A. Hackworth; Joseph P. Baron; Isureal; Caniff; and Dudley (Isureal, Caniff, and Dudley were deputies with the Norfolk Sheriff's Office in or about September and October 2018), and states as follows:

## I.  INTRODUCTION

1.  On October 6, 2018 at 11:12 p.m., EMS was summoned to Hampton Roads Regional Jail (the "Regional Jail")[1] for "an abdominal pain."  Upon arriving at the scene, EMS found 32-year-old Regina Marie Honeycutt ("Ms. Honeycutt") "with dried sputum around the mouth," "unresponsive with agonal respirations [abnormal breathing characterized by gasping, labored breathing], skin jaundice and mottled [patchy and irregular colors], eyes dilated and fixed bilaterally, stomach distended and rigid, [and a] large bruise to her upper inner left arm."

2.  A "prison guard and nurse" told EMS that Ms. Honeycutt had "**been complaining of abdominal pain for <u>two weeks</u> with no relief from tx [treatment]**…." (Emphasis and double emphasis added.)

3.  Despite Ms. Honeycutt's acute condition, EMS's "Patient Care Report" underscored the absence of any emergency medical care at the time of and preceding EMS's arrival on scene. EMS found a nurse merely "by [Ms. Honeycutt's] side"; no life-saving actions were being undertaken. Further, EMS recorded the following:

> **When pt was found at medical room in jail, **no interventions had been previously performed for pt.**  The pt's prison guard stated that the pt had been in the medical wing for approximately 4 hours before EMS was called.  **The prison's medical ward nurse was unable to tell EMS how long the pt had been unresponsive and failed to note or treat the airway compromise.  The prison medical staff had also failed to provide EMS with vitals** during the medical wards time of care due to being unable to obtain them via the automated vitals machine at the pt's bedside.  (Emphasis added.)

4.  EMS initiated certain emergency interventions and then transported Ms. Honeycutt to Bon Secours Maryview Medical Center ("Maryview").  Upon arrival at the Maryview Emergency Department ("ED"), Ms. Honeycutt was noted to be "unresponsive and in respiratory arrest."  Ms. Honeycutt's medical history was initially provided by the correctional officers who

---

[1]  Referred to in certain documents referenced herein as "HRRJ."

accompanied her to Maryview. ED physicians noted in Ms. Honeycutt's chart, "[patient reportedly **with symptoms for a week**." (Emphasis added.). Also, "[p]er the guard from hampton roads regional jail," a triaging nurse recorded, "the patient went to medical around 1800 (6 p.m.) complaint of constipations x a week, and received a fleet enema **two days ago with no relief**." (Emphasis added.)

5.　　ED physicians immediately determined that Ms. Honeycutt was in "Septic shock." An abdomen and pelvis CT scan showed that Ms. Honeycutt's bowel had a hole in it and free fluid had emptied into her abdomen. At 12:51 a.m. on October 7, 2018, a physician recorded that Ms. Honeycutt's prognosis was "very poor."

6.　　At 7:20 a.m. on October 7, 2018, a treating physician noted, "patient requires surgical intervention for bowel perforation with free fluid in peritoneum and pneumoperitoneum but remains too unstable to survive trip to the OR."

7.　　Ms. Honeycutt was pronounced dead at 10:47 a.m. on October 7, 2018.

8.　　Assistant Chief Medical Examiner Michael Hays, M.D., determined that Ms. Honeycutt died from "Acute peritonitis due to bowel perforation due to complications of colonic adenocarcinoma." Acute peritonitis is an acutely dangerous inflammation of the lining of the abdominal cavity resulting from a rupture to the bowel and subsequent infection from the leakage.[2]

9.　　For at least two weeks before her death, Ms. Honeycutt continually sought medical help for abdominal pain, but was regularly rebuffed by correctional officers, deputies, and medical staff. Numerous inmates at Norfolk City Jail (as referred to herein as "Norfolk Jail"), where Ms.

---

[2] Dr. Hays found absolutely no evidence of metastases or "mets," meaning that had Ms. Honeycutt undergone timely surgery with resection [surgical removal] of the obstructing mass and polyps, Ms. Honeycutt would have had a 100% recovery.

Honeycutt was held prior to being transported to the Regional Jail on or about October 5, 2018, state that Ms. Honeycutt was in intense discomfort and, among other symptoms, had been vomiting blood, but the deputies and health care workers disregarded her pleas for help, and those made by fellow inmates on her behalf. Indeed, it appears that ***Norfolk Jail deputies disciplined Ms. Honeycutt as a result of her efforts to obtain help***.

10. On September 29, 2018 – eight days before her death – Ms. Honeycutt was noted to have highly abnormal vital signs – a fever, a ***pulse of 157 beats per minute, and a blood pressure reading of 98/88.*** Despite Ms. Honeycutt's obviously dire condition, Defendant Nurse Lindsey marked Ms. Honeycutt's issues as "Not Urgent" and "Routine." Lindsey advised Ms. Honeycutt to drink more fluids and "increase [her] activity level." Ms. Honeycutt was not examined by Defendant Anderson, NP, at any time from September 29, 2018 to when Ms. Honeycutt was transferred out of Norfolk Jail.

11. Ms. Honeycutt was transferred to the Regional Jail on or about October 5, 2018, despite her poor condition. Following her transfer, the Regional Jail CCS Defendants disregarded Ms. Honeycutt's acute conditions. Defendant Moreno, MD failed to send Ms. Honeycutt to the hospital when she reportedly had a positive sign for abdominal rebound tenderness and a rigid abdomen. Despite her life-threatening condition, Dr. Moreno elected to perform tests that took hours to receive back in a jail setting, and were limited by the resources available at the Regional Jail. He then sent Ms. Honeycutt back to General Population notwithstanding that the tests indicated multiple irregular findings, including blood in the urine, and he had not made a diagnosis as to what was causing Ms. Honeycutt's grave symptoms. Nothing was done for Ms. Honeycutt's acute medical condition for at least approximately 24 hours thereafter. Ms. Honeycutt simply languished under the care and control of correctional officers in General Population. When Ms.

Honeycutt was finally brought to Medical again, as noted above, a correctional officer's report indicates that she languished for about 4 more hours before 911 was called. However, a nurse's medical records materially clash with the correctional officer's report. The nurse indicates that Ms. Honeycutt was not brought to Medical until about 10:30 p.m., and was in considerable distress at the time. The nurse's record does not reflect the 4-hour delay. Notwithstanding the discrepancy in the records, both CCS personnel and correctional personnel at the Regional Jail allowed Ms. Honeycutt's condition to deteriorate and she eventually became unresponsive. When EMS arrived, "no interventions" were underway. By the time Ms. Honeycutt was finally transported to the hospital, hospital physicians were unable to operate as she was too sick to survive surgery.

12.     The Defendants' negligence, gross negligence, willful and wanton negligence, and/or deliberate indifference to Ms. Honeycutt's acute medical needs caused her death. Had the Defendants timely and properly intervened, Ms. Honeycutt would not have died.

13.     Additionally, as detailed herein, Ms. Honeycutt's death represents a pattern of deliberate indifference to the needs of inmates by the Regional Jail Authority, CCS, and their policymakers.[3]

## II.     **JURISDICTION**

14.     Jurisdiction exists in this case pursuant to the Eighth and Fourteenth Amendments to the U.S. Constitution, 42 U.S.C. §§ 1983 and 1988, and 28 U.S.C. § 1331, 1343. Further, this Court has supplemental jurisdiction, pursuant to 28 U.S.C.§ 1367 (a), over the state law claims,

---

[3] *See* Civil Rights Division, U.S. Department of Justice, "Investigation of the Hampton Roads Regional Jail (Portsmouth, Virginia)" Dec. 19, 2018; Blake Ellis and Melanie Hicken, *"'Please help me before it's too late'; A CNN investigation exposes preventable deaths and dangerous care that government agencies have failed to stop,"* CNN, https://www.cnn.com/interactive/2019/06/us/jail-health-care-ccs-invs/index.html, discussed below.

including claims alleged pursuant to Virginia Code § 8.01-50 *et seq.* (wrongful-death statute), or, alternatively, pursuant to Virginia Code § 8.01-25 *et seq.* (survival statute). All relief available under the foregoing statutes is sought herein by the Plaintiff.

## III.    **VENUE**

15.    Venue is proper pursuant to 28 U.S.C. § 1391(b), because a substantial part of the acts and omissions giving rise to Plaintiff's claims occurred in this district.

16.    Assignment to the Norfolk Division of the Eastern District of Virginia is proper pursuant to Eastern District of Virginia Local Rules 3(B)(4) and 3(C), because a substantial part of the acts and omissions giving rise to Plaintiff's claims occurred in this division.

## IV.    **PARTIES**

17.    Plaintiff TIMOTHY SCOTT CARAMILLO is the father of the Decedent, Regina Marie Honeycutt. The Plaintiff is, and was at all relevant times, a resident of the Commonwealth of Virginia. On December 11, 2018, Plaintiff duly qualified as Administrator of the Estate of Regina Marie Honeycutt, Deceased, in the Norfolk Circuit Court, under the applicable provisions of law. A copy of the Certificate/Letter of Qualification is attached hereto, marked as **Exhibit A**. Plaintiff brings this action in his capacity as ADMINISTRATOR OF THE ESTATE OF REGINA MARIE HONEYCUTT, DECEASED, pursuant to, among other statutes, Virginia Code § 8.01-50 *et seq.* (wrongful-death statute) and, alternatively, Virginia Code § 8.01-25 *et seq.* (survival statute). All relief available under Virginia's wrongful-death and survival statutes is sought herein by Plaintiff.

18.    CORRECT CARE SOLUTIONS, LLC was a limited liability company organized under the laws of the State of Kansas with its principal office in Nashville, Tennessee, and with operations in Virginia, and, in particular, in the cities of Portsmouth and Norfolk. Correct Care

Solutions, LLC was co-owned by private equity firms Audax Group and Frazier Healthcare Partners.

        a.      At relevant times hereto, beginning in December 2015 and continuing through Ms. Honeycutt's death in October 2018, Correct Care Solutions, LLC had a contract with the Regional Jail Authority.  By contract, Correct Care Solutions, LLC assumed responsibility for the provision of on-site medical services to all inmates/detainees at the Regional Jail, including Ms. Honeycutt, and also for supervising, directing, and controlling health care personnel at the Regional Jail.[4]  Correct Care Solutions, LLC was paid approximately $6 million in 2018 to provide healthcare services at the Regional Jail.

        b.      Similarly, upon information and belief, at all relevant times hereto, Correct Care Solutions, LLC had a contract with Defendant Baron or the City of Norfolk to provide on-site medical services to all inmates/detainees at the Norfolk Jail, including Ms. Honeycutt, and also to supervise, direct, and control health care personnel at the Norfolk Jail.

        c.      In or about September 2018, private equity firm HIG Capital LLC ("HIG") purchased Correct Care Solutions, LLC.  Thereafter, HIG merged Correct Care Solutions, LLC with Correctional Medical Group Cos., a regional rival that HIG already owned. The combined entity is named "Wellpath LLC."  According to Moody's Investor Service, Wellpath LLC is the largest correctional healthcare provider in the U.S.

---

[4]  The Request for Proposals that Correct Care Solutions, LLC answered to become the Regional Jail's medical contractor (and that is referred to in the contract document itself) conveys that its primary objective was to provide "clinically necessary medical, dental, and psychiatric services to all inmates" in accordance with standards established by the Virginia Department of Corrections, the American Correctional Association ("ACA"), and the National Commission on Correctional Health Care ("NCCHC").

d. With regard to the provision of healthcare services at the Regional Jail and Norfolk Jail, it appears that WELLPATH LLC is a mere continuation of Correct Care Solutions, LLC. At or near the time that Correct Care Solutions, LLC ceased registration in Virginia, Wellpath LLC became registered in the Commonwealth. Wellpath LLC claimed the same principal office and registered agent as had previously been identified in the Virginia State Corporation Commission business entity database for Correct Care Solutions, LLC. As a practical matter and certainly from the perspective of the Regional Jail Authority and Sheriff Baron and inmates/detainees at the Regional Jail and the Norfolk Jail, little, if anything, has changed since the merger, other than that the name of Correct Care Solutions, LLC has changed to Wellpath LLC. Indeed, clicking on Correct Care Solutions, LLC's website now automatically takes one to Wellpath LLC's website. Correct Care Solutions, LLC, now conducting business as Wellpath LLC, is referred to herein as Defendant "CCS."

e. Defendant CCS and its employees/agents, at all relevant times, provided services to the Regional Jail and Norfolk City Jail as an independent contractor. At all relevant times, Defendant CCS and its employees/agents acted under color of state law.

19. Defendant DALE MORENO, MD, is a physician licensed in the Commonwealth of Virginia. At all times relevant hereto, Defendant Moreno, MD, was a CCS employee and/or agent acting within the scope of his employment and/or agency, and under color of state law. In 2018, including at the time of Ms. Honeycutt's incarceration and death at the Regional Jail, Defendant Moreno, MD, served as "Medical Director" of the Regional Jail. Defendant Moreno, MD, had served in that capacity since at least June 2017. As Medical Director at the Regional Jail, Defendant Moreno, MD, assumed responsibility for the provision of on-site medical services to all Regional Jail detainees/inmates, including Ms. Honeycutt, and also for the

supervision, direction, and control of health care personnel at the Regional Jail. Additionally,

upon information and belief, as Medical Director of the Regional Jail, Defendant Moreno, MD,

was responsible for implementing medical protocols, as well as for the training, duties, and

actions of the medical services staff at the Regional Jail. According to a Medical Director Job

Description posted at CCS's website during the relevant period, among other things, a CCS

Medical Director, including Defendant Moreno:

- Provides required documentation of services to the Regional or Corporate Medical Director or designee in order to monitor services provided and compliance with facility/client contract.
- Reports to assigned facility at designated hour to examine referred patients.
- Provides emergency treatment on-site and responds appropriately in urgent or emergency situations.
- Supports standards of correctional medical care through adherence to existing policies and procedures for: admission to the infirmary, transfer to emergency room and utilization review process for specialty consultant referrals.
- Supervises care given by other professional or non-professional personnel providing instructions as needed.
- Reports any doubts or questions regarding the lack of appropriate referrals, nursing or medical intervention necessary for the realization of established patient goals to the Regional or Corporate Medical Director for disposition.
- Provides clinical oversight to the facility medical program, as defined by the NCCHC and ACA standards.
- Provides consultation for all professionals in the system.
- Provides medical services to inmates as scheduled.
- Partners with H.S.A. in supervising continuous quality improvement program, including patient grievances, sanitation, infection control, utilization management, pharmacy and therapeutics and assists in development of appropriate criteria.
- Serves as member of the Continuous Quality Improvement Committee. Make recommendations to improve patient outcomes.
- As needed – not less than annually – reviews and approves the treatment protocols, clinical policies and procedures, to include infection control and infirmary (if applicable at site) and the fire and disaster plans.
- Works with the Health Services Administrator to identify problems and to recommend solutions to improve patient outcomes.

- Assist the Health Services Administrator to establish and maintain Chronic Care Clinics that assure compliance with NCCHC and ACA standards, as well as CCS policy/procedures.

Defendant Moreno, MD, is sued in his individual and official capacities.

20.　Defendants SUSAN D. ANDERSON, NP; AZURADEE LINDSEY, LPN; NIDA NOFTZ, LPN; TIMOTHY WRIGHT, LPN; MELISSA PEPPENHORST, LPC; JEISKALY BODDEN, LPN; and JAMES ROBINSON, LPN, were, at all relevant times, nurses and other medical and/or mental health care providers working at the Norfolk Jail.  At all relevant times, Defendants Anderson, NP; Lindsey, LPN; Noftz, LPN; Wright, LPN; Peppenhorst, LPC, Bodden, LPN; and Robinson, LPN, were agents and/or employees of CCS.  As such, Defendants Anderson, NP; Lindsey, LPN; Noftz, LPN; Wright, LPN; Peppenhorst, LPC; Bodden, LPN; and Robinson, LPN, had specific responsibilities and duties to provide for the medical/mental health/nursing care of Norfolk Jail inmates/detainees, including Ms. Honeycutt.  At all relevant times, Defendants Anderson, NP; Lindsey, LPN; Noftz, LPN; Wright, LPN; Peppenhorst, LPC; Bodden, LPN; and Robinson, LPN, were acting within the scope of their employment and/or agency with CCS, and under color of state law.  Defendants Lindsey, LPN; Noftz, LPN; Wright, LPN; Peppenhorst, LPC; Bodden, LPN; and Robinson, LPN, are sued in their individual capacities.  Defendant Anderson, NP, is sued in her individual and official capacities.

21.　Defendant OLGA V. BARTON, RN, was, at all relevant times, a Registered Nurse at the Regional Jail.  At all relevant times, Defendant Barton, RN, was an agent and/or employee of CCS.  As such, Barton, RN had specific responsibilities and duties to provide for the medical/nursing care of Regional Jail inmates/detainees, including Ms. Honeycutt.  At all relevant times, Defendant Barton, RN, was acting within the scope of her employment and/or

agency with CCS, and under color of state law. Defendant Barton, RN is sued in her individual capacity.

22.     Defendant HAMPTON ROADS REGIONAL JAIL AUTHORITY (the "Regional Jail Authority") is a regional jail authority created by the cities of Chesapeake, Hampton, Portsmouth, Newport News and Norfolk, Virginia pursuant to Va. Code §§ 53.1-95.2 *et seq.* to manage the Regional Jail. The Regional Jail serves the same cities that created the Regional Jail Authority. The Regional Jail's website states, the "facility is operated under the direction of the Hampton Roads Regional Jail Authority which is comprised of the sheriffs, city managers and city council members representing their perspective [sic] jurisdictions."

a.     The Regional Jail Authority is not an arm or agency of the Commonwealth of Virginia, nor was it an arm or agency of the Commonwealth of Virginia at any relevant time hereto. The Regional Jail's Policies and Procedures characterize the Regional Jail Authority as "an **autonomous** regional governmental organization." (Emphasis added.)

b.     The actual creation of the Regional Jail Authority required local activation by one or more municipalities.

c.     The Regional Jail Authority is not a political subdivision of the Commonwealth of Virginia, nor was it a political subdivision of the Commonwealth of Virginia at any relevant time hereto.

d.     The Regional Jail Authority is not a municipal corporation, nor was it a municipal corporation at any relevant time hereto.

e.     Presently, and at all relevant times hereto, the Regional Jail Authority lacked the power of eminent domain.

f.     Presently, and at all relevant times hereto, the Regional Jail Authority was authorized and empowered to sue and be sued in its own name, plead and be impleaded, by virtue of Va. Code § 53.1-95.7.

g.     Va. Code § 53.1-95.7 (3) vests in the Regional Jail Authority the power "[t]o appoint, select, and employ officers, agents, and employees therefor, … and to fix their respective compensations[.]" Accordingly, the Regional Jail Authority was Defendant Hackworth's employer.

23.     Defendant DAVID A. HACKWORTH has been the Superintendent of the Regional Jail from June 2018 through the present date.  Prior to being named Superintendent, Hackworth served as Interim Superintendent of the Regional Jail from March 2018 to his appointment as Superintendent in June 2018.  Before becoming the Regional Jail's Interim Superintendent, Hackworth was the Chief Deputy of the Sheriff's Office in Chesapeake, which runs the Chesapeake Jail.  Chesapeake is a Regional Jail Authority member city that sends inmates to the Regional Jail.

a.     At relevant times, Defendant Hackworth operated and managed the Regional Jail and directed and supervised its personnel.  In addition, at relevant times hereto, Defendant Hackworth was an employee, agent, and/or servant of Defendant Regional Jail Authority, and was acting within the course and scope of his employment and/or agency with Defendant Regional Jail Authority, and under color of state law.  Defendant Hackworth is sued in his individual and official capacities.

b.     According to the Policies and Procedures of the Regional Jail, Defendant Hackworth "[p]erforms the duties of chief executive officer" of the Regional Jail Authority.  The Policies and Procedures further provide that the Regional Jail's Superintendent "[p]lans, directs,

coordinates, and manages all activities of the [the Regional Jail].  Ensures effective management and operation of the facility. … Ensures training, supervision, and performance evaluation of staff are provided…. Administers the custody, care, and discipline of the inmate population…. Manages the inmate population to ensure compliance with institutional policies and procedures, mandatory State standards, and relevant State and Federal law."

          c.       Upon information and belief, at relevant times, the Regional Jail Authority established minimum standards for the administration and operation of the Regional Jail and delegated certain policy and management decisions concerning the Regional Jail to the Superintendent, Defendant Hackworth.

        24.      At all relevant times, Defendant JOSEPH P. BARON was (and currently is) the duly elected Sheriff of the City of Norfolk, Virginia.  Baron began serving as interim sheriff in February 2017 after the retirement of former sheriff Bob McCabe.  Prior to becoming interim sheriff, Baron had worked for the Norfolk Sheriff's Department since 2011.  Baron had served as Chief Deputy (second in command) of the Norfolk Sheriff's Office from 2015 to his appointment as interim sheriff.  Baron thereafter ran for the office of Sheriff in the November 2017 election and won.  Norfolk is also a Regional Jail Authority member city that sends inmates, such as Ms. Honeycutt, to the Regional Jail.  Baron was a member of the board of the Regional Jail Authority beginning with his appointment as interim sheriff and continuing thereafter when he was elected sheriff to the present day.  The Regional Jail Authority board holds regular meetings.  As the Sheriff of the City of Norfolk, Baron was responsible for the care and custody of detainees and inmates committed to his custody.  Defendant Baron was a constitutional officer independent of the City of Norfolk.  He was the commanding officer of all of his deputies, officers and employees.  Baron was responsible for the training, supervision, and conduct of all deputies,

officers, and employees under his command, and for promulgating policies and customs regarding the training and supervision of such deputies, officers, and employees. He was responsible by law for those in his custody, for enforcing the regulations of the Norfolk Sheriff's Office, and for ensuring that personnel under his command obey the laws of the Commonwealth of Virginia and the United States. Defendant Baron was vested with the responsibility and authority to hire, fire, train, and supervise, to set and enforce policies and procedures, and to provide protection and access to medical care for those committed to his custody, including Ms. Honeycutt. At all relevant times, Defendant Baron and his deputies, employees, and agents were acting within the course and scope of their employment and under color of state law. Defendant Baron is sued in his individual and official capacities.

25.     Defendants ISUREAL, CANIFF, and DUDLEY (Deputies, Norfolk Sheriff's Office in or about September and October 2018), at all times relevant hereto, were duly appointed and acting deputies and employees of Defendant Baron, acting within the scope of their employment and under color of state law. Defendants Isureal, Caniff, and Dudley are sued in their individual capacities.

**V.     FACTS**

**A.     Beginning in May 2018, Ms. Honeycutt was detained at the Norfolk Jail**

26.     In May 2018, Ms. Honeycutt was arrested for failing to report for probation. She was detained at the Norfolk Jail awaiting trial.

**B.     Ms. Honeycutt was long confined in an open cell area in close proximity to other inmates and then moved to isolation**

27.     When she was first taken to the Norfolk Jail in late May 2018, Ms. Honeycutt was confined in E Block. She was held there for approximately one month.

28.     Ms. Honeycutt was then taken to A Block, where she was held until approximately four days before she was transferred to the Regional Jail.  At that time, shortly before being transferred to the Regional Jail, Ms. Honeycutt was moved first to an isolation cell area at Norfolk Jail referred to as "C bammers" and then to another Norfolk Jail isolation area referred to as "L bammers."

29.     While in A Block, Ms. Honeycutt was confined with other female inmates in an open cell area.  The inmates were in close proximity to each other and were able to observe and talk with each other, and move within the cell block.  While in "C bammers" and "L bammers," Ms. Honeycutt was kept in individual isolation cells, but still housed in proximity to other inmates.

### C.     In early September 2018, Ms. Honeycutt was sentenced on a "failing to report" probation violation

30.     On September 7, 2018, Ms. Honeycutt was found guilty of failing to report and sentenced to three years in jail.

### D.     In mid-to-late September 2018, Ms. Honeycutt began to vomit and complain of abdominal pain

31.     In or about mid-to-late September 2018, Ms. Honeycutt began to vomit and complain of abdominal pain.  According to an inmate, Ms. Honeycutt began to appear like she had lost weight, and did not look normal, but had an ashen and gray color to her skin.  Other inmates also witnessed Ms. Honeycutt throw up a number of times, and saw blood in her vomit.

32.     Ms. Honeycutt's pain was so bad that she was using a hot water bottle. Another inmate shared some Metamucil with Ms. Honeycutt.

33.     Norfolk Jail deputies and CCS personnel were aware of Ms. Honeycutt's condition.  Both Ms. Honeycutt and her fellow inmates on her behalf sought medical help from

Norfolk Jail deputies and CCS personnel. Per inmates, Ms. Honeycutt was simply told to drink more water.

      a.      Inmates have identified CCS healthcare providers Lindsey, LPN; Noftz, LPN; and Wright, LPN[5] as having dismissed requests for medical help for Ms. Honeycutt.

      b.      Inmates have identified Isureal, Caniff, and Dudley as deputies who disregarded requests for medical care made by Ms. Honeycutt and other inmates on her behalf.[6]

    **E.**    **On September 28, 2018, Ms. Honeycutt submitted a medical request form pleading, "H-E-L-P me PLEASE"**

    34.    Representative of her complaints, on September 28, 2018, Ms. Honeycutt submitted a CCS "Healthcare Request" form pleading, "It has been 3 days and I can't go #2 I've been drinking <u>water</u>. I even had some medimusome [sic for "Metamucil"] stuff and drank alot of water. I can't go #2. Please help I think it's the food **this is Not normal for me H-E-L-P me Please.**" (Emphasis (bold) added).

    35.    At the time, Ms. Honeycutt was already taking Colace, a stool softener, which had been prescribed to her for complaints of constipation. Susan Anderson, NP, prescribed the Colace for 90 days beginning on or about July 10, 2018. Anderson, NP had also recently increased the dosage of the Colace on September 20, 2018. Ms. Honeycutt had previously

---

    [5] Medication administration records identify LPNs Lindsey, Noftz, and Wright as having been assigned to administer medication to Ms. Honeycutt in September and October 2018.
    [6] Sheriff Baron (and Superintendent Hackworth) declined to produce to Plaintiff's counsel pre-litigation any records concerning Ms. Honeycutt other than medical records. Baron (and Hackworth) declined to produce other documents including, but not limited to, incident reports, investigation reports, classification records, videos, photographs, log book entries, emails, letters, memos and other communications, grievances, and witness statements. Baron (and Hackworth) both wrote that such records "are exempt" under Virginia FOIA law. However, Virginia FOIA law gives both Baron and Hackworth the ability to release such records on a discretionary basis.

complained of hemorrhoids and been treated by Anderson with suppositories. Anderson had noted on September 20, 2018 that Ms. Honeycutt had anemia.

36. On September 29, 2018, CCS personnel documented that Ms. Honeycutt had been throwing up. Specifically, Jeiskaly Bodden, LPN recorded, "Pt. states **she feels sick taking the meds been throwing up.**" (Emphasis added.)

### F. Susan Anderson, NP was aware of Ms. Honeycutt's condition on the evening of September 29, 2018

37. According to a late entry made on October 1, 2018 at approximately 3:25 am (nearly two days after the underlying events), CCS Defendant Azuradee Lindsey, LPN received a physician phone order from Susan Anderson, NP at about 8 p.m. on September 29, 2018. The order directed Lindsey, LPN to give Ms. Honeycutt one bottle of magnesium citrate oral solution by mouth now for constipation.

38. However, the medication administration record indicates that Lindsey, LPN did not give the dose until October 1, 2018 at 8:30 p.m., more than 48 hours after it was ordered on September 29, 2018.

### G. Ms. Honeycutt was seen by Lindsey, LPN at 10:00 p.m. on September 29, 2018

39. Further, the record indicates that Ms. Honeycutt was later seen by Lindsey, LPN at 10:00 p.m. on September 29, 2018.

40. Incident to that visit, Lindsey, LPN completed a handwritten[7] "Nursing Documentation Pathway Gastrointestinal Complaints" form.

---

[7] The majority of CCS's records appear to be electronic in nature (eg. typed into an electronic database). However, this record contains handwriting rather than typing. It appears that it was scanned into the records database. Hard copies, apparently printed from the database, were produced to Plaintiff's counsel prelitigation by Sheriff Baron.

41.     Defendant Lindsey, LPN recorded that Ms. Honeycutt presented with constipation and **complained of pain measuring "10" out of "10."** (Emphasis added). "Cramping" was specifically noted.

42.     According to the medical record, Ms. Honeycutt's emesis (vomit) contained "Undigested food particles."

43.     Also, Ms. Honeycutt *was running a fever (100 degrees F), had a pulse of 157 beats per minute* **(tachycardia)***, and an abnormal blood pressure reading of 98/88*.

44.     According to CCS's own form, Ms. Honeycutt's condition required an "Immediate" evaluation by an "HCP" (a Health Care Provider, generally a physician or a Nurse Practitioner). The form further stated that if an HCP was unavailable, to "activate EMS."

45.     Specifically, the form listed the following conditions in the block for an "Emergent" response (immediately notifying an HCP, and if not available, to activate to EMS):

> Active bleeding
> Rigid Abdomen or rebound tenderness
> Absent Bowel Sounds
> Bright red or "coffee ground" emesis
> > 6 emesis in 24 hours
> SBP< 100, Pulse > 100, Temp > 100

46.     There is evidence, described above, indicating that Ms. Honeycutt was experiencing many of the factors noted. The form indicates that a single factor would warrant an "Emergent" response.

a.     Ms. Honeycutt had a Systolic blood pressure of less than 100 (98), a pulse in excess of 100 (157), and a temperature right at 100 (an additional marking to the right of the number was blacked out).

b.     As to "Active bleeding," inmates observed that Ms. Honeycutt was bleeding from the anus area. She had also previously complained of hemorrhoids to CCS.

c. Ms. Honeycutt, as Lindsey, LPN wrote, had been vomiting. Inmates also observed blood in Ms. Honeycutt's vomit and indicate that Ms. Honeycutt had vomited numerous times. As noted above, another CCS record had also described Ms. Honeycutt's having "been throwing up."

d. With regard to Ms. Honeycutt's abdominal condition, documents reflect that Lindsey, LPN performed an assessment alone, without an RN or higher provider present to supervise or repeat the exam. Lindsey, LPN thus independently determined that Ms. Honeycutt had a "soft" abdominal exam.[8] However, Ms. Honeycutt undoubtedly had a "rigid abdomen" and may have had "rebound tenderness." Such can be plausibly inferred, from among other things, Ms. Honeycutt's condition and the progression of the condition as detailed in the autopsy results and hospital records. Ms. Honeycutt would not have had a "soft" abdomen at this time. Lindsey, LPN was not qualified to perform the exam on her own.

47. The foregoing multiple abnormal vital signs and symptoms demanded an emergent response. Ms. Honeycutt's condition required that she be immediately sent to a hospital emergency department.

a. However, despite Ms. Honeycutt's extremely abnormal condition, Defendant Lindsey, LPN marked Ms. Honeycutt's issues as **"Not Emergent."**

---

[8] LPNs are not permitted in Virginia to independently assess patients or render a nursing diagnosis or nursing opinion of a patient's symptoms and potential problems a patient may face. LPNs must always act under the supervision and direction of an RN (who can make such an assessment) or a physician/ nurse practitioner (who has a wider scope of practice and can actually medically diagnose as well). *See* 18VAC90-19-70. Supervision of Licensed Practical Nurses. "Licensed practical nursing shall be performed under the direction or supervision of a licensed medical practitioner, a registered nurse, or a licensed dentist."

b.     Lindsey, LPN also described Ms. Honeycutt's condition as **"Not Urgent,"** failing to note indications in that category including "Chronic constipation"[9] and "Nausea and Vomiting." Instead, Lindsey, LPN assessed Ms. Honeycutt's condition as **"Routine."** (Emphasis added.)

c.     Lindsey, LPN ***merely directed Ms. Honeycutt to "increase fluid intake," "increase activity level," and avoid strain***, and gave **her general dietary instructions.** Lindsey, LPN also made similar notations concerning educating Ms. Honeycutt to increase fluid intake on Ms. Honeycutt's previously filed Healthcare Request form.

d.     Ms. Honeycutt was told to "contact medical" if her symptoms worsened.

e.     There are no boxes checked on the form indicating "Immediate evaluation by the HCP" or even "Contact HCP using SBAR format" (a less immediate way of contacting a physician or nurse practitioner through the electronic medical records system).

f.     Lindsey, LPN makes a reference to the "new orders" recently received for the one dose of magnesium citrate. However, as noted above, her records indicate that this order was given before the time when Lindsey, LPN saw Ms. Honeycutt on September 29.

g.     Moreover, records indicate that Lindsey, LPN ***did not give the medicine as ordered but inexplicably waited two days.***

48.     The records do not indicate that Anderson, NP or any other physician or nurse practitioner examined Ms. Honeycutt at this time.

---

[9] Lindsey, LPN noted that prior to this encounter, Ms. Honeycutt was already on "Colace 2 caps BID [twice a day]." Colace had been previously prescribed to Ms. Honeycutt by CCS for constipation.

**H.      On September 30, 2018 at 6 a.m., Ms. Honeycutt was placed on suicide watch**

49.      According to an entry[10] made by Melissa Peppenhorst, a CCS "Mental Health Professional" and licensed professional counselor (LPC), on September 30, 2018 at 6 a.m., Ms. Honeycutt was placed on suicide watch by "Nursing" after saying that she wanted to commit suicide.  Upon information and belief, Ms. Honeycutt was moved to a cell area referred to as "C bammers" and into an isolation cell.

**I.      Records document that Ms. Honeycutt was suffering from "GI problems"**

50.      On October 1, 2018, Lindsey, LPN entered a Progress Note stating, "See Nursing Pathway for GI problems."

**J.      On the morning of October 1, 2018, Ms. Honeycutt told CCS personnel that she "[c]an't keep anything down.  Vomiting and nausea."**

51.      On October 1, 2018 at approximately 8:00 a.m., Ms. Honeycutt told Jeiskaly Bodden, LPN that she **"[c]an't keep anything down.  Vomiting and nausea."**  (Emphasis added.) At that time, Ms. Honeycutt declined to take any medications because, as written by Bodden, LPN, Ms. Honeycutt "[b]elieves medications are making her sick."

**K.      On October 1, 2018, Ms. Honeycutt was evaluated by Mental Health, who documented that Ms. Honeycutt said that she had been "throwing up" and "didn't feel good"**

52.      While in C bammers, Ms. Honeycutt was seen by a mental health practitioner who was described by inmates as being tall and female.  Upon information and belief, this was Melissa Peppenhorst, LPC, a CCS "Mental Health Professional."  On October 1, 2018 at or about 2:58 p.m., Ms. Honeycutt was evaluated by Peppenhorst for a "Suicide Watch Initial Assessment."  Peppenhorst, LPC, recorded that Ms. Honeycutt admitted that she "'wasn't

---

[10]  The entry was made at 2:58 p.m. on October 1, 2018.

suicidal.'" Peppenhorst further noted that Ms. Honeycutt said that she had been **"throwing up"** and **"didn't feel good"** and "wanted to be by myself." (Emphasis added.).

53. Additionally, on or about October 2, 2018, Peppenhorst, LPC recorded that, when asked, she confirmed to Norfolk Jail deputies that Ms. Honeycutt said that she wanted to harm herself because she did not feel well and wanted to be alone. However, Peppenhorst did not record at any time a referral to Anderson, NP or another provider concerning Ms. Honeycutt's condition.

54. Upon information and belief, buttressed by an understanding of the extreme level of pain that she was undoubtedly experiencing, Ms. Honeycutt stated that she was suicidal in a desperate attempt to obtain medical treatment as her other attempts to receive medical care had been rebuffed.

55. However, records indicate that Norfolk Jail personnel focused solely upon Ms. Honeycutt's alleged admission that she was not suicidal and ignored Ms. Honeycutt's medical complaints and the likely linkage between her symptoms/acute need for medical help and her statement that she was suicidal.

a. Ms. Honeycutt was "discharged" from suicide watch on October 1. Peppenhorst, LPC recorded, "MHC was informed by security that they are violating her for lying about suicidal ideations." "Violating" refers to the issuance of a disciplinary reprimand to Ms. Honeycutt.

b. No action was taken by Peppenhorst, LPC, or any other Norfolk Jail or CCS personnel, concerning Ms. Honeycutt's underlying medical illness.

**L.** **On or about October 2 or 3, Ms. Honeycutt was placed into another isolation cell**

56.     On or about October 2 or 3, 2018, Ms. Honeycutt was taken to "L bammers," another isolation cell area.  A note recorded by Peppenhorst, LPC, on October 2 indicates that Ms. Honeycutt was moved as a punishment in connection with the violation issued to her.

57.     Per an inmate also housed in "L bammers" at the same time as Ms. Honeycutt, Ms. Honeycutt stated that her stomach hurt "real bad" and that she had a weird taste in her mouth.  The other inmate also described Ms. Honeycutt as being unusually quiet while in L bammers.

**M.** **Records indicate that Defendant Anderson, NP was aware that Ms. Honeycutt was declining medications due to her perfuse vomiting, inability to keep the medications down, and feeling ill taking the medications; however, Anderson did nothing in response**

58.     On October 3, 2018, medication administration records indicate that CCS licensed practical nurse Onyesha Cummings referred Ms. Honeycutt to Anderson, NP because Ms. Honeycutt had reportedly refused medications Anderson had prescribed three times.  Upon information and belief, it was CCS policy that medication nurses were to make such provider referrals in instances of three refusals.  However, records do not indicate that Anderson, NP saw Ms. Honeycutt that day or prior to Ms. Honeycutt's transfer to the Regional Jail.  As described herein, certain records recorded by medication administration clinicians indicated that Ms. Honeycutt was declining medication specifically because of her perfuse vomiting, inability to keep the medications down, and feeling ill taking the medications.  However, Anderson, NP did not follow up with Ms. Honeycutt despite being given this referral.

**N.** **Notwithstanding Ms. Honeycutt's recent complaints and symptoms and a plan to transfer her, it does not appear that she was examined prior to the transfer, nor any determination made about the medical soundness of transferring her in her condition**

59.     On October 4, 2018 at or about 10:17 a.m., a CCS "Transfer Form (Intra-System)" was filled out for Ms. Honeycutt by DeAngelo Pegram, MA/LNA (medication assistant/ licensed nurse assistant).  The form indicated that Ms. Honeycutt was to be transferred from the Norfolk City Jail (Norfolk Sheriff's Office) to Hampton Roads Regional Jail. Notwithstanding Ms. Honeycutt's recent complaints and symptoms and the plan to transfer her, records do not reflect that she was examined prior to the transfer.  It also does not appear that any determination was made about the medical soundness of transferring her in her condition.  The vital signs listed on the Transfer Form were not current vital signs, but vital signs noted to be pulled from September 20, 2018.  No pending consultations or outside appointments were listed. Ms. Honeycutt's gastrointestinal problems, which had caused vomiting, nausea, pain, irregular vital signs, bleeding and other symptoms as noted above, were not reflected on the Transfer Form under "Patient Problems."

**O.** **Notwithstanding Anderson, NP's acknowledgment of Ms. Honeycutt's ongoing gastrointestinal problems, Anderson did not examine Ms. Honeycutt prior to her transfer; Bodden, LPN, failed to provide Anderson, NP with information about Ms. Honeycutt's symptoms that Bodden observed during pill pass**

60.     On October 4, 2018 at or about 1:11 p.m., a Medication Order was entered into Ms. Honeycutt's Norfolk Jail CCS records by Jeiskaly Bodden, LPN.

        a.      The Order was for medication prescribed by Susan Anderson, NP. Anderson ordered Bisacodyl 5 mg tablets, delayed release, to be given to Ms. Honeycutt by mouth, two tablets BID [twice a day] AM & HS [at bedtime] PRN [as needed] for 5 days. Bisacodyl is a laxative.  Notwithstanding Anderson, NP's acknowledgment of Ms. Honeycutt's

ongoing gastrointestinal problems through her order, there is no record that Anderson examined Ms. Honeycutt prior to Ms. Honeycutt's transfer. There also is no record that Anderson caused the Transfer Form to be updated with information about this condition.

b. Also, Bodden, LPN, failed, even at that time, to inform Anderson, NP of Ms. Honeycutt's vomiting, nausea, inability to keep anything down, and feelings that medication Anderson prescribed was making her sick. There are no records from Bodden indicating that she informed Anderson, NP of the foregoing information that Bodden obtained from her pill pass encounters with Ms. Honeycutt.

**P.**      **Defendant Robinson, LPN witnessed Ms. Honeycutt's distress, but ignored it**

61. On the morning of October 5, 2018, at Norfolk Jail (before Ms. Honeycutt was transferred to the Regional Jail), James Robinson, LPN, administered medications to Ms. Honeycutt. At the time, Ms. Honeycutt was greatly ill – when assessed shortly thereafter at the Regional Jail, she had a racing heart rate and very elevated blood pressure. She also had long been experiencing nausea, abdominal pain, vomiting, irregular vital signs, and bleeding with no diagnosis or relief. Ms. Honeycutt also complained at the Regional Jail of suffering from abdominal pain, nausea and vomiting throughout that morning and throwing up everything given to her by Medical at Norfolk Jail. Robinson, LPN witnessed Ms. Honeycutt's distress, but ignored it. He failed to report Ms. Honeycutt's condition to medical/nursing supervisors, failed to initiate emergency procedures, and failed to even note Ms. Honeycutt's condition in her medical record. Robinson, LPN merely carried on with pill pass as usual.

**Q.**      **Notwithstanding that she was very ill, on or about October 5, Ms. Honeycutt was transferred to the Regional Jail**

62. On or about October 5, 2018, Ms. Honeycutt was transferred to the Regional Jail by deputies to Defendant Baron. As noted herein, records indicate that Ms. Honeycutt was

transferred to the Regional Jail notwithstanding that she was very ill and had not been examined prior to transfer. She was not taken to a hospital at this time by the deputies. CCS was also the medical contractor at the Regional Jail. Upon information and belief, the same CCS database of medical records was available at both facilities (hence the "Intra System" transfer). Along with CCS records from the Regional Jail itself, copies of CCS records from Norfolk Jail were among the records produced to Plaintiff's counsel prelitigation by the Regional Jail.

**R.** **Ms. Honeycutt had tachycardia and a very high blood pressure upon arrival at the Regional Jail**

63.      Ms. Honeycutt's "Receiving Screening" at the Regional Jail (conducted on October 5, 2018 at 10:09 a.m. by Terry L. Mikeska, RN) indicates that her **heart rate was 112**. That rate indicates that Ms. Honeycutt had **tachycardia** at the time (referring to a heart rate that exceeds 100 beats per minute). Ms. Honeycutt also had a significantly elevated **blood pressure of 169/96.**

64.      Notwithstanding her abnormal vital signs, Ms. Honeycutt was not given a referral to a medical provider by Mikeska, RN. Ms. Honeycutt was only given a referral to Mental Health for "Routine Problems" and marked for general population.

**S.** **At 11:45 a.m. on October 5, Regional Jail CCS staff were aware that Ms. Honeycutt had no bowel sounds and was vomiting, her abdomen was rigid, and she displayed rebound tenderness.**

65.      On October 5, 2018 at 1:21 p.m., Mikeska, RN recorded an entry in Ms. Honeycutt's medical records with regard to events she listed as having occurred at 11:45:06 *p.m.* that same day. However, the time 11:45 p.m. had not yet occurred by 1:21 p.m., when the entry was entered in the electronic database and electronically time-stamped. The context indicates that the events in fact occurred at 11:45 *a.m.* on October 5, 2018.

a.　　Mikeska, RN noted that Ms. Honeycutt had **"no bowel sounds."** (emphasis added).

b.　　Mikeska, RN wrote that Ms. Honeycutt **"[s]tates has been having nausea and vomiting since being assessed this morning in intake."** (Emphasis added).

c.　　Per Mikeska, RN, Ms. Honeycutt also stated that she had been having **abdominal pain.**

d.　　Mikeska, RN wrote that Ms. Honeycutt reported having been "given a bottle of laxative" at Norfolk Jail and that she "**vomited it up and everything up that they gave her**." (Emphasis added).

e.　　Mikeska, RN further documented that Ms. Honeycutt's "**Abdomen** [was] **noted rigid to touch**…" and that Ms. Honeycutt had "a **positive sign for abdominal rebound tenderness.**"[11] (emphasis added).

f.　　Mikeska, RN first notified an "NP point provider" and then "the medical provider."

**T.　　Dr. Moreno was made aware of Ms. Honeycutt's condition**

66.　　However, rather than order that Ms. Honeycutt be sent to a hospital ER for the grave conditions of acute abdomen and rebound tenderness with no identified cause, the medical provider gave orders for tests to be performed at the Regional Jail (dipstick urinalysis, blood

---

[11] Blumberg's sign, also referred to as rebound tenderness, is a clinical sign that is elicited during physical examination of a patient's abdomen by a doctor or other health care provider. It refers to the patient being in pain upon removal of pressure rather than application of pressure to the abdomen (using his/her hands, a provider applies pressure to an area of the abdomen and then releases the pressure by removing his/her hands without informing the patient; a patient with rebound tenderness experiences great pain when the provider releases the pressure). Rebound tenderness identifies an acute surgical abdomen and is indicative of peritonitis.

work and a stat abdominal X-ray). Mikeska, RN also wrote that an IV of normal saline was started, with a 22 gauge. As noted below, it would be hours before the blood work and X-ray were read, findings transmitted, and results reported by nursing staff to the provider.

67. Records indicate that the "medical provider" described was Defendant Dale Moreno, MD. Moreno is listed as having electronically signed Ms. Honeycutt's October 5, 2018 lab results, and is also referenced as the referring physician on the report of the "ABDOMEN 1 view" X-ray that was taken of Ms. Honeycutt on October 5, 2018. Additionally, as noted in greater detail below, shortly after Ms. Honeycutt's death, Dr. Moreno entered a late entry into her Regional Jail CCS records indicating that he personally saw Ms. Honeycutt on October 5, 2018 in connection with a nurse referral for abdominal pain. Dr. Moreno mentions in his late entry that his "Plan" included ordering the tests described above, and, as discussed below, a Fleets enema.

**U.**   **CCS medical staff recorded that Ms. Honeycutt "Continues to c/o [complain of] pain in abd [abdomen]"**

68. An October 5, 2018, 6:04 p.m. entry by N. Desouza, RN describes events occurring at 5:30 p.m. on that day. It states, "20 gauge IV inserted to right AC with 1000ml NS running without incident, pt tolerated procedure well. **Continues to c/o** [complain of] **pain in abd** [abdomen]. Will continue to monitor." (Emphasis added).

**V.**   **At 7:21 p.m. on October 5, Defendant Moreno, MD was informed of the results of Ms. Honeycutt's labs and X-ray**

69. An October 5, 2018, 7:21 p.m. entry by Shaneka Brown, RN states, "Dr. Moreno was informed of abdominal X-ray results & recent lab results."

a. The lab results reported to Dr. Moreno included abnormal results – high Glucose and Bilirubin levels, as well as a high ALT (SGPT) level (a liver functioning test).

b.      Abnormally low levels of Hemoglobin and Hematocrit were found.

c.      A urinalysis report revealed blood in Ms. Honeycutt's urine and that she was positive for ketones.

d.      The X-ray, a one-view X-ray of the abdomen, indicated that Ms. Honeycutt had moderate gas and that the loops of her small bowel and colon were distended. The X-ray report stated that "**findings may represent ileus**." "Ileus" is the medical term for lack of movement somewhere in the intestines that leads to a buildup and potential blockage of food material. An ileus can lead to an intestinal obstruction. This means no food material, gas, or liquids can get through.

e.      However, **Dr. Moreno did not send Ms. Honeycutt to the hospital.**

70.      Instead, Brown, RN wrote, "Phone order received from Dr. Moreno for a fleets enema. Pt layed [sic] on left side and tolerated fleets enema well. Dr. Moreno was made aware of bowel movement after enema. Okay for pt to return to pod after IVF completed. Phone order received for Bisacodyl 5 mg 3 tabs qam x3days."[12]

a.      Neither the enema nor the Bisacodyl were helpful treatments. Bisacodyl is a stimulant laxative drug. It is typically prescribed for relief of constipation. A fleets enema is typically prescribed for relief of occasional constipation, or to clean stool from the intestines before surgery or procedures such as colonoscopies. Here, Ms. Honeycutt had a rigid abdomen and rebound tenderness, indicating an acute surgical abdomen and peritonitis. The foregoing procedures were not appropriate for this life-threatening condition that indicates treatment in a

---

[12] As noted herein below, in contrast to this record, EMS documented the report of a Regional Jail officer who said that notwithstanding the fleets enema, Ms. Honeycutt had reported that she still had not had a bowel movement yet.

hospital, where the ability to perform surgery is present (in addition to access to diagnostic equipment such as CT scans and consult with multiple accredited specialists).

b. Indeed, the enema and the Bisacodyl were exactly the wrong things to do. By adding fluid, the bowel was expanded, increasing pain and accelerating leakage from the perforation into the abdominal cavity. Such was a known risk of prescribing these procedures under these circumstances, where the cause of an acute surgical abdomen was not determined.

**W.    There appear to be no medical entries relating to Ms. Honeycutt for a 27-hour stretch from the evening of October 5 to the evening of October 6**

71.    Despite Ms. Honeycutt's emergent condition, there are no medical records concerning her during the period beginning after the October 5, 2018 7:21 p.m. entry until October 6, 2018 at 10:30 p.m.

72.    Ms. Honeycutt languished in general population under the care and control of Regional Jail officers for at least approximately 24 hours, her painful acute surgical abdomen unresolved. No correctional officers brought Ms. Honeycutt to Medical until at least 6:45 p.m. on October 6, and, according to CCS records, did not do so until several hours later, notwithstanding her complaints of unresolved abdominal pain and open and obvious signs of distress such as her vomiting.

**X.    According to a Correctional Officer who Spoke with EMS, at 6:45 p.m. on October 6, 2018, Ms. Honeycutt was escorted to Medical for "abdominal pain and continued constipation"**

73.    Per the EMS Patient Care Report, a Regional Jail correctional officer reported having brought Ms. Honeycutt to Medical from her cell at about 6:45 p.m. on October 6, 2018 and that she was complaining of "abdominal pain and continued constipation." EMS reiterated that the "pt's prison guard stated that the pt had been in the medical wing **for approximately 4 hours** before EMS was called." (Emphasis added).

**Y.** **According to CCS, Ms. Honeycutt arrived in Medical at about 10:30 p.m.**

74.    In contrast to the foregoing description given to EMS by a correctional officer (hereinafter, "John Doe Correctional Officer"), an entry by Barton, RN for October 6, 2018 at 10:30 p.m. (recorded late at 1:51 a.m. on October 7, 2018) states, "[Ms. Honeycutt was] brought to the clinic on stretcher. [She] c/o [complained of] abdominal pain and she was vomiting. Gatorade offered patient was vomiting about 300 cc clear yellow vomit. At 2245 [10:45 p.m.] rate increase and irregular. Patient c/o [complained of] abdominal pain 10/10 on pain scale...Dr. Moreno notified New order to send patient to ER by Jail transport. 2310 [11:10 p.m.] when patient try to move from stretcher to w/c [wheelchair] she fell on to the stretcher.  Patient sweating, and altered mental status change.  Dr. Moreno notified.  New order to send patient to ER by 911. ..." According to records made elsewhere in the same entry, Ms. Honeycutt had elevated heart rates of 120 and 158 while in Medical prior to the arrival of EMS.

75.    At 11:10 p.m. on October 6, EMS was called.

**Z.** **EMS personnel documented the neglect of Ms. Honeycutt's emergent condition**

76.    In their official "Patient Care Report," EMS personnel noted that they were "dispatched for abdominal pain."

       a.    Upon arrival at the scene, EMS found Ms. Honeycutt with "dried sputum around the mouth and the nurse by side."

b. Ms. Honeycutt was described by EMS as "unresponsive with agonal respirations, skin jaundice and mottled[13], eyes dilated and fixed bilaterally, stomach distended and rigid, large bruise to her upper inner left arm."

c. EMS further documented, "[p]er prison guard and nurse pt [patient] **had been complaining of abdominal pain for approximately two weeks with no relief from medical tx [treatment]**…." (Emphasis added.)

77. EMS included in its report the following:

> **When pt was found at medical room in jail, **no interventions had been previously performed for pt.** The pt's prison guard stated that the pt had been in the medical wing for approximately 4 hours before EMS was called. **The prison's medical ward nurse was unable to tell EMS how long the pt had been unresponsive and failed to note or treat the airway compromise.** (Emphasis added.)

78. Records indicate that Defendant Barton, RN was the nurse who:

a. failed to perform interventions for Ms. Honeycutt prior to the arrival of EMS,

b. was unable to tell EMS how long Ms. Honeycutt had been unresponsive,

c. had failed to note or treat Ms. Honeycutt's airway compromise,

d. according to John Doe Correctional Officer, did nothing for Ms. Honeycutt while she was in Medical for approximately four hours before the calling of 911, and

e. apparently, according to the information reported by John Doe Correctional Officer, recorded medical records that portrayed the events of the evening of October 6, 2018 in an untruthful manner (indicating that Ms. Honeycutt was not brought to

---

[13] Mottling occurs when the heart is no longer able to pump blood effectively. The blood pressure slowly drops and blood flow throughout the body slows, causing a person's extremities to begin to feel cold to the touch.

Medical until 10:30 p.m., when the Officer reported she had been there for several hours prior to that time).

79.     Notwithstanding the late entry from Barton, RN noting elevated heart rates, EMS also wrote:

> **The prison medical staff had also failed to provide EMS with vitals** during the medical ward's time of care due to being unable to obtain them via the automated vitals machine at the pt's bedside. ** (Emphasis added.)

80.     EMS further noted:

> The guard reported that the pt had received a fleet enema approximately two days prior but the pt reported she had still not had a bowel movement yet. … The guard reported that the pt was talking and alert when the pt was brought to the jail's medical ward this evening.

81.     Ms. Honeycutt was transported by ambulance to Bon Secours Maryview Medical Center's Emergency Department.

### AA.     ED and Hospital personnel documented Ms. Honeycutt's grave condition and Defendants' neglect

82.     Upon her arrival at the Maryview ED, physicians determined Ms. Honeycutt to be "mottled," "pale," "cold to the touch," and "critically ill."  Ms. Honeycutt was "hypotensive" and described as being positive for "chills, abdominal distention, abdominal pain, constipation, and vomiting, vaginal bleeding."  Ms. Honeycutt had tachycardia and "fixed dilated" pupils.  Her abdomen was noted to be "tense."

83.     ED clinicians noted that Ms. Honeycutt was "found unresponsive with agonal respirations on medics arrival."  Based upon the input of a Regional Jail correctional officer, Maryview healthcare employees more specifically recorded that Ms. Honeycutt went to Medical around 6:00 p.m. "complaining of constipations x a week, and received a fleet enema two days

ago with no relief." ED physicians also noted that Ms. Honeycutt "**had been complaining of abdominal pain, distention, constipation and vomiting x several days.**" (Emphasis added).

84. Ms. Honeycutt was admitted to the hospital's ICU. She was diagnosed as suffering from septic shock, unresponsive state, perforated sigmoid colon, malignant neoplasm of descending colon, acute renal failure, encounter for intubation, and hypoglycemia. Ms. Honeycutt's prognosis was termed to be "very poor."

85. At approximately 1:00 a.m. on October 7, 2018, Maryview performed a CT scan[14] on Ms. Honeycutt and found that she had an "apple core" mass. The "apple core" mass was described as "a tumor unless proven otherwise, in the mid-level descending colon." It was determined that Ms. Honeycutt required "surgical intervention for bowel perforation with free fluid in peritoneum and pneumoperitoneum." Physicians observed that the perforations had caused "multi-organ failure."

86. A surgeon was consulted, but deemed Ms. Honeycutt to be too unstable for surgery.

### BB. **Ms. Honeycutt was pronounced dead on the morning of October 7**

87. At 10:47 a.m. on October 7, 2018, Ms. Honeycutt was pronounced dead.

### CC. **After Ms. Honeycutt's Death, Dr. Moreno Makes a Self-Serving Late Entry**

88. *After* Ms. Honeycutt's death on October 7 (and after he had called the ICU at about 9:40 a.m. on October 7 and learned of her "poor" prognosis and apple core mass), Dr.

---

[14] A CT scan ("computerized tomography" scan) takes a series of X-ray images from a variety of angles around the body, combines the images, and uses computer technology to create 3-D cross-sectional (topographic) images of the bones, blood vessels and soft tissues. CT scan images provide more detailed information than plain X-rays do. CT scans can see hundreds of different levels of density and tissues within a solid organ.

Moreno made a *late* entry. In his late entry, Dr. Moreno indicated for the first time in the record that he had examined Ms. Honeycutt on October 5, 2018.

      a.      In his description of events, Dr. Moreno wrote that he had seen Ms. Honeycutt on October 5 as she had been "referred through Nurse Sick Call for abdominal pain."

      b.      He said Ms. Honeycutt "c/o [complained of] generalized abdominal pain associated with nausea and vomiting."

      c.      Dr. Moreno described his abdominal exam as "nabs (heard 3 bowel sounds within 1 minute), no hyperactive bowel sounds, soft with generalized tenderness with voluntary guarding on moderate palpation, no peritoneal signs. No palpable masses."

      d.      Dr. Moreno wrote that Ms. Honeycutt was "uncomfortable from abdominal pain but is in no acute distress."

      e.      **Ms. Honeycutt would not have had the clinical presentation described by Dr. Moreno on October 5, 2018.** Dr. Moreno's exam also wildly conflicts with contemporaneous nursing entries that describe Ms. Honeycutt having "no bowel sounds," "Abdomen noted rigid to touch…" and "a positive sign for abdominal rebound tenderness" – descriptions consistent with her bowel perforation and acute peritonitis. Dr. Moreno's depiction of Ms. Honeycutt not being in acute distress is contrary to the contemporaneous nursing description of Ms. Honeycutt having had "nausea and vomiting since being assessed this morning in intake." Plaintiff asserts that ***Dr. Moreno's note was an attempt after the fact to vindicate his wrongful actions.***

**DD.** **The Medical Examiner concluded that Ms. Honeycutt died from "[a]cute peritonitis due to bowel perforation due to complications of colonic adenocarcinoma"**

89. The Office of the Chief Medical Examiner conducted an autopsy on October 8, 2018. Assistant Chief Medical Examiner Michael Hays, MD, declared Ms. Honeycutt's cause of death to be "[a]cute peritonitis due to bowel perforation due to complications of colonic adenocarcinoma." Dr. Hays noted in his report that Ms. Honeycutt's abdomen "appears distended and is tense to palpation."

90. When Dr. Hays examined Ms. Honeycutt's colon, he found a walnut size[15] "circumferential, ulcerated mass," and several polypoid lesions on the colon mucosal surface. The mass allowed only approximately two centimeters of room for colon contents to pass, which resulted in the perforation. The colon emptied into the abdominal cavity, which led to peritonitis. The process took time. Dr. Hays wrote that the "colon proximal to the mass is filled and distended with a large amount of liquid stool." Dr. Hays also described "severe constipation" and "obstructive colitis." Dr. Hays noted that **greater than 1000 cc (1 liter) of feculent fluid** was recovered from Ms. Honeycutt's abdominal cavity.

91. Ms. Honeycutt's apple-core cancer mass was located in the left colon. Dr. Hays found **absolutely no evidence of metastases or "mets."**[16] Had Ms. Honeycutt undergone timely surgery with resection (surgical removal) of the obstructing mass and polyps, Ms. Honeycutt would have had a total recovery. In short, Ms. Honeycutt's mass (like her abdominal condition) was very treatable. Indeed, she had the most treatable form of colon cancer.

---

[15] Specifically measuring 4.2 cm x 2.5 cm x 2.5 cm.
[16] Metastasis is a pathogenic agent's spread from an initial or primary site to a different or secondary site within the host's body. The newly pathological sites are referred to as metastases (mets).

## VI. **DEFENDANTS REGIONAL JAIL AUTHORITY'S AND CCS's CONSTITUTIONAL VIOLATIONS PURSUANT TO AN OFFICIAL CUSTOM, POLICY, PATTERN AND/OR PRACTICE**

92.     Moreover, Ms. Honeycutt's case is not the first instance of death and/or inadequate medical care occurring to detainees/inmates at the Regional Jail. Rather, other lawsuits, investigations, and the local and national press have reported numerous instances of lack of medical treatment, and related deaths and catastrophic injuries of detainees/inmates at the Regional Jail. Upon information and belief, deviations from the Regional Jail's medical policies and protocols, and other instances of negligence and abuse concerning medical care, have become commonplace at the Regional Jail. This pattern of indifference to detainee/inmate serious medical needs, including the likelihood of continued injuries as a result, was well known to the Jail Authority Defendants, and, beginning in December 2015 when the company began contracting to provide healthcare at the Regional Jail, was well known to CCS as well.

93.     On December 19, 2018, the U.S. Department of Justice's Civil Rights Division concluded an investigation into conditions at the Regional Jail and issued a report of its findings. "Investigation of the Hampton Roads Regional Jail (Portsmouth, Virginia)" Dec. 19, 2018. (hereinafter, "Report," attached hereto as **Exhibit B**). The investigation had been opened in December 2016, after, among other groups and individuals, Virginia Attorney General Mark Herring had requested that the DOJ investigate the Regional Jail.[17] The investigation was ongoing at the time of Ms. Honeycutt's death, and had involved multiple site visits to the Regional Jail, interviews with personnel, and comprehensive review of the Regional Jail records.

---

[17]  Among other things, Herring remarked in his letter appeal to then U.S. Attorney General Loretta Lynch, "I write to you with urgency. Virginia is once again confronted with significant questions about the provision of medical care at this regional jail."

94.     According to the 2018 Report of its findings, DOJ had been "prompted to conduct an investigation of the Jail's treatment of prisoners in the wake of tragic deaths that captured local and national attention." Report p. 5.  The DOJ cited in particular the August 2015 jail death of an individual identified as "AA" and the August 2016 death of an individual identified as "BB." *Id.*  The individual described as "AA" was, per media reports and jail records, 24-year-old Jamycheal M. Mitchell.  The individual described as "BB" was, per media reports and jail records, 60-year-old Henry Clay Stewart.

95.     Like Ms. Honeycutt, the Report describes **<u>Jamycheal M. Mitchell</u>** ("AA") as in need of acute medical care.  Mitchell suffered significant mental and physical "decompensation" at the Regional Jail.  Mitchell "lost nearly 40 pounds."  He developed "bilateral extremity edema" (severe swelling of the feet and legs).  Mitchell died at the jail from "heart failure as a result of rapid weight loss."  *Id.*  He was not seen by a doctor in the approximately three weeks immediately before his death and was not assisted by jail or medical personnel on the date of his death until he was already unresponsive. *Id.*

96.     Individual "BB," **<u>Henry Clay Stewart</u>**, died in August 2016, one year after Mitchell's death.  The Report documents that Stewart submitted multiple medical grievances asking to be seen by a medical provider, but was continually rebuffed.  Report p. 6.  For about a month beginning on July 10, Stewart described suffering from heartburn and asked to be seen by a doctor because the abdominal pain he was experiencing was not being relieved with the medication the jail was providing him.  *Id.* A response was not made to Stewart until 9 days later, when he was told he would be seen by a provider.  However, Stewart was not given access to a doctor – he would not be seen by a doctor prior to his death. *Id.*  Thereafter, Stewart described on July 30 that "he had not been able to keep down food for two weeks and had lost 14

pounds since the last time he was weighed." By August 1, Stewart begged to see a doctor "ASAP" due to experiencing a lot of problems with his bladder movement and bowels. On August 2, Stewart "complained that he had not used the bathroom in two weeks and had not been eating for days," and asked for help "'before its [sic] too late.'" The head nurse ignored his complaints about his stomach and wrote back that Stewart had been seen previously related to another condition. Stewart then wrote on August 4 that "he had blacked out two times in less than 24 hours and could not eat or hold down water." *Id.* Stewart's complaints were again dismissed by a nurse and he was not seen by a doctor. He would die two days after submitting this last request for emergency medical help. *Id.* He was found to have died of a perforated ulcer; the autopsy "revealed that he had a pint of blood in his stomach at the time of his death." *Id.* Stewart's pleas for help and tragic death were the subject of a recent CNN expose. *See* Blake Ellis and Melanie Hicken, *"'Please help me before it's too late'; A CNN investigation exposes preventable deaths and dangerous care that government agencies have failed to stop,"* CNN, https://www.cnn.com/interactive/2019/06/us/jail-health-care-ccs-invs/index.html.

97.     In its Report, in which it also chronicled multiple site visits to the Regional Jail, DOJ concluded that there is reason to believe that the Regional Jail "fails to provide constitutionally adequate medical and mental health care to prisoners." DOJ Press Release, *"Justice Department Alleges Conditions at Hampton Roads Regional Jail Violate the Constitution and Federal Law,"* Dec. 19, 2018; Report, p. 1. DOJ also found reasonable cause to conclude "that the Jail has engaged in a pattern or practice of resistance to rights protected by the Eighth and Fourteenth Amendments because it fails to provide prisoners with constitutionally adequate medical and mental health care…" Report at 43. Specifically, DOJ determined that the Regional Jail "fails to provide adequate intake, discharge planning, sick call, chronic care, and

emergency care such that prisoners are subjected to an unacceptable risk of harm due to delays or lack of treatment." *Id.* at 1. DOJ also concluded that, "as a result of systemic failures, the Jail often fails to provide an adequate level of care, including proper medication administration." *Id.* at 13. DOJ described in detail the cases of ***more than thirty inmates*** besides Jamycheal Mitchell and Henry Clay Stewart in illustration of its identified patterns, going back to the year 2013 forward.

98. Notably, DOJ found that "[o]fficials at the Jail have **been aware of the deficiencies in medical care for years and have failed to adequately address these deficiencies**. By disregarding the obvious risks to prisoner health and safety, officials at the Jail evince a deliberate indifference to prisoners' constitutional rights to adequate medical care." (Emphasis added)). *Id.* at 17. DOJ observed that "Jail officials have been aware of the harm caused to prisoners due to inadequate medical treatment and lack of access to care" for years before Ms. Honeycutt's death – specifically, "at least since the 2015 death of [Jamycheal Mitchell], which attracted national attention." *Id.* at 17.

99. In its Report, DOJ noted that although the Regional Jail switched medical providers after Jamycheal Mitchell's death (from NaphCare to CCS), "medical care under the Jail's current medical provider, CCS, has not significantly improved." *Id.* DOJ wrote that nine months after switching medical providers and one year after Jamycheal Mitchell's death, "BB [Stewart] died of a bleeding ulcer after his repeated requests for medical attention were ignored." *Id.* DOJ noted that in the Regional Jail's answer and cross-claim filed in the wrongful death suit brought by the administrators of BB's estate, the Regional Jail claims that CCS breached its service agreement with the Regional Jail Authority by "failing to provide appropriate clinically necessary medical services, sick call, on-site health care services, and offsite services and

hospitalization" to the deceased prisoner prior to his death in August 2016. *Id.* DOJ noted that "though the Jail claims that the medical services provided to this prisoner prior to his death were deficient, the Jail nonetheless chose to renew CCS's contract in February 2017." *Id.*

100. Indeed, beyond Mr. Jamycheal Mitchell and Mr. Stewart's tragic circumstances, evidence of indifference towards inmate/detainee serious medical needs at the Regional Jail was widespread prior to Ms. Honeycutt's incarceration.

101. For instance, it was reported by the *Virginian-Pilot* that the federal agency Immigration and Customs Enforcement (ICE) had pulled all of its detainees out of the Regional Jail back in 2014.

    a. An ICE public affairs officer reportedly stated to the *Virginian-Pilot* that "Detention facilities used by ICE must comply with the ICE National Detention Standards, which ensure that detainees in ICE custody reside in safe, secure and humane environments. ICE discontinued its relationship with the Hampton Roads Regional Jail in March 2014 because it could not verify the facility's compliance with the National Detention Standards."

    b. ICE had reportedly overhauled its national standards in 2008, following several detainee deaths, including a disturbing one at the Regional Jail where ICE detainee **Sandra Kenley** had been allowed to hemorrhage uncontrollably and been denied medications prior to her death in December 2005.

    c. Kenley's sister, June Everett, reportedly testified at a 2007 congressional hearing on ICE detainee deaths about her sister's conditions at the Regional Jail as follows: "No medicine for her high blood pressure, no medical treatment for her heavy bleeding, no legal help. Even though she was afraid of retaliation, my sister did everything she could to get help also.

She was hemorrhaging non-stop. Blood poured down her legs and spilled on the floor of her cell. My sister was scared, and suffering unnecessarily. But no one would do anything."

   d.  According to the *Pilot*'s reporting, while Ms. Kenley was confined at the Regional Jail, she wrote to her sister, "They supposed to get my regular medicine that I haven't gotten yet," she wrote. "My pressure was 186 over 120. … I am bearly [sic] living … trying to hold on until you get a lawyer to help me."  When Ms. Kenley passed out facedown in her cell on the day of her death, it reportedly took 20 minutes for jail staff to respond to her cellmate's calls for help.

   e.  Also in 2007, the American Bar Association apparently found that "there appear to be delays in responding to non-emergency sick call requests" at the Regional Jail. After ICE started implementing its new standards, in 2008, Human Rights Watch reportedly submitted findings of problems with administration of medication at the Regional Jail to the House Judiciary Committee's Subcommittee on Immigration, Citizenship, Refugees, Border Security and International Law.  One inmate reportedly mentioned in Human Rights Watch's submission kept a diary of his receipt of AIDs medication; it was reported that he received the correct dose only 65 percent of the time, and that he commented "There seemed to be no system for giving us the AIDS drugs."

   f.  In 2010, ICE reportedly conducted a review of the Regional Jail and found twelve deficiencies, including "communication and health care," and two physicians who did not have current certification; another review in 2012 apparently found nine deficiencies.

   g.  As noted above, the Regional Jail had never complied with the standards according to ICE, so the agency stopped housing its detainees there in 2014.

h. According to the *Pilot*, the decision to remove all detainees was rare, as ICE still uses about 82% of the facilities it has used for long-term detention since August 2011.

102. In January 2013, **<u>Betty Wills</u>**, a 52-year-old inmate with diabetes, thyroid disease congestive heart failure and psychosis died in a local hospital after being allowed to deteriorate at the Regional Jail for two weeks despite writing that her whole body was swollen and she was having problems breathing. Report at 15; *see also* Harki, Gary A., "While mired in investigations and death, Hampton Roads Regional Jail's board fought against change," *The Virginian-Pilot*, April 11, 2019.

103. In April 2015, according to reporting by the *Richmond Times-Dispatch*, an inmate named **<u>Alton Cowins</u>** died at the Regional Jail of a perforated intestine. Mr. Cowins, who reportedly was being detained on charges of trespassing and concealing or altering the price of merchandise, appeared to be suffering from mental health conditions. The *Times-Dispatch* reported that court records describe Cowins chanting and pantomiming swimming on the floor of his cell. Although Mr. Cowins's court-appointed attorney reportedly moved for mental competency and psychological evaluations of Mr. Cowins, he never underwent them. Instead, when a provider went to the Regional Jail to evaluate Cowins, he was told that Cowins had died six days previously. The *Times-Dispatch* further reported that a physician and medical director whom they interviewed described perforated intestines as "serious medical emergencies that should be detectable." The physician also stated that the condition is "treatable with surgery in a hospital."

104. Regional Jail inmate **<u>Mark Goodrum</u>** died on November 13, 2015. Mr. Goodrum was a 60-year-old man reportedly facing a misdemeanor charge for smoking marijuana in his own home and jailed due to inability to pay a small bond. He reportedly died of renal

disease.  A friend interviewed by *The Huffington Post* following Goodrum's death reportedly said that despite existing medical conditions, Goodrum "was all right until he got locked up. When he got locked up, he died."

105.  Regional Jail inmate **Carlton Dillard** reportedly filed nine different emergency grievance forms in January 2016 for medical problems at the Regional Jail, but all of them were rejected.  *The Virginian-Pilot* wrote that Dillard's partner produced the nine grievances to the paper, which published the grievances.  In the same article, president of the Portsmouth chapter of the NAACP, James Boyd, stated that Dillard has had his cancer medication mixed up with another inmate's medicine at the Regional Jail, and is not getting the chemotherapy he needs. Among the emergency grievances by Dillard that were rejected were ones describing very serious medical conditions:

Dillard grievance dated January 5, 2016:

"My cellmate had to get me up from choking on my blood this morning." "Haven't eaten because it keeps coming up. I need to see the doctor A.S.A.P."

Dillard grievance dated January 14, 2016:

"I keep throwing up blood every time I eat anything." [According to the *Pilot*, Dillard also wrote that he was supposed to see a doctor the day before, but he did not].

Dillard grievance dated January 30, 2016:

"I'm suppose to take a pill 4 times daily every six hours, and the only nurse that have had it on the cart is the morning nurse.  I need to have my medicine.  I don't know why my med are not issued as prescribed.  This is a matter of me not throwing up blood when I'm asleep at night or in the morning after breakfast.  I need my meds A.S.A.P."

Dillard's partner additionally told the *Pilot* that he calls her every day and tells her he is throwing up and urinating blood at the Regional Jail.

106.     On March 20, 2016, **William Otis Thrower, Sr.** was pronounced dead by EMS after being found not breathing and without a pulse while incarcerated at the Regional Jail.[18]  His cause of death was found to be "Acute gallstone pancreatitis with hypertensive atherosclerotic cardiovascular disease contributing."  Thrower was also denied emergency medical care at the Regional Jail, including shortly before he died, notwithstanding making multiple requests in writing and verbally.

a.     In a February 7, 2016 emergency grievance, Thrower wrote that he was experiencing sharp pains and could not sleep, and he implored Regional Jail staff, "Please help me."  However, a nurse rebuffed Thrower's request for emergency care, writing under the part of the form designated "Determined not to be an emergency" that Thrower's concerns should be addressed later in "sick call."  However, Thrower was never examined in sick call or otherwise in connection with this request.

b.     Thereafter, a physician seeing Thrower on March 11, 2016 for follow up concerning his chronic health condition of hypertension noted that Thrower's abdominal exam was "normal."  The physician made his finding notwithstanding Thrower's untreated complaints of "Very Sharp Stomach Pains. Cant Eat or Sleep.  Been Up for three Days" dating back to February, and his death nine days later involving gastric disease and the presence of a severely inflamed gallbladder and gallstones.  The physician either did not truly examine Thrower's abdomen at all or knowingly performed a woefully negligent exam.

---

[18]  The Administrator of Thrower's Estate is represented by The Krudys Law Firm, PLC in his action currently before this Court.  Thrower is also described in the DOJ Report (as inmate "DD") to illustrate "The Jail's failure to adequately and timely address concerns raised in sick call forms resulted in worsening conditions and harm."  Report at 11.

c.     A second emergency grievance was then filed by Thrower on March 19, 2016, the day before he died.  Thrower's grievance states, "I have been unable to sleep for four days because my stomach… as of right now I haven't been able to Sh*t!  I am in Real bad pain!  Help me Please!" Instead of allowing Medical to process the complaints as a potential emergency grievance, however, a correctional officer Unit Manager and Sergeant took it upon herself, as a non-medical provider, to proclaim that Thrower's condition was not an emergency, did not need immediate medical review or care, and should be removed from the emergency grievance system.  Apparently because she did not like Thrower's choice of words ("sh*t" in context for "to defecate," not used as an expletive),[19] the Sergeant marked on the form that it did not meet the definition of an emergency grievance.  She also entered it into the Regional Jail's computer database for grievances as a "Non Emergency" and marked that the grievance had been "returned" to Thrower.  The Sergeant then put Thrower's grievance in a "box/crate" where *non-emergency* paper requests for Medical were placed.  She did not explain to Medical that she had done so.  The Regional Jail had a problematic system for requesting medical care in which, among other things, non-grievance entreaties (paper sick call requests and electronic kiosk requests) were not timely or appropriately administered, *causing inmates to effectively rely solely on emergency medical grievances to try to get access to medical help*.  The Sergeant's decision made it *even less likely* that Thrower would receive access to timely, appropriate medical care under the Regional Jail's broken medical system than if the complaints had remained in a true emergency grievance.  The relegated grievance-turned-sick call request was never answered by CCS but sat in the box for more than 24 hours before Thrower's death.

---

[19]  The Sergeant wrote, "You do not use profanity on documents. Resubmit as a sick call" on the form next to where she marked "did not meet definition of an emergency grievance."

107. Thrower made another emergent plea for medical care on March 19, 2016, on a CCS "Healthcare Request" form. His form states, "Can't Pass my Bowels it's been four days. I am in ~~red~~ Real Bad pain." No response to Thrower was made at all by CCS, and there is no record that he was examined in response to this plea. This request would also be in CCS's custody for a considerable period of time before Thrower's death.

108. Thereafter, according to a Regional Jail Sergeant, a CCS licensed practical nurse (LPN) saw Thrower during pill pass on the evening of March 19 and gave him "something for his stomach." Although LPNs are not licensed in Virginia to prescribe or order medications or independently assess patients, this LPN decided to do so. Notwithstanding Thrower's status as suffering from the chronic condition of hypertension and his advanced age, in addition to his unexplained, severe stomach pain and inability to sleep or pass bowels for many days, the LPN did not alert a doctor. She also did not document the encounter at all.

109. The LPN then administered Thrower his blood pressure medicine on the morning of March 20, 2016, but either did not follow up with him at all or ignored that his symptoms had not gotten better despite her intervention.

110. On March 20, 2016 at 2:41 p.m., medical records show that Thrower made yet another request for immediate medical care, this time electronically through the Regional Jail's kiosk system. His request stated:

> I NEED TO SEE THE DOCTOR PLEASE. I HAVE NOT HAD A BOWEL MOVEMENT IN FIVE DAYS I REALLY NEED SOMETHING SO I CAN PASS IT THROUGH. MY STOMACH IS HURTING BECAUSE I HAVE NOT USED THE RESTROOM. IM 68 YRS OLD AND IM HURTING. PLEASE SEE ME ASAP. THANK YOU.

The request was never answered. Records indicate that it was not even forwarded to CCS by Regional Jail personnel until about 10 hours after it was entered and after Thrower was deceased.

111. Later that day, Thrower complained of chest pain to a correctional officer. He also stated that he was not feeling well and had not had a bowel movement in five days. Rather than call a Medical code to summon providers immediately, the correctional officer gave Thrower and another inmate helping him another paper grievance form to fill out.

112. Thereafter, Thrower was discovered unresponsive while sitting on the toilet in his cell. On autopsy, the medical examiner described "a severe acute pancreatitis with patchy necrosis, main pancreatic duct dilation, numerous gallstones in the gallbladder, [and] a gallstone in the duodenum...The etiology of the pancreatitis was a gallstone that had become impacted in the main pancreatic duct."

113. Another inmate, **Ronnie Lee Proffitt**, died at the Regional Jail on April 27, 2016. According to *The Huffington Post*, Mr. Proffitt died of acute coronary insufficiency due to congestive heart failure. Mr. Proffitt was reportedly arrested by Chesapeake police officers on March 31, 2016 for a violation of probation and held in the Chesapeake City Jail until April 14, 2016; he was transferred to the Regional Jail on April 15, 2016, where he remained until his death there on April 27, 2016. Mr. Proffitt's Estate reportedly claimed to Regional Jail Authority member City of Chesapeake and numerous other parties that Mr. Proffitt's death was caused by the Regional Jail's neglect of Mr. Proffitt's physical health and denial of required medication and medical equipment for Mr. Proffitt's heart condition.

114. Regional Jail inmate **Christopher Boyce** died in the custody of Hampton Roads Regional Jail on March 23, 2016. Another inmate, **Valerie Anderson**, died on May 26, 2016, a day after she was transferred from the Regional Jail to a state mental hospital.

115. On July 25, 2017, 56-year-old Regional Jail inmate **Frederick Mitchell** died. CCS staff was aware that Frederick Mitchell (referred to as "GG" in the Report) had a large mass

in his liver.  Report P. 14. Medical records transferred from the Norfolk Jail where he was originally held showed that the mass had been discovered on ultrasound in June.  However, no biopsy was scheduled. *Id.*  Frederick Mitchell instead spent the five weeks from his transfer to the Regional Jail and his death in great pain, losing weight, becoming increasingly jaundiced, suffering serious dehydration and having problems eating.  No diagnosis was made at the jail or sought from outside providers as to what was causing Frederick Mitchell's condition. *Id.*  A nurse noted that on July 16, Frederick Mitchell was vomiting, had an elevated and irregular heart rate and complained of extreme pain.  The nurse wrote that she would call the physician on-call.  But Frederick Mitchell was not seen by a doctor until July 18, and that was for a routine, chronic care visit. Id.  Still no biopsy was performed.  According to the Report, "Staff watched him deteriorate without benefit of diagnosis or treatment." *Id.*  Frederick Mitchell reportedly died of liver cancer due to hepatitis B and hepatitis C infection.

116.    On May 15, 2018 at 4:53 a.m., 18-year-old **Davageah K. Jones** ("DJ") was pronounced dead by EMS, after being found unresponsive in his cell at the Regional Jail.  The Assistant Chief Medical Examiner determined the cause of death to be "DIABETIC KETOACIDOSIS DUE TO TYPE 1 DIABETES MELLITUS."  Diabetic ketoacidosis results from insufficiency of insulin.

a.    A May 5, 2019 amended complaint filed by the Administrator of DJ's Estate[20] alleges that in May 2018, CCS and certain of its employees failed to provide DJ urgently needed medical care and access to that care.  As a Type 1 diabetic, DJ required twice-a-day insulin injections to stay alive; Type 1 diabetics, who comprise only 5% of diabetics, are

---

[20]  The Administrator of DJ's Estate is represented by The Krudys Law Firm, PLC in his action currently before this Court.

incapable of producing insulin.  The complaint alleges that CCS and certain of its employees were fully aware that DJ, who also suffered from schizophrenia and bipolar disorder, and had significantly decompensated while detained at the Regional Jail, had not taken antipsychotic medication, nor received sufficient insulin, for more than two weeks.  Previous times when DJ had not taken his medication, medical providers, including CCS staff, had requested/obtained temporary detention orders (TDOs), which had caused DJ to be transferred to mental health hospitals such as Eastern State Hospital to become medication compliant. However, despite their awareness of DJ's mental and physical decline, CCS staff failed to seek a TDO for DJ in May 2018.

b.     On May 14, 2018, despite the foregoing circumstances, DJ was transported to Norfolk General District Court by Norfolk Sheriff's deputies.  The judge suspended the hearing when it became obvious that DJ was acutely ill.  The judge directed DJ's public defender to contact the Regional Jail staff and tell them that DJ required medical care. The public defender immediately called her supervisor who, in turn, contacted the Regional Jail's Assistant Superintendent and the Regional Jail's CCS Health Services Administrator and told them of DJ's acute condition.  Records, however, reveal that neither provided any help to DJ.  Norfolk Sheriff deputies also did not help DJ.  Instead, DJ was just returned to the Regional Jail.  When DJ was returned to the Regional Jail, CCS staff ignored DJ's critical condition. DJ was returned to his segregation cell.  Thereafter, at approximately 4:29 a.m. on May 15, DJ was found unresponsive.  He was supine on the floor, indicating that he had fallen.  Shortly after being found, DJ was declared dead by EMS.

c.     A medical investigator found evidence that DJ had been vomiting in his cell.  DJ's vomiting, losing control of his faculties and falling, and lying on the floor

unresponsive, were open and obvious signs that he needed help. However, Regional Jail correctional officers, despite being required to perform inmate checks twice an hour, did not intervene. Instead, it was not until a medical provider arrived for a routine diabetic check that DJ was found, and he was already unresponsive.

       d.     The complaint asserts that the indifference of all defendants (including CCS employees, CCS, the Regional Jail Authority, Hackworth, former Regional Jail Assistant Superintendent Bryant, three Regional Jail correctional officers, and Norfolk Sheriff Baron) to DJ's acute medical needs caused DJ's death.

117.     Numerous inmate legal actions also reflect indifference to serious inmate medical needs going back to before and continuing through the additional deaths detailed above. For example, former Regional Jail inmate **LaQuan Wright** filed a *pro se* federal action against multiple Regional Jail employees, as well as against multiple former Regional Jail healthcare providers alleging failures to provide him with appropriate medical care for his paraplegic condition, which caused serious medical conditions that were indifferently neglected.

       a.     Wright alleges that he was not properly provided with catheters for voiding; he would be given single use catheters and expected to use them multiple times, an unsanitary practice that led to urinary tract and bladder infections.

       b.     When he developed such infections, Wright alleges that he was denied care and medications for them.

       c.     The Regional Jail also reportedly denied Wright, a paraplegic, a medical mattress needed to prevent the development of bed sores, and denied him even extra regular blankets and pillows. According to Wright, he was put on "lock down" as a form of punishment for asking for a mattress to prevent the bed sores.

d.      Mr. Wright states that he developed bed sores, which were not properly treated; among other things, the wound vacuum used was not changed and cleaned properly. Wright alleges that one bed sore was down to the bone.

e.      He also developed a staph infection from the growing, purulent bed sores, and was denied medication several times even as he was so ill that he was vomiting and could not hold down food.  Wright also contracted a more severe bone infection.

f.      Multiple outside facilities reportedly opined that Wright needed reconstructive surgery to repair the wounds caused by the bed sores, but such was not allowed by the Regional Jail.

g.      Wright claims that he made many complaints that were ignored and that most of his grievances were closed and not resolved. In conjunction with his suit, Wright filed 42 pages of grievances, including emergency grievances, that he filed with the Regional Jail, ranging in date from June 2014 to July 2015.

h.      Replies by Regional Jail medical and correctional officer personnel repeatedly dismiss Mr. Wright's concerns.  For example, a medial grievance stating, in part, "This is the second day in a row I haven't been given catheters causing me to urinate on myself..." is answered by a statement that "This submission does not meet the criteria for grievance...You will receive 4 catheters every other day" and closed; a response by Mr. Wright, "it clearly say [sic] on the back of the catheters single use only, you being a nurse should know that I will be at an even higher risk of infections..." is ignored.

i.      An emergency grievance stating, in part, "I've had my bedsore for over 6 months, I have been waiting patiently for a special kind of mat.  The mattress I'm sleeping on now caused my bedsore... Now when I lay on it on my side, it wakes me up out of my sleep from

so much pain to my side hip/back.  Breakdown started on my left hip now I'm laying on my right

hip.  Soon breakdown will take place their [sic] too.  I can't lay flat on my back due to the huge

bedsore on my butt. ..." is responded to by a non-medical Sergeant.  The Sergeant makes

bureaucratic requests that appear to include nonsensically asking Mr. Wright where the Regional

Jail should obtain proper medical equipment he has been requesting for some time, "Mr. Wright

submit a paper request form so I can look further into your concerns.  As in who has this special

mattress."  Mr. Wright states in his complaint that he also made many complaints to officials that

were ignored, and his mother also called and made complaints.  Mr. Wright says that "nothing

was done" until his mother sent an email copying several organizations outside of the Regional

Jail.  According to Mr. Wright, he got a visit from officials the very next morning after the email

was sent.  Still, however, he was not given proper care- instead, he was transferred to another

facility within a week of the email.[21]

118.    Inmate **Maurice Brown** filed a *pro se* federal action against the Hampton Roads

Regional Jail in August 2015, the same month when Jamycheal Mitchell died there.  In his

complaint, Mr. Brown describes a tragically neglectful situation much like Mr. Wright's; Mr.

Brown, who is also paralyzed, alleges that the Regional Jail allowed a painful bedsore to develop

on his behind by failing to permit him proper medical equipment for his condition, including

requiring him to "lay on hard surfaces" while a paraplegic.  Although Mr. Brown was "in

---

[21] Plaintiff notes that Mr. Wright's matter has now been closed, following dismissal of
multiple defendants either due to their not being served, or on motions to dismiss or motions for
summary judgment.  However, Plaintiff also notes that Mr. Wright was a disabled, still
incarcerated *pro-se* plaintiff and did not appear to have opposed any of the motions filed against
him by defense counsel, nor to have engaged in meaningful discovery or proper service efforts.
Indeed, in July 2017, the Regional Jail publicly stated that it could not provide proper care to a
man (Leonard Allen Morrison III) who was paralyzed in a gun battle with police and sent to the
Regional Jail; the Regional Jail cited the inmate's need for assistance to use the bathroom as one
of their concerns.

constant pain and discomfort" from the bedsore, the Regional Jail, he said, was not properly treating the bedsore and was actually allowing it to grow bigger over a period of several months. Mr. Brown alleged that the Regional Jail's actions threatened his life. He also alleged that the Regional Jail was doing nothing to prevent him from suffering another dangerous bedsore and had not responded properly to a grievance he filed concerning the bedsore.[22]

119.     Inmate **Richard Henry Byrd** filed a *pro se* federal complaint against a former superintendent, Hampton Roads Regional Jail, and medical contractor NaphCare in November 2014, concerning alleged denial of access to and provision of proper medical care for a serious medical need from September 7-September 10, 2014. Mr. Byrd detailed in his complaint that he developed a tonsil infection that was not treated properly or timely, and resulted in his having to be rushed to the emergency room. For four days in September 2014 prior to the emergency hospitalization, Mr. Byrd described that he repeatedly requested medical attention, but was not given proper care.

a.      In three different emergency grievances filed with his complaint, Mr. Byrd describes how he is coughing up blood and mucus, running a fever, experiencing "a great deal of pain," his mouth and throat are bloody and sore, he is vomiting, that he has not been able to eat anything for three days because he cannot swallow, and that he has been having trouble breathing; he begs for help, including through such pleas as, "I'm sincerely and humbly asking for some help. ...Please help me. It's been three days... Please help me."

b.      All three of Mr. Byrd's grievances were "determined not to be emergencies." He explains in his complaint how a nurse who responded to his first grievance

---

[22] Mr. Brown's action was later dismissed without prejudice due to failure to pay an initial partial filing fee; the final order was returned undeliverable to the Court. Mr. Brown may have been transferred or released.

told him his throat was in fact swollen and he was having cold sweats due to a fever; however, she merely told Mr. Byrd that his illness was not an emergency, and did not treat him or give him any pain medication.  The nurse said she would put Mr. Byrd in for a doctor's visit, but, he was never seen.  Mr. Byrd informed correctional officers of his ailments, including that he could not swallow food, had throat swelling and extreme pain and a tonsil infection, but that the officers simply replied that "it was not their problem and to inform medical."

      c.      After a night of crying and pacing, unable to sleep due to the pain, and still not being seen, Mr. Byrd filed a second emergency grievance; after waiting hours for a response, he still was not seen.  Not only was his request deemed "not to be an emergency," but it was needlessly not even processed; he was told to file yet another form, a request to the sick call nurse.  Mr. Byrd explains that he did so, but he still was not seen by medical providers.

      d.      After another day went by, Mr. Byrd writes that he asked an officer to ask a nurse to evaluate him while conducting her rounds on the unit.  The officer asked Mr. Byrd to open his mouth so that he, a non-medical provider, could "see it for himself"; when Mr. Byrd complied, but also cried due to the extreme pain, the officer laughed in his face and informed him that "these tears will not get you to medical any faster."  The nurse declined to check Mr. Byrd's severe throat condition, referencing her current task of pill call as the apparent reason she could not help an inmate in acute distress.  Mr. Byrd states that the following day, he submitted a third emergency grievance request.

      e.      After hours of additional pain and suffering without being given access to medical care, he was finally called to Medical and seen by a nurse.  However, although the nurse said upon examining Mr. Byrd that his "throat was so swollen that she was afraid to touch or bother with it," her remedy was not to summon a doctor on call or EMS, but simply to put Mr.

Byrd on the list to be seen by the doctor the next day. She gave him Motrin, and sent him back to his cell.

f.     The next morning, Mr. Byrd says he "began to lose oxygen" and "couldn't breathe" because of further swelling. His cell mate helped him bang on the cell door to get an officer's attention. A sergeant was summoned, who took Mr. Byrd to Medical. A nurse who looked at Mr. Byrd's throat immediately told him he needed to go to the emergency room. Mr. Byrd was started on a IV and given a steroid shot to help him breathe, as well as pain medication.

g.     Mr. Byrd was taken to Maryview Hospital emergency room. Mr. Byrd says he was given more pain medication, a CAT scan and additional medication to bring down the swelling because it was so bad that the doctor could not effectively examine him. X-rays were later obtained after the swelling went down. The doctor originally stated that Mr. Byrd would need to be transferred to another hospital to undergo surgery to remove the infection. However, it was later determined to release Mr. Byrd back to the Regional Jail with orders to closely monitor him and give him a potent antibiotic to loosen the infection and have it drain out, which was supposed to be less painful. Vicodin was also prescribed for pain.

h.     However, Mr. Byrd writes that when he was returned to the Regional Jail, the discharge orders were not followed. The Regional Jail's doctor did not see Mr. Byrd until "days later" and then took him off of a liquid diet he was supposed to be on for 14 days, told him he would no longer receive anything for the pain, and told him his antibiotic medication would only last for four days.

i.     Mr. Byrd describes that he started writing "request reports" on the situation and asked his mother to call the Regional Jail; his mother informed him in a letter that

she was hung up on when trying to intercede on his behalf.  The day he received his mother's letter, Mr. Byrd discovered that his phone privileges were terminated.  Mr. Byrd also alleges that when he attempted to notify security about these incidents, he was told by Internal Affairs that if he proceeded with his complaints, he would have disciplinary actions brought against him.  Mr. Byrd alleges that he then sought copies of all request reports that had been made since his arrival at the Regional Jail; he was at first denied them, being told he would have to subpoena them through the courts, and then told he could receive them for $0.25/ copy, but his request to receive them was still unanswered.[23]

120.    Another inmate, **David Perry**, filed a complaint in federal court in October 2015. In his public complaint, Mr. Perry stated that he has HIV and hepatitis C.  Mr. Perry states that he was prescribed a medication for curing his Hepatitis C.  A gastroenterologist had also recently determined that Mr. Perry had "the most extensive case of h pylori [Helicobacter pylori (H. pylori) bacteria] in my stomach she ever came across," and had prescribed "2 strong antibiotics and a stomach pill."  The gastroenterologist gave orders that the infection needed to be cleared first, so that Mr. Perry could then be treated for the Hepatitis C.  Mr. Perry stated that his girlfriend and power of attorney had sent all of his prescriptions and medical records to the Regional Jail.  However, the Regional Jail was not providing Mr. Perry treatment for his H. pylori digestive tract infection, nor for his Hepatitis C.  Mr. Perry further writes in his complaint that he was "refused a 1983 form" (his complaint is written on paper in the form of a letter) and

---

[23] Mr. Byrd's complaint was later dismissed without prejudice; a previous order responding to an *in forma pauperis* motion and requiring filing fee payment or a signed consent to collection of fees was returned non-deliverable to the Court, as was the Court's dismissal order. Mr. Byrd may have been moved in the system away from the Regional Jail or released.

that he "has been threatened by staff here at HRRJ." Mr. Perry also states that he "has asked to no avail for grievances and access to the law library to no avail."[24]

121.   On August 2, 2016, while Mr. Stewart was dying at the Regional Jail, a Regional Jail inmate named **William Peacock** filed a federal court complaint against then Regional Jail Superintendent David Simons.  Mr. Peacock made several disturbing allegations, including that he "was unable to walk for days and medical treatment was denied" to him, that he was being denied treatment for his Hepatitis C condition, and that the Regional Jail had failed to follow up on a CT scan that reportedly indicated that he may have cancer.  Mr. Peacock alleged that he had filed two emergency grievances on July 4, 2016 and one regular grievance and that they were "disregarded," and that "nothing" was done when he appealed.  He also alleged that he "spoke with pill pass nurse and security staff on numerous occasions."  As part of his requested relief, Mr. Peacock asked for "transferal to a facility that will address my issues."[25]

122.   On August 4, 2016, while Mr. Stewart was dying at the Regional Jail, an inmate named **Kennyon Harris** filed a federal complaint alleging lack of access to medical care at the Regional Jail.  Mr. Harris alleged that he had diabetes and was not getting his diet needs met, and was often being skipped for his diabetes checks, and that he "has been left to lay in an over crowded cell in extream [sic] pain, unable to have a bowl [sic] movement for weeks at a time." He alleged that when he filed a grievance, jail nurse S. Taylor, RN "shows no concern at all, state I was seen already!" and also wrote that he "complain[ed] to Sargent [sic] Whitehead who

---

[24] Mr. Perry's action was later dismissed without prejudice due to failure to return a consent to collection of fees form and *in forma pauperis* affidavit / failure to pay filing fee.  The court's final order was returned undeliverable to the court; Mr. Perry may have been transferred out of the Regional Jail or released.
[25] Mr. Peacock's complaint was thereafter dismissed without prejudice after court mailings to him were returned undeliverable. He may have been transferred or released.

stated they can't control Medical." Harris stated that "CCS Medical staff has failed to respond to the emergency Grievance filed on 5-7-16 still to this day" and that he "has yet to see the doctor." Mr. Harris alleged that "family members have called the Jail staff in regards to this matter" to no avail, and he noted four "electronic request" numbers he had filed at the Regional Jail. Harris wrote that "prison officials stated that they do not control medical and its [sic] out of there [sic] hands." He requested "preliminary injunctions" to be seen by outside medical doctors.[26]

123.    In September 2016, the *Richmond Times-Dispatch* reported that, according to its analysis of statistics from the Virginia Department of Corrections and the state Compensation Board, "[i]nmates died nearly nine times more often in custody at Hampton Roads Regional Jail than at other local or regional jails in Virginia during the past three years." The paper elaborated that between June 2013 and September 2016, of the 6,716 inmates who have been incarcerated at the Regional Jail, 12 of them died, a rate of 178.7 per 100,000. Per the *Times-Dispatch*, a total of 129 inmates had died statewide in Virginia during the same period, a rate of only 20.4 per 100,000. (Kleiner, Sarah and Evans, K. Burnell, "Hampton Roads Regional Jail is deadliest in the Virginia for inmates," *Richmond Times-Dispatch*, September 3, 2016). Former Regional Jail Interim Superintendent Sheriff McCabe also released documentation in 2016 showing that between 2012 and 2016, 18 inmates had died at the Regional Jail.

124.    The Regional Jail Authority's contract documents with its medical providers also indicate how the Regional Jail Authority and its representatives were well aware that access to and provision of healthcare at the Regional Jail was inadequate.

---

[26] Mr. Harris's complaint was later dismissed without prejudice to his right to resubmit the case due to failure to pay an initial partial filing fee or timely submit an objection to such.

a.     The Request for Proposals RFP # 000146 for a new healthcare provider issued August 21, 2015, which proposal CCS answered to become the Regional Jail's medical contractor and which is referred to in the contract between CCS and the Regional Jail Authority,[27] indicates that an "appropriate HRRJ and/or security representative" was a member of the healthcare Continuous Quality Improvement committee at the Regional Jail.[28]

b.     The contract between the Regional Jail Authority and CCS for the relevant period provides for daily narrative reports to the Regional Jail that include medical incident report copies, transfers to hospital ERs, reports of status of inmates in hospitals, medical grievance reports, and history and physical and medical intake screening reports.  Monthly reports "concerning the overall operation of the health services rendered...and the general health of the inmate population of the Facility" were also required.  These included, among other things, inmates' requests for various services, inmates seen at sick call, inmates seen by

---

[27]  The February 1, 2017 contract between CCS and the Regional Jail Authority states that "CCS shall manage comprehensive institutional health care services for the Facility according to the terms and provisions of this Agreement, in accordance with a Cost Plus Management Fee arrangement, and according to the terms and provisions of the Request for Proposal 000146, attachments to the RFP, addenda #1-#4 of the RFP, the Proposal Response submitted by CCS to the RFP, and the attachments to this Agreement." The contract was subsequently renewed for the year 2018.  The previous contract between CCS and the Regional Jail Authority, executed in December 2015, had a similar clause citing the Request for Proposal 000146 in connection with the manner in which "CCS shall manage" Jail healthcare.

[28]  The Regional Jail's "Medical Services" policy also specifically mentions the "Superintendent" as recipient of the compliance reports of the Continuous Quality Improvement committee.  Indeed, when NaphCare, Inc. was the Regional Jail Authority's medical contractor from 2012 to December 2015, the former superintendent David Simons attended Medical Advisory Committee meetings at times, and also sent to such meetings former assistant superintendent Eugene Taylor and other representatives reporting to him or Taylor (Jail Major and Captain).  Representatives reporting to Simons or Taylor (Jail Major and Captain) had also attended Continuous Quality Improvement committee meetings while NaphCare was at the Jail. Upon information and belief, bolstered by the contract and policy documents described herein, this practice of the Regional Jail Superintendent, Assistant Superintendent, and/or senior officers directly on their behalves attending medical compliance meetings continued through October 2018 when Ms. Honeycutt died.

physician, infirmary admissions, off-site hospital and ER admissions, specialty referrals, diagnostic studies, intake medical screenings, 14-day history and physical assessments, and inmate mortality. Defendants Regional Jail Authority and Superintendent Hackworth were well aware of the Regional Jail's failings and that Ms. Honeycutt and persons like her were at risk of serious harm.

125.    With regard to Defendant Medical Director Moreno, MD and Defendant CCS, information from CCS's contract with the Regional Jail Authority and recent significant events also show how Moreno, MD and CCS were certainly aware, even prior to Dr. Moreno's contact with Ms. Honeycutt, that inmates similarly situated to Ms. Honeycutt with serious medical needs were not receiving proper care.

126.    First, as noted herein, CCS became the Regional Jail's healthcare contractor very soon after the high-profile death of Jamycheal Mitchell. Thereafter, at least two state agencies (Department of Behavioral Health and Developmental Services (DBHDS) and the Office of the State Inspector General (OSIG)) were investigating Mitchell's death, including conducting interviews of Regional Jail personnel. Then, inmates William O. Thrower, Sr. and Henry Clay Stewart both died at the Regional Jail while CCS was the provider. Additional death and significant injury followed as chronicled herein. The United States Department of Justice then began investigating the Regional Jail and meeting with and interviewing jail and medical personnel. The investigation was ongoing when Ms. Honeycutt died.

127.    Further, the Regional Jail Authority's Request for Proposals RFP # 000146, referred to in the contract between CCS and the Regional Jail Authority, (*see* note 27) states, among other things, "It is also a requirement of this contract that the medical director, H.S.A.,

DON, infirmary RN, and PhD mental health director meet each weekday morning to discuss significant care needs and hospitalizations."

a.    This requirement of daily meetings between Medical Director Moreno, MD; the Director of Nursing; the Health Services Administrator and other providers underscores that Dr. Moreno's individual knowledge of the Regional Jail's faulty health care administration system and the risks to inmates with serious medical conditions was amplified by Dr. Moreno's regular dialogue with the DON, HSA and others about their experiences, work and observations.

b.    However, Moreno, MD, simply was indifferent to Ms. Honeycutt and her circumstances despite, in addition to his actual contacts with her, apparent daily meetings specifically designed to help Ms. Honeycutt and other inmates with significant care needs.

128.    The Request for Proposals RFP # 000146 also states that the health contractor (CCS):

> shall maintain a comprehensive CQI [Continuous Quality Improvement] program in accordance with professional standards.  The multi-disciplinary committee will consist of the Medical Director, Psychologist, Dentist, HSA, DON, Contract Monitor, and appropriate HRRJ and/or security representative.  All other MSC [Medical Services Contractor] staff will participate in CQIP on a rotating or as needed basis.  There will be bi-monthly CQIP meetings with monthly studies. … The Contract Monitor will review the program on a quarterly basis and make recommendations as necessary.  CQIP studies of interest may be required by HRRJ regardless of the MSC [Medical Services Contractor]'s CQI schedule."

129.    Moreover, according to the contract document itself, the Continuous Quality Improvement program was to be instituted by CCS and "monitor the health services provided to the inmate population of the Facility, including peer reviews and audit and medical chart review procedures to ensure compliance with this Agreement, as well as NCCHC and ACA standards." Given his involvement in such programs, Moreno, MD, could not have failed to know of the numerous barriers to proper medical care plaguing the jail.

130.     Notwithstanding the foregoing, and his role of authority and knowledge of the problems, Moreno, MD (and CCS) did not adequately address the continuous and obvious risk of harm to inmates like Ms. Honeycutt with serious medical needs.

131.     Evidence further indicates that it was long known to the Regional Jail Authority and its representatives that the Regional Jail lacked adequate staffing and funding.  However, these conditions were not corrected.

132.     For about twenty years, there has been documented history of jail experts stating that the Regional Jail does not have sufficient officers and support staff to handle or secure its inmate population.  The Virginia Board of Corrections has determined in state studies from 1999 forward that the Regional Jail does not have adequate staff.  The Department's last study, conducted in 2017, found that 122 new positions were needed (an increase from 300 to 422 positions, or about 40% more staff). (Harki, Gary A., "While mired in investigations and death, Hampton Roads Regional Jail's board fought against change," *The Virginian-Pilot*, April 11, 2019; hereinafter "*Pilot*, April 11, 2019").

133.     The U.S. Justice Department informed the Regional Jail Authority in 2017 during its investigation that the jail was insufficiently staffed to provide for its population.  *Pilot*, April 11, 2019.

134.     *The Virginian-Pilot* determined through a review of state data that while the Regional Jail receives the sickest inmates from its five member cities, it has a disproportionately low amount of staff.  The jails in each of the member cities that make up the Regional Jail Authority (Chesapeake, Hampton, Newport News, Norfolk, and Portsmouth) and that send inmates to the Regional Jail all have more correctional officers and support staff per inmate than does the Regional Jail.  *Pilot*, April 11, 2019.

135.     Former Regional Jail Superintendent Ronaldo Myers, who was hired in March 2017 and resigned in March 2018, tried to get each city member of the Regional Jail to largely increase its funding to the regional jail.

a.      Myers was hired while the Department of Justice investigation was up and running.  In 2017, he also cautioned the Regional Jail finance committee that the Regional Jail was dangerous – for both inmates and guards – due to insufficient staffing. *Pilot*, April 11, 2019. Myers warned, in both Regional Jail board and finance committee meetings in 2017, that the jail required more than 100 more positions.  He said at least 50 of those positions were critical to safe operations.  *Pilot*, April 11, 2019.

b.      However, instead of supporting Myers and heeding his suggestions, the Regional Jail Authority decided to focus on chastising him for using overtime to provide coverage at the Regional Jail, and purportedly not filling positions quickly enough, despite the Regional Jail's problem with turnover. *Pilot*, April 11, 2019.

136.     The Regional Jail Authority put pressure on the Regional Jail to control costs while also asking it to take not only the sickest inmates from member jails, but to take them as quickly as possible.  In Summer 2017, the Hampton Sheriff sent a paralyzed inmate to the Regional Jail without previously notifying the facility of his condition.  Board members were angry when Myers then decided to enforce a previously unenforced rule requiring member cities to keep inmates for at least 14 days prior to transferring them to the Regional Jail.  Enforcement of the rule would help control the Regional Jail's costs.  However, among others, the Hampton Sheriff and the Norfolk Sheriff's Office were upset at the move because it pushed costs back on their cities.  Norfolk, for example, would have to spend thousands on additional HIV medications alone due to the enforcement. *Pilot*, April 11, 2019.

137.    Notwithstanding wanting the Regional Jail to take on so many sick persons, the Regional Jail Authority gave the Regional Jail a 2018 budget far less (about 45 % less) than what then-Superintendent Myers stated he needed.  The budget also did not provide any money for additional staff. *Pilot*, April 11, 2019.  But the Regional Jail Authority was also upset when Myers attempted to get funding through the Virginia General Assembly (an attempt that ended up not being successful).  The Regional Jail Authority blamed Myers for the Regional Jail's staffing issues. *Id*.

138.    Former Superintendent Myers resigned in March of 2018.  He was replaced by Defendant Hackworth, who until then had been Chief Deputy of the Sheriff's Office in member city Chesapeake.  Myers reportedly told *The Virginian-Pilot*:

> I really don't think the board knows what it's created in the regional jail.
> It is basically a mental health and medical hospital. … I believe that's what it was designed for. I think they believed that if they consolidated everything into one, it would be better. But you have to understand, once you consolidate, you have to pay for it.

*Pilot*, April 11, 2019.

139.    Seven Regional Jail inmates, including Ms. Honeycutt, died in 2018.  This was more than those who died in 2015, when Jamycheal Mitchell died, or 2016, when Henry Stewart died. *Pilot*, April 11, 2019.

## VII.   THE DEFENDANTS OWED DUTIES TO MS. HONEYCUTT, BUT BREACHED THOSE DUTIES

### A.    Defendants Owed Ms. Honeycutt Duties

140.    From May 2018 until on or about October 5, 2018, Ms. Honeycutt was in the custody and under the care of Defendant Sheriff Baron, Baron's deputies/employees/agents (including Defendants herein), and the Norfolk Jail CCS Defendants (Defendant CCS and its Defendant employees/agents working at the Norfolk Jail).  When Ms. Honeycutt was transported

to the Regional Jail on or about the morning of October 5, 2018, Ms. Honeycutt was in the custody of Sheriff Baron, and his deputies/employees/agents. The Norfolk Sheriff's Office, like the other locality members of the Regional Jail Authority, routinely transferred certain Norfolk inmates to the Regional Jail.

141. From on or about the morning of October 5, 2018, when she was transferred to the Regional Jail, until the night of October 6, 2018, when she was taken by ambulance to Maryview Hospital ED, Ms. Honeycutt was in the custody and under the care of the Jail Authority Defendants (the Regional Jail Authority and Hackworth), correctional officers/employees/agents of the Regional Jail Authority, and the Regional Jail CCS Defendants (Defendant CCS and its Defendant employees/agents working at the Regional Jail). Upon information and belief, Ms. Honeycutt remained in the Regional Jail Authority's custody until she was declared dead on October 7, 2018.

142. As discussed herein, the Defendants owed duties to Ms. Honeycutt. Among these duties, Defendants, and each of them, had statutory and common law duties of care to Ms. Honeycutt, including affirmative duties to provide adequate medical care or access to adequate medical care.

143. At all relevant times herein, Defendants, and each of them, also had duties to Ms. Honeycutt, pursuant to the Eighth and Fourteenth Amendments to the U.S. Constitution.

144. Pursuant to state statute, Defendant Hackworth, the Superintendent of the Regional Jail, was responsible for the day-to-day operations at the Regional Jail, and had the duty of care and custody for Ms. Honeycutt while she was incarcerated at the Regional Jail. Va. Code § 53.1-95.8, incorporating by reference Va. Code §§ 53.1-116 *et seq.* and 15.2-1609.

145.    Defendants Regional Jail Authority, Hackworth and Baron, by and through their deputies, agents and employees, including CCS, had specific statutory duties to provide, or provide access to, medical treatment to Ms. Honeycutt under Va. Code § 53.1-126. Under that statute, the foregoing Defendants had a specific responsibility to inmates/detainees, in that "medical treatment shall not be withheld for any communicable diseases, serious medical needs, or life threatening conditions." *Id.*

146.    Moreover, Virginia legislative authority also enabled various regulations, including, but not limited to, those requiring that 24-hour emergency medical care be made available to inmates. Va. Code §§ 53.1-68, 53.1-95.2; 6 VAC 15-40-360.

147.    Furthermore, the Virginia Board of Corrections has an entire chapter of administrative regulations dedicated to Minimum Standards for Jail and Lockups.

148.    The second regulation, directly following the definitions for the chapter, is regulation 6 VAC 15-40-20, entitled "Responsibility." It plainly states, "The primary responsibility for application of these standards shall be with the sheriff or chief executive officer of the jail or lockup."

149.    Closely following this regulation is 6 VAC 15-40-50, "Chief Executive Officer," which mandates, "Written policy shall provide that each facility shall be headed by a single chief executive officer to whom all employees and functional units are responsible."

150.    The Virginia Code further emphasizes the responsibilities of sheriffs and jail superintendents for jail management by providing that the State Board of Corrections can sue a local sheriff or superintendent for not fulfilling his jail operations duties: "If any sheriff or jail superintendent through his default or neglect fails to comply with the requirements of the Board in the operation and management of any jail under his control or management, the Board shall

69

file a complaint with the circuit court of the county or city in which such jail is located…" *See* Va. Code § 53.1-125. This provision continues by stating that if the court finds that the Board's claim has merit, it can order the State Compensation Board "to withhold approval of the payment of any further salary to the sheriff or jail superintendent until there has been compliance with specified requirements of the Board." *Id.*

151.    Accordingly, Defendant Sheriff Baron was responsible for operations of the Norfolk Sheriff's Office and was the chief executive officer with direct control over his office. Therefore, Baron had the ability, personally, or through his staff, to implement and modify such operations to protect jail inmates/detainees in his custody.

152.    In connection with Plaintiff's state law claims, Defendants Regional Jail Authority, CCS, and Baron, and each of them, are accountable, under the doctrine of *respondeat superior* liability, for the actions and inactions of their deputies, employees, and agents, including, but not limited to, Defendants hereto.

153.    All Defendants owed duties to Ms. Honeycutt to exercise reasonable care in providing her, and/or in providing her timely access to, medical care, nursing care, professional, and/or correctional services during the time period of her detention/incarceration at the Regional Jail, and/or while in the custody of Defendant Baron/his deputies at the Norfolk Jail and otherwise.

154.    Defendants CCS; Moreno, MD; Anderson, NP; Lindsey, LPN; Noftz, LPN; Wright, LPN; Peppenhorst, LPC; Bodden, LPN; Robinson, LPN; and Barton, RN; and other CCS employees who encountered Ms. Honeycutt had duties to render that degree of knowledge, skill, diligence and care to Ms. Honeycutt that is rendered by a reasonably prudent health care provider or similar professional in the Commonwealth.

155.     At all relevant times herein, the final policymaking decision maker for the Regional Jail Authority in the daily operation of the Regional Jail was Defendant Regional Jail Authority itself or Defendant Hackworth. *See* Va. Code Ann. § 53-1-106(A), and *Thornhill v. Aylor*, No. 3:15-CV-00024, 2016 WL 8737358 (W.D. Va. Feb. 19, 2016).  Upon information and belief, at all relevant times herein, the final policymaking decision maker for CCS in the daily provision of medical services at the Norfolk Jail was Anderson, NP, and at the Regional Jail was Moreno, MD.

**B.      Defendants breached duties owed to Ms. Honeycutt; Defendants' conduct and omissions violated clearly established statutory and Constitutional rights of which Defendants knew**

156.     Notwithstanding the duties described above, the Defendants, individually, and/or through their agents and employees, and each of them, breached the duties they owed to Ms. Honeycutt, and were negligent, grossly negligent, willfully and wantonly negligent, and/or deliberately indifferent to Ms. Honeycutt's care and needs.

157.     The CCS Defendants failed to conduct proper examinations, failed to make an accurate diagnosis of an acute abdomen, failed to keep proper records, failed to report up the chain of command effectively, and failed to form and carry out an effective treatment plan with regard to Ms. Honeycutt.

158.     As more fully discussed below, the Regional Jail CCS Defendants (Defendant CCS and its Defendant employees/agents working at the Regional Jail)  and the Jail Authority Defendants (the Regional Jail Authority and Hackworth) were aware that the Regional Jail had become the subject of federal and state investigations concerning, among other things, the failure to provide adequate medical care to inmates and detainees.  There could have been no greater issue for the Regional Jail CCS Defendants and the Jail Authority Defendants to address than the

foregoing failures. However, the Regional Jail CCS Defendants and the Jail Authority Defendants disregarded these continuing problems resulting in Ms. Honeycutt's death.

159. Defendant Baron and his deputies/employees/agents failed to respond, or responded with deliberate indifference, to Ms. Honeycutt's deteriorating medical situation. Because of his position on the Regional Jail Authority Board and previous position as Chief Deputy of the Norfolk Sheriff's Office, Baron was aware that the Regional Jail had become the subject of federal and state investigations concerning, among other things, the failure to provide adequate medical care to inmates and detainees. However, he still sent or caused to be sent inmates confined to his custody to the Regional Jail, including Ms. Honeycutt.

160. Defendants breached their express duties as set forth in the statutes, rules, policies, and procedures applicable to the Defendants. Among other provisions, Defendants failed to comply with Section 53.1-126 of the Code of Virginia, which states that, with regard to detainees/inmates, "…medical treatment shall not be withheld for any … serious medical needs, or life threatening conditions."

161. Thus, the Defendants violated: an express directive by the Virginia General Assembly to provide medical treatment for all serious medical needs or life-threatening conditions; the U.S. Constitution; as well as their individual expressed duties and responsibilities, in failing to provide Ms. Honeycutt with adequate medical care, and/or access to adequate medical care.

162. Defendants' actions and omissions, in denying obvious and necessary care and attention to Ms. Honeycutt, rose to the level of deliberate indifference to serious medical needs. Additionally, the several acts of negligence of individual defendants, when combined, had a

cumulative effect showing a reckless or total disregard of Ms. Honeycutt and her acute medical

condition.

163.    Defendants' specific breaches of duties include the following:

    a.    **All Defendants -** In or about September and October 2018, the Defendants in this matter failed to provide Ms. Honeycutt urgently needed medical care and/or access to that care.

    b.    **Defendants CCS and Anderson, NP**

        1.    Notwithstanding awareness that Ms. Honeycutt was experiencing ongoing, unrelieved gastrointestinal problems that were an escalation of her previous presentation, Defendant Anderson, NP failed to examine Ms. Honeycutt at any time from September 29, 2018 to her discharge from Norfolk Jail on October 5, 2018.

            i.    Defendant Anderson, NP was aware of Ms. Honeycutt's acute abdomen/aggravated gastrointestinal condition at least by the evening of September 29, 2018.  Previously, Anderson, NP was aware of Ms. Honeycutt's constipation, and had attempted to treat it since July 2018, including with a recent increase in medication dosage.  Previously, Anderson, NP was aware of Ms. Honeycutt's hemorrhoids and had attempted to treat them. Also had recently diagnosed Ms. Honeycutt with anemia. However, Anderson did not examine Ms. Honeycutt on September 29, 2018 or at any time thereafter notwithstanding that Ms. Honeycutt's condition had grown worse and was not relieved.

           ii.    Anderson further did not examine Ms. Honeycutt on October 3, 2018, when Anderson was informed that Ms. Honeycutt had reportedly refused prescribed medications and records indicate that such declines were specifically because of Ms. Honeycutt's perfuse vomiting, inability to keep down medications, and feeling ill when taking them.

          iii.    Anderson again did not examine Ms. Honeycutt on October 4, 2018.

              1.    Instead of examining Ms. Honeycutt, Anderson prescribed her more medication- magnesium citrate on September 29 and Bisacodyl on October 4 – without actually seeing her or diagnosing her condition.

2. Anderson did not examine Ms. Honeycutt even when the first prescription she wrote without an exam (September 29 magnesium citrate) did not relieve the problems.

iv. Anderson did not examine Ms. Honeycutt even when Ms. Honeycutt was scheduled to be transported to another jail, and Anderson knew she was experiencing a serious condition, but had not been examined by a doctor. Anderson wrote the Bisacodyl prescription, without seeing Ms. Honeycutt, after the Transfer Form was entered into the CCS system.

2. Multiple times, while Anderson was prescribing medication for Ms. Honeycutt but not examining her, Anderson disregarded and did not incorporate into her plan of care problematic medical records in Ms. Honeycutt's electronic CCS chart that were created by other medical practitioners who did see her (including LPNs who cannot assess independently and should be working under a higher provider like Anderson).

i. On October 3, 2018 and October 4, 2018, such records included: records from LPNs indicating that Ms. Honeycutt was declining medications prescribed by Anderson due to her serious medical condition; LPN Lindsey's disturbing record of September 29 (which also showed an LPN solo examination/assessment); records from Peppenhorst LPC indicating that Ms. Honeycutt had reportedly feigned suicide/self-harm thoughts due to her continued vomiting and not feeling well, but had not been medically examined.

ii. By the time of Anderson's medication order on October 4, a Transfer Form (Intra-System) also indicated that Ms. Honeycutt was going to be transferred in her condition and without a provider exam (and also with considerable information about her current condition left off the Form).

iii. These records required intervention and examination by a provider – but Anderson disregarded them.

3. Failed to update Ms. Honeycutt's Transfer Form with information about her gastrointestinal condition notwithstanding providing orders for her after the entry of the Form concerning that very condition, and also failing to examine Ms. Honeycutt for the same.

4. Otherwise failed to care for Ms. Honeycutt adequately.

5. Upon information and belief, improperly assigned low-credentialed LPNs to carry out inmate screening tasks independently and without supervision,

6. Improperly allowed low-credentialed LPNs to independently assess inmates/detainees,

7. Promulgated a system wherein LPNs were required to perform beyond their licensed duties,

8. Failed to implement a system whereby inmate serious medical needs were promptly and properly acted upon.

9. Tolerated, or otherwise failed to correct a system that did nothing in the face of inmate failures to receive life-sustaining treatments.

10. Failed to have systems in place to provide that inmates under the care of her and her Medical Department were medically stabilized prior to any transfer.

11. Failed to implement a system that provided adequate monitoring and coordination of care for acutely ill/at-risk inmates.

12. Failed to have systems in place to support proper examination, assessment, diagnosis, treatment, monitoring and care of Ms. Honeycutt, including referral of Ms. Honeycutt to a hospital / the calling of 911.

13. In or about September and October 2018, failed to provide Ms. Honeycutt urgently needed medical care and access to that care.

14. Ignored, or dismissed without basis, Ms. Honeycutt's obvious serious medical condition and risk for additional harm.

15. Despite awareness of Ms. Honeycutt's serious condition, failed to provide needed medical care, and failed to call 911 or otherwise send Ms. Honeycutt to the hospital.

16. Failed to monitor adequately Ms. Honeycutt's condition.

**c. Defendants CCS; Lindsey, LPN; Noftz, LPN; and Wright, LPN**

1. Beginning in mid-to-late September and into October when Ms. Honeycutt was held at Norfolk Jail, dismissed requests by Ms. Honeycutt and inmates on her behalf for medical help for her condition, including abdominal pain, vomiting, and vomiting of blood.

2. Failed to inform medical care providers (physician and/or nurse practitioner) of Ms. Honeycutt's acute condition

3. Failed to care adequately for Ms. Honeycutt.

4. Failed to obtain proper medical care for Ms. Honeycutt.

5. Failed to send Ms. Honeycutt to a hospital or to call 911.

**d. Defendants CCS and Lindsey, LPN**

1. Failed to give Ms. Honeycutt medication ordered by Anderson, NP until more than 48 hours after the order was given. Received an order from Anderson, NP to give Ms. Honeycutt one bottle of magnesium citrate now at about 8 p.m. on September 29, 2018, but did not give the dose until October 1, 2018 at 8:30 p.m.

2. Did not inform Anderson, NP that she had failed to follow an order as given. There is no record by Lindsey that she told Anderson about the late administration of the magnesium citrate.

3. Examined and assessed Ms. Honeycutt alone on September 29, 2018 at 10 p.m., when she is an LPN and not licensed to independently assess patients or render a nursing diagnosis, but must act under the supervision and direction of an RN or physician/nurse practitioner. This included, but is not limited to, performing an abdominal exam independently.

4. In addition to wrongfully performing an abdominal exam and making assessments of abdominal condition alone as an LPN, without the supervision and direction of an RN or provider, performed the exam erroneously. Determined that Ms. Honeycutt had a "soft" abdomen, when Ms. Honeycutt's then current condition and the progression of her illness as detailed in her autopsy and other records indicate that Ms. Honeycutt undoubtedly had a rigid abdomen, and may have had rebound tenderness, at the time of the exam.

5. Failed to refer Ms. Honeycutt to an emergency room – indeed, failed to refer her even to a physician/nurse practitioner- on September 29, 2018, notwithstanding her records that Ms. Honeycutt presented with severe, "10" out of "10" pain, cramping, constipation, vomiting, "undigested food particles" in her vomit, a fever, tachycardia, and an abnormal blood pressure reading, and, per inmate reports, Ms. Honeycutt was vomiting blood and bleeding from the vagina or anus area as well.

6. Wrongfully assessed Ms. Honeycutt's condition as "Not Emergent" and "Not Urgent" on September 29, 2018. Wrongfully assessed Ms. Honeycutt's condition as "Routine" on September 29, 2018.

7. On September 29, 2018, failed to note indications in the "Urgent" section of her form, including that Ms. Honeycutt was experiencing chronic constipation and nausea and vomiting.

8. Disregarded Ms. Honeycutt's serious medical condition on September 29, 2018, writing off her need for acute care with general directives such as to increase fluid intake, and to contact Medical if her symptoms worsened.

9. Was dismissive of Ms. Honeycutt's presentation on September 29, 2018 to the point that she ignored directives from CCS's protocol on the form she filled out that indicated that Ms. Honeycutt's condition be treated with an "Emergent" response.

10. Disregarded Ms. Honeycutt's condition again on October 1, 2018. Saw Ms. Honeycutt on October 1, 2018 at 8:30 p.m. to give her late administration of the magnesium citrate. Records by others (LPN Bodden and Peppenhorst, LPC) indicate that on October 1, 2018, Ms. Honeycutt was experiencing vomiting and nausea, "can't keep anything down," and "didn't feel good." But Lindsey did not refer Ms. Honeycutt to a nurse practitioner or physician on October 1, 2018 despite not only her late medication failure, but also Ms. Honeycutt's continued serious condition.

**e. Defendants CCS and Peppenhorst, LPC**

1. On October 1 and October 2, 2018, was aware that Ms. Honeycutt had been "throwing up," "didn't feel good," and that her medical condition was poor enough that it reportedly motivated her to desperate extremes – saying that she was suicidal when she did not, in fact, want to harm herself. However, Peppenhorst dismissed Ms. Honeycutt's medical condition. Peppenhorst did not make a referral to Anderson, NP or another nurse practitioner or physician concerning Ms. Honeycutt.

2. Failed to care adequately for Ms. Honeycutt.

3. Failed to obtain proper medical care for Ms. Honeycutt.

4. Failed to send Ms. Honeycutt to a hospital or to call 911.

5. Failed to adequately coordinate care with medical providers concerning Ms. Honeycutt

**f. Defendants CCS and Bodden, LPN**

1. Recorded on September 29, 2018 that Ms. Honeycutt "states she feels sick taking the meds been throwing up." However, failed to make a referral for Ms. Honeycutt to Anderson, NP or another provider.

2. Was informed by Ms. Honeycutt on October 1, 2018 that Ms. Honeycutt "[c]an't keep anything down" and was experiencing "vomiting and nausea." Recorded that Ms. Honeycutt was declining medications because "[b]elieves medications are making her sick." However, failed to make a referral for Ms. Honeycutt to Anderson, NP or another provider.

3. Recorded an order for the laxative Bisacodyl on October 4, 2018 for provider Anderson, NP. However, failed, even at that time, to inform Anderson of Ms. Honeycutt's vomiting, nausea, inability to keep anything down, and feelings that medication Anderson prescribed was making her sick.

4. Failed to care adequately for Ms. Honeycutt.

5. Failed to obtain proper medical care for Ms. Honeycutt.

6. Failed to send Ms. Honeycutt to a hospital or to call 911.

**g. Defendants CCS and Robinson, LPN**

1. Administered medication to Ms. Honeycutt on the morning of October 5, 2018 at Norfolk Jail during pill pass. Records indicate that Ms. Honeycutt was in considerable distress at this time – when assessed shortly thereafter at the Regional Jail, she had a racing heart rate and very elevated blood pressure. She also had long been experiencing nausea, abdominal pain, vomiting, irregular vital signs, and bleeding with no diagnosis or relief. Ms. Honeycutt also complained at the Regional Jail of suffering from abdominal pain, nausea and vomiting throughout that morning and throwing up "everything" given to her by Medical at Norfolk. Robinson witnessed Ms. Honeycutt's distress, but ignored it, carrying on with pill pass as usual.

2. Failed to inform medical care providers (physician and/or nurse practitioner) of Ms. Honeycutt's acute condition

3. Failed to care adequately for Ms. Honeycutt.

4. Failed to obtain proper medical care for Ms. Honeycutt.

5. Failed to send Ms. Honeycutt to a hospital or to call 911.

**h. Defendants CCS and Moreno, MD**

1. Failed to send Ms. Honeycutt to a hospital ER on October 5, 2018 at or about 11:45 am when Moreno was informed that Ms. Honeycutt had "no bowel sounds," was experiencing abdominal pain, had an abdomen that was rigid to the touch, had a positive sign for rebound tenderness, and had been experiencing prolonged nausea and vomiting, and he further had not diagnosed the cause. Instead, ordered testing that he had to have known was insufficient to diagnose or treat Ms. Honeycutt, and would take hours to perform in a jail setting while she suffered unnecessarily with an unknown, life-threatening condition that could be treated effectively and efficiently at a hospital.

2. Failed to send Ms. Honeycutt to a hospital ER on October 5, 2018 at or about 7:21 p.m., when provided with the results of the lab tests and one-view abdominal X-ray he ordered, which included abnormal results: abnormally high Glucose, Bilirubin, and ALT (SGPT) (a liver functioning test) levels; abnormally low levels of Hemoglobin and Hematocrit; blood in Ms. Honeycutt's urine and that she was positive for ketones; and distended loops of Ms. Honeycutt's small bowel and colon, which "findings may represent ileus." Instead, again ordered procedures – Bisacodyl (stimulant laxative drug) and a fleets enema – that were not sufficient for Ms. Honeycutt's life-threatening condition. Such procedures in this context – where the cause of an acute abdomen was not determined – were a significant risk for (and did) cause additional harm to Ms. Honeycutt. By adding fluid, the bowel was expanded, increasing pain and accelerating leakage from the perforation into the abdominal cavity.

3. After engaging in the foregoing failures on the evening of October 5, 2018, sent Ms. Honeycutt back to her pod and away from Medical (nursing notes indicate "Okay for pt to return to pod..."). Caused Ms. Honeycutt not to be monitored by Medical nor in proximity to Medical for an approximately 24- hour period (from the evening of October 5 to the evening of October 6). Did this despite still not having diagnosed her condition.

4. Wrongfully delayed Ms. Honeycutt's access to hospital care on the night of October 6, 2018, when he first gave an order to send Ms. Honeycutt to the hospital not via ambulance, but via Jail transport, when, among other things, she was brought to Medical on a stretcher,

was vomiting, and was complaining of abdominal pain. As noted herein, the Regional Jail had long had a staffing problem. Accessing correctional staff available to take someone to the hospital could be time-consuming. But Moreno did not issue an order to call EMS until Ms. Honeycutt debilitated further, falling and exhibiting altered mental status.

5. Knowingly made incorrect records in an attempt to conceal his wrongful actions. Specifically, after Ms. Honeycutt's death, Moreno, MD made a self-serving late entry in her medical records that contains falsified information. In the entry, Moreno, MD indicates for the first time in the record that he examined Ms. Honeycutt on October 5, 2018. His entry directly contradicts contemporaneous nursing notes (as well as the pathogenesis of Ms. Honeycutt's condition as described on autopsy and in hospital records) and wrongfully characterizes Ms. Honeycutt's condition.

6. Overall, duly aware of Ms. Honeycutt's serious condition, Moreno failed to properly examine, treat, care for, and monitor Ms. Honeycutt, or otherwise obtain adequate medical assistance for her.

7. Failed to diagnose Ms. Honeycutt's condition properly and adequately.

8. Moreno overall knew of the vast failures in healthcare delivery at the Regional Jail. This includes, as cited shortly after Ms. Honeycutt's death by DOJ at the conclusion of their two year investigation, ongoing during her death, failure to provide adequate intake, discharge planning, sick call, chronic care, and emergency care such that prisoners are subjected to an unacceptable risk of harm due to delays or lack of treatment. It also includes systemic failures *often* causing the failure to provide an adequate level of care. Moreno therefore knew that Ms. Honeycutt and persons like her with acute conditions were at significant risk. But he inexplicably decided to long block her access to a hospital – a healthcare system that, in addition to being designed to treat emergent conditions, also undoubtedly functioned better than the knowingly troubled Regional Jail healthcare system.

9. CCS overall knew of the vast failures in healthcare delivery at the Regional Jail. This includes, as cited shortly after Ms. Honeycutt's death by DOJ at the conclusion of their two year investigation, ongoing during her death, failure to provide adequate intake, discharge planning, sick call, chronic care, and emergency care such that prisoners are subjected to an unacceptable risk of harm due to delays or lack of treatment. It also includes systemic failures *often* causing the failure to provide an adequate level of care. CCS therefore knew that Ms. Honeycutt and persons like her with acute conditions

were at significant risk. But, CCS did not remedy its healthcare system at the Regional Jail.

10. According to EMS, the automated vitals machine at Ms. Honeycutt's bedside was not functional, and, therefore, vital signs for Ms. Honeycutt during her time in Medical on October 6, 2018 were not provided to EMS. CCS failed to have functioning medical equipment and otherwise systems in place to ensure that vital signs could be taken accurately and timely.

11. Failed to implement a system that provided adequate monitoring and coordination of care for acutely ill/at-risk inmates.

12. Failed to have systems in place to support proper examination, assessment, diagnosis, treatment, monitoring and care of Ms. Honeycutt, including referral of Ms. Honeycutt to a hospital / the calling of 911 in a timely manner.

13. Ignored, or dismissed without basis, Ms. Honeycutt's obvious serious medical condition and risk for additional harm. Disregarded the severity of Ms. Honeycutt's condition despite her transfer to the Regional Jail in an emergent condition.

14. Despite awareness of Ms. Honeycutt's serious condition, failed to timely call 911 or otherwise timely send Ms. Honeycutt to the hospital.

### i. Defendants CCS and Barton, RN

1. On October 6, 2018, according to John Doe Correctional Officer, did nothing for Ms. Honeycutt while she was in Medical for approximately four hours.

2. On October 6, 2018, failed to perform interventions for Ms. Honeycutt prior to the arrival of EMS.

3. On October 6, 2018, was unable to tell EMS how long Ms. Honeycutt had been unresponsive, despite Ms. Honeycutt's being in her care.

4. On October 6, 2018, had failed to note or treat Ms. Honeycutt's airway compromise prior to the arrival of EMS, despite Ms. Honeycutt's being in her care.

5. According to the information reported by John Doe Correctional Officer, recorded medical records that portrayed the events of the evening of October 6, 2018 in an untruthful manner (indicating that

Ms. Honeycutt was not brought to Medical until 10:30 p.m., when the Officer reported she had been there for several hours prior to that time).

6. According to EMS, on October 6, 2018, failed to provide EMS with vitals for Ms. Honeycutt during the time when Ms. Honeycutt was in her care. If this is correct, it appears Barton, RN also made false records of vitals in her late entry in Ms. Honeycutt's medical record.

6. Failed to care adequately for Ms. Honeycutt.

7. Failed to obtain proper medical care for Ms. Honeycutt.

**j. Jail Authority Defendants (the Regional Jail Authority and Hackworth)**

1. The OSIG Report, observed that "HRRJ has a direct responsibility to provide quality medical and mental health care for those in their custody[.]" Indeed, the OSIG Report noted that although NaphCare is no longer the Regional Jail's healthcare contractor, "a change in provider offers limited promise of improvement in care or documentation in the absence of a change in **oversight practices.**" (Emphasis added.) These Defendants did not fulfill their responsibilities with regard to providing medical care to inmates, including failing to engage in adequate oversight practices.

2. Knew that they had a long-standing, severe, pervasive, systemic problem with providing access to and provision of medical care to inmates/detainees for serious medical needs. This included, as cited shortly after Ms. Honeycutt's death by DOJ at the conclusion of their two year investigation, ongoing during her death, failure to provide adequate intake, discharge planning, sick call, chronic care, and emergency care such that prisoners are subjected to an unacceptable risk of harm due to delays or lack of treatment. It also included systemic failures *often* causing the failure to provide an adequate level of care, including proper medication administration. Therefore, these Defendants knew that Ms. Honeycutt and persons like her were at significant risk. But, they did not take appropriate steps to remedy such problems.

3. Knew from DOJ investigators and the previous superintendent, as well as years of history of Department of Corrections reports, that the Regional Jail was dangerously understaffed. Knew that the Regional Jail had fewer staff per inmate than its feeder cities and received the sickest inmates from each city. Knew that pressure was put on the Regional Jail to take the sickest inmates from each city as soon as

possible, and knew that funding was inadequate. Ms. Honeycutt, in particular, was sent out of Norfolk Jail to the Regional Jail when she was not medically stabilized. These Defendants knew prior to her transfer that the member cities' push to send the sickest inmates as fast as possible to the Regional Jail was dangerous because the Regional Jail could not safely treat them due to its lack of proper staffing and funds, and other problems with its healthcare system. However, these Defendants failed to adequately address these problems.

4. Failed to have systems in place to support proper examination, assessment, diagnosis, treatment, monitoring and care of Ms. Honeycutt, including timely referral of Ms. Honeycutt to a hospital / the calling of 911.

5. Knew that their correctional officers were preventing inmates like Ms. Honeycutt with serious medical conditions from having access to and receiving proper medical care despite measures such as security checks and supervisory rounds/inspections and physical head count. Correctional officers were still failing to elevate clear emergent matters to medical or 911 promptly. However, did not remedy the situation.

6. Knew that they were not adequately auditing the work of, nor communicating/coordinating with, medical care contractor CCS to ensure access to and provision of medical care for serious medical needs.

7. Knew that they were not adequately seeking medical care for inmates beyond CCS. Failed to take effective measures to change this. Indeed, as to the Regional Jail Authority, renewed CCS's contract.

8. Failed to obtain necessary medical care for Ms. Honeycutt for a serious medical need.

9. Failed to send Ms. Honeycutt promptly to a hospital or to call 911.

**k. Defendant Regional Jail Authority**

1. Did not timely or appropriately intervene to provide Ms. Honeycutt with access to urgently needed medical care in October 2018.

2. Regional Jail Officers disregarded Ms. Honeycutt's open and obvious acute medical condition.

3. Regional Jail Officers failed to inform a supervisor of Ms. Honeycutt's acute, and open and obvious medical condition.

4. Regional Jail Officers failed to timely inform the Medical Department of Ms. Honeycutt's acute condition

5. Regional Jail Officers failed to promptly send Ms. Honeycutt to a hospital or to call 911.

6. Liable under *respondeat superior* liability for state law claims for actions/inactions of its agents and employees, including, but not limited to, named Defendants herein.

7. Regional Jail Officers allowed Ms. Honeycutt to languish in general population under their care and control for at least approximately 24 hours (and maybe about 27 hours) from the evening of October 5 to the evening of October 6, 2018, her painful acute surgical abdomen unresolved. No correctional officers brought Ms. Honeycutt to Medical until at least 6:45 p.m. on October 6, and, according to CCS records, did not do so until several hours later, notwithstanding her complaints of unresolved abdominal pain and open and obvious signs of distress such as her vomiting. John Doe Correctional Officer, according to EMS, was well-aware that Ms. Honeycutt "had been complaining of abdominal pain for approximately two weeks with no relief from medical tx [treatment]," including that she reported no relief from the enema that she had received. This indicates that Ms. Honeycutt was complaining to correctional officers about her medical state. Additionally, according to Barton, RN, Ms. Honeycutt was on a stretcher and profusely vomiting when she was finally brought to Medical again on October 6. This report, its great contrast from John Doe Correctional Officer's report of Ms. Honeycutt's presentation when brought to Medical, and earlier records describing Ms. Honeycutt's vomiting indicate that she was continuing to vomit throughout this period, but was being disregarded despite this open and obvious sign of illness.

8. To the extent that John Doe Correctional Officer (who reported to EMS, among other things, that Ms. Honeycutt had been in Medical on October 6, 2018 for approximately 4 hours before EMS was called) reported false information to protect his/her own wrongful conduct in impeding Ms. Honeycutt's access to medical care, the Regional Jail Authority is liable under *respondeat superior* liability for this Officer's actions/inactions. According to Olga Barton, RN's late entry, Ms. Honeycutt was not brought to Medical until 10:30 p.m. and was in considerable distress at that time, which contrasts greatly with the John Doe Correctional Officer's report.

**l. Defendant Baron**

1. As a Regional Jail Authority member since February 2017 (and Chief Deputy – second in command – of Authority member Norfolk Sheriff's Office from 2015 to February 2017), Baron knew that the Regional Jail was under investigation by the U.S. Department of Justice's Civil Rights Division over, among other things, whether the Jail violates prisoners' rights to adequate medical and mental health care. Baron knew this investigation had been "prompted ...in the wake of tragic deaths that captured local and national attention." Report p. 5. Baron knew that the DOJ was conducting site visits of the Regional Jail. Baron knew that the DOJ informed the Regional Jail Authority in 2017 during its investigation that the jail was insufficiently staffed to provide for its population. Baron knew that then-superintendent Myers warned that the Regional Jail needed a larger budget to accommodate its population. Baron knew about the high-rate of death at the Regional Jail in recent years and about widely-publicized accounts of inmates unable to get access to medical care at the Regional Jail. But Baron still made the choice to send certain inmates in his custody like Ms. Honeycutt to the Regional Jail.

2. Failed to have systems in place to provide that when inmates such as Ms. Honeycutt were transferred to the Regional Jail, they were medically stabilized prior to transfer.

3. Records indicate that Ms. Honeycutt was in considerable distress when deputies to Defendant Baron transported her to the Regional Jail on the morning of October 5, 2018 – when assessed shortly thereafter at the Regional Jail, she had a racing heart rate and very elevated blood pressure. She also had long been experiencing nausea, abdominal pain, vomiting, irregular vital signs, and bleeding with no diagnosis or relief. Ms. Honeycutt also complained at the Regional Jail of suffering from abdominal pain, nausea and vomiting throughout that morning and throwing up "everything" given to her by Medical at Norfolk. Deputies to Defendant Baron witnessed Ms. Honeycutt's distress, but ignored it, and simply took her to the Regional Jail. They did not take her to a hospital or call 911.

4. When told that Ms. Honeycutt had stated that she wanted to harm herself because she did not feel well and wanted to be alone, deputies to Defendant Baron focused solely upon Ms. Honeycutt's alleged admission that she was not suicidal and ignored Ms. Honeycutt's medical complaints and the likely linkage between her symptoms/acute need for medical help and her statement that she was suicidal. They issued her a violation and moved her to a different isolation area as punishment, but did not take action concerning Ms.

Honeycutt's underlying medical illness, such as referring her to Anderson, NP.

5. Liable under *respondeat superior* liability for state law claims for actions/inactions of his agents and employees, including, but not limited to, named Defendants herein

### m. Defendants Baron, Isureal, Caniff, and Dudley

1. Beginning in or about mid-to-late September and into October 2018 when Ms. Honeycutt was held at Norfolk Jail, disregarded requests by Ms. Honeycutt and inmates on her behalf for access to medical care for her condition, including abdominal pain, vomiting, and vomiting of blood. Did not provide Ms. Honeycutt access to medical care.

2. Disregarded Ms. Honeycutt's open and obvious acute medical condition

3. Failed to inform a supervisor of Ms. Honeycutt's acute, and open and obvious medical condition,

4. Failed to inform the Medical Department of Ms. Honeycutt's acute condition,

5. Failed to obtain medical care for Ms. Honeycutt, and

6. Failed to call 911.

7. Defendant Baron is liable under *respondeat superior* liability for state law claims for actions/inactions of his agents and employees, including, but not limited to, named Defendants herein

### C. Defendants' wrongful conduct and omissions caused Ms. Honeycutt's worsening condition and death

164. As a direct and proximate cause of the negligent, grossly negligent, willful and wanton, and/or deliberately indifferent actions and omissions of the Defendants, Ms. Honeycutt's condition worsened, she suffered great physical pain and mental anguish, and she died. Ms. Honeycutt's worsening condition, great physical pain and mental anguish, and death constitute constitutional injuries.

165.     As a direct and proximate cause of the negligent, grossly negligent, willful and wanton, and/or deliberately indifferent actions and omissions of the Defendants, the surviving beneficiaries of Ms. Honeycutt have suffered, and will continue to suffer, sorrow, mental anguish, and the loss of decedent's society, companionship, comfort, guidance, kindly offices, and advice of their loved one, as well as economic losses, and have incurred hospital, doctors', and related bills, as well as funeral expenses.

(The following counts are asserted cumulatively, or in the alternative, individually.)

## X.     COUNTS

### COUNT I

**State Law Claim – Wrongful Death** *(and, In the Alternative, Survival Claim)*

**NEGLIGENCE**

**(Against Defendants CCS; Moreno, MD; Anderson, NP; Lindsey, LPN; Noftz, LPN; Wright, LPN; Peppenhorst, LPC; Bodden, LPN; Robinson, LPN; Barton, RN; the Regional Jail Authority; and Hackworth)**

166.     Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein. Plaintiff asserts his survival claim *in the alternative* to Plaintiff's wrongful-death claim.

167.     Defendants CCS; Moreno, MD; Anderson, NP; Lindsey, LPN; Noftz, LPN; Wright, LPN; Peppenhorst, LPC; Bodden, LPN; Robinson, LPN; Barton, RN; the Regional Jail Authority; and Hackworth (collectively referred to *in this Count* as "the Foregoing Defendants"), had, among other duties, duties to exercise reasonable care with regard to Ms. Honeycutt; however, the Foregoing Defendants breached these duties. The Foregoing Defendants had, among other duties, duties to obtain or provide prompt medical care for Ms. Honeycutt's acute and open and obvious condition.

168.     Defendants CCS; Moreno, MD; Anderson, NP; Lindsey, LPN; Noftz, LPN; Wright, LPN; Peppenhorst, LPC; Bodden, LPN; Robinson, LPN; and Barton, RN, owed duties to Ms. Honeycutt to treat her in accordance with recognized and acceptable standards of medical care, health care, and/or nursing care and treatment; however, these Defendants breached the standard of care.

169.     As described throughout this Complaint, the Foregoing Defendants breached duties owed to Ms. Honeycutt, and these breaches constituted negligence.

170.     As a direct and proximate cause of the negligence of the Foregoing Defendants, which contributed to and was the proximate cause of the death herein complained of, Ms. Honeycutt suffered great physical pain, injury, and mental anguish.

171.     As a direct and proximate result of the negligence of the Foregoing Defendants, Ms. Honeycutt died.

172.     As a direct and proximate cause of the negligence of the Foregoing Defendants, which contributed to and was the proximate cause of Ms. Honeycutt's injuries and death, the Statutory Beneficiaries have sustained damages, including, but not limited to:

   a)     Sorrow, mental anguish, and solace, which may include society, companionship, comfort, guidance, kindly offices, and advice of the decedent; and

   b)     Loss of services, protection, care, and assistance provided by the decedent.

173.     As a direct and proximate cause of the negligence of the Foregoing Defendants, which contributed to and was the proximate cause of Ms. Honeycutt's injuries and death, the Estate of Ms. Honeycutt sustained damages, including, but not limited to:

   a)     Expenses for the care and treatment of the decedent incidental to the injury resulting in death; and

b)      Reasonable funeral expenses.

174.      The Foregoing Defendants' negligence establishes causes of action for monetary relief consisting of compensatory damages and costs to the Plaintiff.

**COUNT II**

**State Law Claim – Wrongful Death** *(and, In the Alternative, Survival Claim)*

**GROSS NEGLIGENCE**

**(Against All Defendants)**

175.      Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein. Plaintiff asserts his survival claim *in the alternative* to Plaintiff's wrongful-death claim.

176.      Defendants CCS; Moreno, MD; Anderson, NP; Lindsey, LPN; Noftz, LPN; Wright, LPN; Peppenhorst, LPC; Bodden, LPN; Robinson, LPN; Barton, RN; the Regional Jail Authority; Hackworth; Baron; Isureal; Caniff; and Dudley (collectively referred to *in this Count* as "the Foregoing Defendants"), had, among other duties, duties to exercise reasonable care with regard to Ms. Honeycutt; however, the Foregoing Defendants breached these duties.

177.      Defendants CCS; Moreno, MD; Anderson, NP; Lindsey, LPN; Noftz, LPN; Wright, LPN; Peppenhorst, LPC; Bodden, LPN; Robinson, LPN; and Barton, RN, also owed duties to Ms. Honeycutt to treat her in accordance with recognized and acceptable standards of medical care, health care, and/or nursing care and treatment; however, these Defendants breached the standard of care.

178.      The Foregoing Defendants were grossly negligent in that their actions and inactions, described throughout this Complaint, showed such a level of indifference to Ms. Honeycutt so as to constitute an utter disregard of prudence, amounting to a complete neglect for Ms.

Honeycutt's safety. Additionally, the several acts of negligence of each of the Foregoing Defendants, when combined, had the cumulative effect of showing a reckless or total disregard for Ms. Honeycutt.

179. As a direct and proximate cause of the gross negligence of the Foregoing Defendants, which contributed to and was the proximate cause of the death herein complained of, Ms. Honeycutt suffered great physical pain, injury, and mental anguish.

180. As a direct and proximate result of the gross negligence of the Foregoing Defendants, Ms. Honeycutt died.

181. As a direct and proximate cause of the gross negligence of the Foregoing Defendants, which contributed to and was the proximate cause of Ms. Honeycutt's injuries and death, the Statutory Beneficiaries have sustained damages, including, but not limited to:

a) Sorrow, mental anguish, and solace, which may include society, companionship, comfort, guidance, kindly offices, and advice of the decedent; and

b) Loss of services, protection, care, and assistance provided by the decedent.

182. As a direct and proximate cause of the gross negligence of the Foregoing Defendants, which contributed to and was the proximate cause of Ms. Honeycutt's injuries and death, the Estate of Ms. Honeycutt sustained damages, including, but not limited to:

a) Expenses for the care and treatment of the decedent incidental to the injury resulting in death; and

b) Reasonable funeral expenses.

183. The Foregoing Defendants' gross negligence establishes causes of action for monetary relief consisting of compensatory damages and costs to the Plaintiff.

## COUNT III

**State Law Claim – Wrongful Death** *(and, In the Alternative, Survival Claim)*

### WILLFUL AND WANTON NEGLIGENCE

### (Against All Defendants)

184.     Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.  Plaintiff asserts his survival claim *in the alternative* to Plaintiff's wrongful-death claim.

185.     Defendants CCS; Moreno, MD; Anderson, NP; Lindsey, LPN; Noftz, LPN; Wright, LPN; Peppenhorst, LPC; Bodden, LPN; Robinson, LPN; Barton, RN; the Regional Jail Authority; Hackworth; Baron; Isureal; Caniff; and Dudley (collectively referred to *in this Count* as "the Foregoing Defendants"), had, among other duties, duties to exercise reasonable care with regard to Ms. Honeycutt; however, the Foregoing Defendants breached these duties.

186.     Defendants CCS; Moreno, MD; Anderson, NP; Lindsey, LPN; Noftz, LPN; Wright, LPN; Peppenhorst, LPC; Bodden, LPN; Robinson, LPN; and Barton, RN also owed duties to Ms. Honeycutt to treat her in accordance with recognized and acceptable standards of medical care, health care, and/or nursing care and treatment; however, these Defendants breached the standard of care.

187.     The Foregoing Defendants were willfully and wantonly negligent in that they acted, or failed to act, in the manner described throughout this Complaint, consciously in disregard of Ms. Honeycutt's rights.  In addition, the Foregoing Defendants acted, or failed to act, in the manner described throughout this Complaint, with a reckless indifference to the consequences to Ms. Honeycutt when they were aware of their conduct and also aware, from their knowledge of existing circumstances and conditions, that their conduct would result in injury to Ms. Honeycutt.

188.     As a direct and proximate cause of the willful and wanton negligence of the Foregoing Defendants, which contributed to and was the proximate cause of the death herein complained of, Ms. Honeycutt suffered great physical pain, injury, and mental anguish.

189.     As a direct and proximate result of the willful and wanton negligence of the Foregoing Defendants, Ms. Honeycutt died.

190.     As a direct and proximate cause of the willful and wanton negligence of the Foregoing Defendants, which contributed to and was the proximate cause of Ms. Honeycutt's injuries and death, the Statutory Beneficiaries have sustained damages, including, but not limited to:

    a)     Sorrow, mental anguish, and solace, which may include society, companionship, comfort, guidance, kindly offices, and advice of the decedent; and

    b)     Loss of services, protection, care, and assistance provided by the decedent.

191.     As a direct and proximate cause of the willful and wanton negligence of the Foregoing Defendants, which contributed to and was the proximate cause of Ms. Honeycutt's injuries and death, the Estate of Ms. Honeycutt sustained damages, including, but not limited to:

    a)     Expenses for the care and treatment of the decedent incidental to the injury resulting in death; and

    b)     Reasonable funeral expenses.

192.     The Foregoing Defendants' willful and wanton negligence establishes causes of action for monetary relief consisting of compensatory damages and costs to the Plaintiff.

193.     Also, the foregoing willful and wanton negligence claim supports, and Plaintiff seeks, the imposition of significant punitive damages.

## COUNT IV

### DEPRIVATION OF CIVIL RIGHTS –
### EIGHTH AMENDMENT / 42 U.S.C. § 1983

### (DENIAL, DELAY, AND WITHHOLDING OF MEDICAL CARE)

**(Against Defendants Moreno, MD; Anderson, NP; Lindsey, LPN; Noftz, LPN; Wright, LPN; Peppenhorst, LPC; Bodden, LPN; Robinson, LPN; Barton, RN; Hackworth; Isureal; Caniff; and Dudley)**

194.     Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

195.     At all times relevant to the allegations in this Complaint, Defendants Moreno, MD; Anderson, NP; Lindsey, LPN; Noftz, LPN; Wright, LPN; Peppenhorst, LPC; Bodden, LPN; Robinson, LPN; Barton, RN; Hackworth; Isureal; Caniff; and Dudley (collectively referred to *in this Count* as "the Foregoing Defendants"), acted or failed to act under color of state law.

196.     The  Eighth Amendment to the U.S. Constitution protects inmates from cruel and unusual punishment and affords to inmates the right to receive treatment for serious medical needs.

197.     As described in the Complaint, the Foregoing Defendants failed to provide necessary medical care, and/or access to necessary medical care, in response to obvious, serious medical needs.

198.     The Foregoing Defendants engaged in this injurious conduct with deliberate indifference to Ms. Honeycutt's health and safety, thereby placing Ms. Honeycutt in substantial risk of serious harm.

199.     At numerous times throughout the course of her detention, the Foregoing Defendants learned that there was a substantial risk that Ms. Honeycutt had serious medical

needs that were not being met. Despite such knowledge, the Foregoing Defendants failed to reasonably respond.

200. The acts or omissions of the Foregoing Defendants were conducted within the scope of their official duties and employment.

201. As a direct and proximate result of the Foregoing Defendants' conduct, Ms. Honeycutt was injured in various respects, including, without limitation, suffering physical injuries and severe mental anguish due to the egregious nature of the Foregoing Defendants' actions, all attributable to the deprivation of her constitutional rights guaranteed by the Eighth and Fourteenth Amendments to the U.S. Constitution and protected under 42 U.S.C. §1983.

202. As a direct and proximate result of the Foregoing Defendants' conduct, Ms. Honeycutt died. Ms. Honeycutt's death constitutes a deprivation of her constitutional rights guaranteed by the Eighth and Fourteenth Amendments to the U.S. Constitution and protected under 42 U.S.C. §1983.

203. The Foregoing Defendants' aforesaid actions and omissions constitute a willful, wanton, reckless, and conscious disregard of Ms. Honeycutt's rights, by reason of which Plaintiff is entitled to recover punitive damages.

204. The Foregoing Defendants' violations of the Eighth and Fourteenth Amendments to the U.S. Constitution establish a cause of action, pursuant to 42 U.S.C. § 1983, for monetary relief consisting of compensatory damages and punitive damages, attorney's fees and costs to the Estate.

<u>**COUNT V**</u>

**DEPRIVATION OF CIVIL RIGHTS – 42 U.S.C. § 1983**
**(DELIBERATE INDIFFERENCE - SUPERVISORY LIABILITY)**

**(Against Defendants Moreno, MD, and Hackworth)**

205.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

206.    Through their actions and omissions set forth above, and while acting under color of state law, and in their individual capacities, Defendants Moreno, MD, and Hackworth (collectively referred to *in this Count* as "the Foregoing Defendants"), acted in a manner that was deliberately indifferent to Ms. Honeycutt's Eighth and Fourteenth Amendment rights.

207.    The Foregoing Defendants had actual knowledge that their subordinates, including, but not limited to, individual Defendants in this matter, were engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like Ms. Honeycutt.

a.    As noted above, among other things, through his duties according to the Regional Jail's policies and procedures; the removal by ICE of its inmates from the Regional Jail; the multiple other deaths from preventable conditions that had occurred at the Regional Jail in recent years; the multiple state investigations and federal investigation following the deaths of Jamycheal Mitchell and Henry Stewart; the plethora of other complaints describing severe medical conditions that were being ignored at the Regional Jail concerning other inmates before Ms. Honeycutt's death; warnings from former Superintendent Myers and the Department of Justice concerning dangerous insufficient staffing levels; receipt of medical contractor reports per the Regional Jail policy and contract; and role in reviewing and approving medical contractor policies and procedures regarding inmate requests for medical treatment, Defendant Hackworth

certainly knew that his subordinates were preventing inmates like Ms. Honeycutt with serious medical conditions from having access to and receiving proper medical care.

b.      As noted above, Defendant Moreno, MD, through, among other things as described herein, his role in daily meetings, Continuous Quality Improvement participation, reports to the Regional Jail administration, knowledge of the Department of Justice investigation and the failings in medical services and staff that it was continuing to expose, and the multiple preventable deaths occurring during CCS's tenure at the Regional Jail, also knew that, just like he himself, his subordinates were preventing inmates like Ms. Honeycutt with serious medical conditions from having access to and receiving proper medical care.

208.    The Foregoing Defendants' response to that knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices. The Foregoing Defendants failed to act on their knowledge, failed to carry out *their own obligations* properly to supervise their subordinates and/or intervene on Ms. Honeycutt's behalf, and failed to provide Ms. Honeycutt with access to appropriate, timely medical care; instead, they let her languish and die.

209.    There was an affirmative causal link between the Foregoing Defendants' inaction and the particular constitutional injury suffered by Ms. Honeycutt.  Specifically, as a result of the Foregoing Defendants' unconstitutional, deliberate indifference to the needs, circumstances, and requirements regarding Virginia inmates and detainees, including to Ms. Honeycutt, Ms. Honeycutt unnecessarily languished without appropriate medical intervention, and ultimately died a preventable death.  Ms. Honeycutt thereby suffered a denial of her constitutional rights and severe physical pain and suffering.  The Foregoing Defendants' unconstitutional, deliberate indifference to Ms. Honeycutt's circumstances caused her untimely death.

210. The Foregoing Defendants' aforesaid actions and omissions constitute a willful, wanton, reckless, and conscious disregard of Ms. Honeycutt's constitutional rights, by reason of which Plaintiff is entitled to recover punitive damages.

211. The Foregoing Defendants' violations of the Eighth and Fourteenth Amendments to the U.S. Constitution establish a cause of action, pursuant to 42 U.S.C. § 1983, for monetary relief consisting of compensatory damages and punitive damages, attorney's fees and costs to the Estate.

## COUNT VI

### § 1983 CLAIM
### (OFFICIAL CUSTOM, POLICY, PATTERN AND/OR PRACTICE CLAIM)

### (Against Defendants Regional Jail Authority; CCS; and, in their official capacities, Hackworth and Moreno, MD; and Anderson, NP)

212. Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

213. This Count is brought against: 1) Defendant Regional Jail Authority, and its policy makers – either the Authority itself or Defendant Hackworth (in his official capacity), and 2) Defendant CCS and its policy makers in their official capacities – Moreno, MD, and Anderson, NP, pursuant to the Eighth and Fourteenth Amendments to the United States Constitution in violation of 42 U.S.C. § 1983 and § 1988.

214. During the relevant time period, through their actions and inactions as set forth above, Defendants Regional Jail Authority and CCS, acting under color of state law, pursuant to an official custom, policy, pattern and/or practice, operated the Regional Jail and/or the provision of healthcare services at the Norfolk Jail and the Regional Jail in a manner that posed a substantial risk to the health and safety of the inmates/detainees, including Ms. Honeycutt, in that

the Regional Jail Authority and CCS failed to provide, and/or provide access to, reasonable and adequate medical care to inmates and detainees.

215.    As set forth in detail herein, the policy or custom was manifest in certain affirmative decisions and omissions by the policy makers for the Regional Jail Authority and CCS alleged herein, as well as by a persistent and widespread practice of deliberate indifference to the health care needs of the inmates/detainees sufficient to constitute an official custom. The custom, policy, pattern and/or practice is established by, among other acts, Defendants Regional Jail Authority and CCS's failure to act – whether through appropriate training, discipline, supervision or other intervention – in the face of a known pattern of constitutional deprivations that had occurred within the Regional Jail, and, as to CCS, had also occurred elsewhere including the Norfolk Jail.  Such failure was patently likely to cause (and in the case of Ms. Honeycutt, did cause) constitutional deprivations to the inmates/detainees who were confined at the Norfolk Jail and the Regional Jail, and to whom the Regional Jail Authority and CCS owed affirmative duties of care.

216.  Defendants Regional Jail Authority or Hackworth (policy makers for the Regional Jail Authority), and Defendants Anderson, NP and Moreno, MD (policymakers for CCS), and any other policy makers for the Regional Jail Authority and CCS (collectively referred to in this Count as "Policy Makers"), were deliberately indifferent to the rights of inmates/detainees to receive, and/or obtain access to, adequate medical care at the Regional Jail, and, as to CCS, also elsewhere including the Norfolk Jail.  Such deliberate indifference is evidenced by, among other things, as discussed herein:

- the large number of deaths at the Regional Jail from 2015 to just before Ms. Honeycutt's death in October 2018, including after CCS's involvement at the

Regional Jail began in December 2015.  Alton Cowins, Jamycheal Mitchell, Mark Goodrum, William Thrower, Christopher Boyce, Ronnie Lee Profitt, Henry Clay Stewart, Frederick Mitchell and Davageah K. Jones all lost their lives while incarcerated at the Regional Jail, and Valerie Anderson died one day after transfer from the Regional Jail.  Multiple other inmates also died in 2018, the year of Ms. Honeycutt's death;

- public records reflecting that inmates died nearly ***nine times more*** often in custody at the Regional Jail than at other local or regional jails in Virginia during the period from June 2013 to early September 2016 (with 12 total deaths during that expanded period), and records released by the Regional Jail indicating 18 deaths in the period from 2012 to September 2016;

- the tragic circumstances surrounding the deaths of mentally ill inmates Jamycheal Mitchell and Alton Cowins;

- the tragic circumstances surrounding the death of the Regional Jail inmate Mr. Stewart in August 2016, who submitted multiple grievances asking for help prior to his death;

- the tragic neglect surrounding the death of Mr. Thrower in March 2016, including how his multiple emergency grievances detailing serious medical needs (experiencing sharp pains, was unable to sleep *for multiple days*, unable to defecate, "Please help me," "I am in real bad pain!") were simply rebuffed and deemed not to be emergencies, including the day before his death, and how his chest pain on his date of death was met by an officer response to fill out another grievance;

- the wrongful death of Mr. Proffitt in April 2016, who reportedly died after being denied required medication and medical equipment for his heart condition, and, further, simply having his compromised health condition neglected;

- the tragic neglect of Davageah K. Jones, an inmate well-known at the Regional Jail and Norfolk Jail who was known to be acutely ill but was permitted to decompensate from diabetic ketoacidosis;

- the multiple grievances filed by other inmates, including LaQuan Wright, Richard Henry Byrd, David Perry, Maurice Brown, Carlton Dillard, William Peacock and Kennyon Harris, who, fortunately, did not die at the Regional Jail, but suffered considerable wrongful denials of proper medical care and access to medical care-including situations as atrocious as Carlton Dillard, an inmate who filed 9 different emergency grievances in one month that were all rejected,  being consigned to throw up and urinate blood on a daily basis and be routinely denied medication and other treatment, and Kennyon Harris inexplicably having diabetes checks routinely skipped, being denied access to a doctor despite continued pain and inability to have bowel movements for weeks, being rejected by a nurse because he had "already been seen" and being rebuffed by a Regional Jail sergeant he turned to for help after his grievance was rejected;

- the common themes underlying the stories of the foregoing persons who suffered significant injury or death at the Regional Jail, including that obvious signs of medical distress were ignored;

- the multiple investigations of the Regional Jail by Virginia state agencies, including the finding that "a change in provider offers limited promise of improvement in care

or documentation in the absence of a change in **oversight practices.**" (Emphasis added);

- the federal investigation by the U.S. Department of Justice, which was ongoing and exposing, by extensive interviews and records review at the Regional Jail, multiple constitutional flaws;

- recent warnings from DOJ and a previous superintendent that staffing at the Regional Jail was inadequate; and

- The systemic nature of CCS's wrongful conduct, including medical failures spanning two sister Virginia facilities that refer and/or accept inmates from each other.

Despite having actual knowledge of the foregoing, the Policy Makers did not take appropriate steps to properly train correctional officers and CCS employees. As a direct and proximate result of Policy Makers' failures, Ms. Honeycutt suffered constitutional injuries, including death.

217. Defendants Regional Jail Authority and CCS, themselves, had knowledge of the constitutionally inadequate medical services and access to medical services available to inmates/detainees at the Regional Jail, and, through CCS at the Norfolk City Jail, and engaged in an official custom, policy, pattern and/or practice of deliberate indifference towards the inmates/detainees at the Regional Jail, and, as to CCS, also at the Norfolk City Jail, in the period prior to, and at the time of, Ms. Honeycutt's death. Specifically, the Policy Makers perpetuated a medical system that for years failed to provide adequate intake, discharge planning, sick call, chronic care, and emergency care such that prisoners were subjected to an unacceptable risk of harm due to delays or lack of treatment and suffered from systemic problems that *often* caused the failure to provide an adequate level of care. With regard to the Regional Jail Authority's policy makers, they also perpetuated a correctional system that did not have adequate

correctional staff (and knowingly had not for years) and was not properly funded, despite being required to take the sickest inmates from its member cities as fast as possible. The Policy Makers propagated a culture of neglect and indifference to inmate serious medical needs that allowed unnecessary injuries and deaths to occur; among other things, correctional officers washed their hands of their duties to adequately monitor inmates or provide them access to medical care for serious medical needs, and medical providers utterly failed to communicate and coordinate care properly among themselves and provide inmates/detainees with critically needed care.

218. This official custom, policy, pattern and/or practice reflected a deliberate indifference to, and has resulted in a deprivation of, Ms. Honeycutt's constitutional rights under the Fourteenth Amendment and/or other statutory rights, and, such custom, policy, pattern and/or practice has caused, or has contributed to cause, Ms. Honeycutt's death. As stated herein, Defendants Regional Jail Authority and CCS's policies and customs were directly related to, and the moving force behind, the violation of Ms. Honeycutt's constitutional rights by, among other acts, those of Policy Makers and their employees and agents. As a result, Ms. Honeycutt suffered a denial of her constitutional rights, physical pain, and untimely death. Defendants' unconstitutional, deliberate indifference to Ms. Honeycutt caused her untimely death.

219. WHEREFORE, Defendants' violations of the Eighth and Fourteenth Amendments to the U.S. Constitution establish causes of action, pursuant to 42 U.S.C. § 1983, for monetary relief consisting of compensatory damages in an amount to be established at trial, and attorney's fees and costs to the Estate.

## XI.   **JURY TRIAL DEMANDED**

220. Plaintiff demands that all issues of fact of this case be tried to a properly

impaneled jury to the extent permitted under the law.

## XII.   **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in his favor and against each of the Defendants, specifically, Defendants Correct Care Solutions, LLC, now conducting business as Wellpath LLC; Dale Moreno, MD; Susan D. Anderson, NP; Azuradee Lindsey, LPN; Nida Noftz, LPN; Timothy Wright, LPN; Melissa Peppenhorst, LPC; Jeiskaly Bodden, LPN; James Robinson, LPN; Olga V. Barton, RN; Hampton Roads Regional Jail Authority; David A. Hackworth; Joseph P. Baron; Isureal; Caniff; and Dudley, jointly and severally, in the amount of $15 million ($15,000,000.00), or in such greater amount to be determined at trial, costs, pre-judgment and post-judgment interest, attorneys' fees (in connection with the federal civil rights claims), punitive damages in the amount of $1.5 million ($1,500,000.00) for the federal claims asserted herein, and $350,000.00 in connection with the state willful and wanton negligence claim asserted herein, and grant such other and further relief that the Court may deem appropriate.

TIMOTHY SCOTT CARAMILLO, ADMINISTRATOR
OF THE ESTATE OF REGINA MARIE HONEYCUTT,
Deceased


By: _____ /s/ Mark J. Krudys
                        Counsel

Mark J. Krudys (VSB# 30718)
THE KRUDYS LAW FIRM, PLC
SunTrust Center
919 East Main Street, Suite 2020
Richmond, Virginia 23219
804.774.7950 Phone
804.381.4458 Fax
mkrudys@krudys.com

*Counsel for Plaintiff Timothy Scott Caramillo, Administrator of the Estate of Regina Marie Honeycutt, Deceased*