# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Norfolk Division

TIMOTHY SCOTT CARAMILLO,
Administrator of the Estate of
Regina Marie Honeycutt, Deceased,

        Plaintiff,

v.                                ACTION NO.  2:19cv362

CORRECT CARE SOLUTIONS, LLC, et al.,

        Defendants.


## UNITED STATES MAGISTRATE JUDGE'S
## REPORT AND RECOMMENDATION

This matter comes before the Court on the motions to dismiss the complaint for failure to

state a claim filed by defendants Hampton Roads Regional Jail Authority and David A. Hackworth,

ECF No. 25, and filed by defendants Sheriff Joseph P. Baron, Deputy Isureal, Deputy Caniff, and

Deputy Dudley, ECF No. 29.  The motions were referred to the undersigned United States

Magistrate Judge on October 21, 2019, pursuant to 28 U.S.C. § 636(b)(1)(B) and Federal Rule of

Civil Procedure 72(b).  ECF No. 39.  After examining the briefs and the record, the Court

determines that oral argument is unnecessary because the facts and legal contentions are

adequately presented and oral argument would not aid in the decisional process. Fed. R. Civ. P.

78(b); E.D. Va. Loc. R. 7(J).  For the reasons discussed below, the undersigned **RECOMMENDS**

that the motions to dismiss the complaint for failure to state a claim be **GRANTED in part and**

**DENIED in part**.

## I.   **FACTUAL AND PROCEDURAL HISTORY**[1]

Plaintiff is the father of the decedent, Regina Marie Honeycutt ("Honeycutt"), and the administrator of her estate. Compl. ¶ 17.  Honeycutt was arrested in May 2018 for failing to report for probation,[2] and was detained at the Norfolk City Jail.  *Id.* at ¶ 26.  In September 2018, Honeycutt began vomiting and complaining of abdominal pain.  *Id.* at ¶ 31.  Honeycutt was transferred to Hampton Roads Regional Jail ("HRRJ"), arriving at 10:09 a.m. on October 5, 2018. *Id.* at ¶¶ 62–63, 65.  On the evening of October 6, 2018, Honeycutt was transported by ambulance to Maryview Medical Center's emergency department.  *Id.* at ¶¶ 75, 81.  Honeycutt was admitted to the Intensive Care Unit ("ICU"), diagnosed with septic shock, unresponsive state, perforated colon, acute renal failure, and hypoglycemia with a "very poor" prognosis.  *Id.* at ¶ 84.  Honeycutt was determined to be too unstable for surgery, and was pronounced dead on October 7, 2018.  *Id.* at ¶¶ 86–87.  The medical examiner determined Honeycutt died from "[a]cute peritonitis due to bowel perforation due to complications of colonic adenocarcinoma."  *Id.* at ¶ 8.  A tumor and polyps obstructed Honeycutt's colon, her bowel ruptured, and feculent fluid leaked into her abdominal cavity causing infection and inflammation (acute peritonitis).  *Id.* at ¶¶ 8 n.2, 90.

For the majority of her incarceration at the Norfolk City Jail, and until approximately four days before her transfer to HRRJ, Honeycutt was housed in an open cell area in close proximity to other inmates, who could talk to each other and move within the cell block.  *Id.* at ¶¶ 27–29.  In

---

[1] The factual history detailed below is based on the complaint.  *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011) ("When ruling on a Rule 12(b)(6) motion to dismiss, 'a judge must accept as true all of the factual allegations contained in the complaint.'") (quoting *Erickson v. Pardus*, 551 U.S. 89, 94 (2007)); *see also Bd. of Trs., Sheet Metal Workers' Nat'l Pension Fund v. Four-C-Aire, Inc.*, 929 F.3d 135, 145 (4th Cir. 2019).

[2] On September 7, 2018, Honeycutt was found guilty of failing to report to probation, and sentenced to three years in jail.  Compl. ¶ 30.

mid-to-late September 2018, inmates witnessed Honeycutt throw up a number of times, saw blood in her vomit, and observed that she appeared to lose weight and had an ashen and grey color to her skin. *Id.* at ¶ 31. Inmates were aware that Honeycutt sought medical help, and they sought medical help on her behalf, from deputies Isureal, Caniff, and Dudley,[3] but the requests were "disregarded." *Id.* at ¶¶ 9, 25, 33. Honeycutt also sought medical care from Correct Care Solutions ("CCS"), the medical services provider for the Norfolk City Jail and HRRJ. *Id.* at ¶¶ 34–48, 51–55, 58–61. CCS nurses prescribed Colace, magnesium citrate, and Bisacodyl for constipation, directed Honeycutt to increase fluid intake and activity level, and assessed her condition as "Routine" and "Not Emergent." *Id.* at ¶¶ 35, 37, 47, 60. On September 30, 2018, Honeycutt was moved to an isolation cell and placed on suicide watch by "Nursing" after indicating she wanted to commit suicide. *Id.* at ¶ 49. During her initial assessment by a mental health practitioner on October 1, 2018, Honeycutt admitted she was not suicidal, but had been "throwing up," "didn't feel good," and "wanted to be by [her]self." *Id.* at ¶ 52. Honeycutt was discharged from suicide watch, issued a disciplinary reprimand for lying about suicidal ideations, and taken to another isolation cell area on October 2 or 3, 2018, as punishment. *Id.* at ¶¶ 55–56.

On October 4, 2018, a medication assistant/licensed nurse assistant completed a form for Honeycutt's transfer from Norfolk City Jail to HRRJ. *Id.* at ¶ 59. Records do not reflect any examination prior to transfer, and Honeycutt's gastrointestinal problems that caused vomiting, nausea, pain, irregular vital signs, bleeding, and other symptoms were not noted on the form under "Patient Problems." *Id.*

---

[3] Joseph P. Baron served as interim sheriff of the City of Norfolk beginning in February 2017, and won the election for sheriff in November 2017. *Id.* at ¶ 24. Deputies Isureal, Caniff, and Dudley were employees of Sheriff Baron in September and October 2018. *Id.* at ¶ 25.

On October 5, 2018, Honeycutt was transferred to HRRJ. *Id.* at ¶ 62. During her "Receiving Screening" by a registered nurse at HRRJ, her heart rate was 112 and her blood pressure was 169/96. *Id.* at ¶ 63. Honeycutt was placed in general population at HRRJ[4] with a referral to mental health for "routine problems." *Id.* at ¶¶ 63–64. The same day, a CCS nurse noted that Honeycutt had no bowel sounds, her abdomen was rigid to the touch, she had been having nausea and vomiting since intake, and she had a positive sign for abdominal rebound tenderness. *Id.* at ¶ 65. Later that day, a CCS doctor ordered a urinalysis, blood work, and an abdominal x-ray. *Id.* at ¶¶ 65–66. After reviewing the x-ray, the CCS doctor ordered a fleets enema. *Id.* at ¶ 70.

According to a patient care report completed by emergency medical services ("EMS"), an HRRJ correctional officer reported having brought Honeycutt to medical at about 6:45 p.m. on October 6, 2018, due to her complaints of "abdominal pain and continued constipation." *Id.* at ¶ 73. The officer indicated that Honeycutt had been in the medical wing for four hours before EMS was called. *Id.* According to a CCS nurse, Honeycutt was brought to the medical clinic on a stretcher at 10:30 p.m. on October 6, 2018. *Id.* at ¶ 74. Honeycutt was vomiting and complaining of abdominal pain, which she rated at a 10 on a pain scale of 10. *Id.*

EMS was called at 11:10 p.m. on October 6, 2018. *Id.* at ¶ 75. EMS described Honeycutt as "unresponsive with agonal respirations, skin jaundice and mottled, eyes dilated and fixed bilaterally, stomach distended and rigid, [with a ] large bruise to her upper inner left arm." *Id.* at ¶ 76. A correctional officer and nurse informed EMS that Honeycutt "had been complaining of

---

[4] HRRJ is managed by Hampton Roads Regional Jail Authority, which was created by the cities of Chesapeake, Hampton, Portsmouth, Newport News, and Norfolk, Virginia. *Id.* at ¶ 22. David A. Hackworth has been the superintendent of the HRRJ since June 2018, and served as the interim superintendent from March 2018 to June 2018. *Id.* at ¶ 23.

abdominal pain for approximately two weeks with no relief from medical [treatment]." *Id.* EMS further noted:

- "[t]he prison's medical ward nurse was unable to tell EMS how long [Honeycutt] had been unresponsive and failed to note or treat the airway compromise;"

- "[t]he prison medical staff had also failed to provide EMS with vitals during the medical ward's time of care due to being unable to obtain them via the automated vitals machine at [Honeycutt's] bedside;" and

- "[t]he guard reported that [Honeycutt] had received a fleet enema approximately two days prior but [Honeycutt] reported she had still not had a bowel movement . . . [and she] was talking and alert when [she] was brought to the jail's medical ward this evening."

*Id.* at ¶¶ 77, 79–80.

Honeycutt was transported by ambulance to Maryview Medical Center's emergency department, where she was admitted to ICU. *Id.* at ¶¶ 81, 84. Upon arrival, Honeycutt was mottled, pale, cold to the touch, hypotensive, with fixed, dilated pupils, and noted positive for "chills, abdominal distention, abdominal pain, constipation, [] vomiting, [and] vaginal bleeding." *Id.* at ¶ 82. A CT scan performed at 1:00 a.m. on October 7, 2018, revealed an "apple core" mass described as "a tumor unless proved otherwise, in the mid-level descending colon." *Id.* at ¶ 85. Honeycutt required "surgical intervention for bowel perforation with free fluid in peritoneum and pneumoperitoneum." *Id.* Honeycutt was deemed too unstable for surgery, the perforations caused "multi-organ failure," and Honeycutt was pronounced dead at 10:47 a.m. on October 7, 2018. *Id.* at ¶¶ 85–87.

An autopsy, conducted on October 8, 2018, revealed a walnut size, ulcerated mass and several polypoid lesions on her colon. *Id.* at ¶ 90. The mass allowed only two centimeters for colon contents to pass, resulting in the perforation and emptying of the colon into the abdominal cavity, with over one liter of feculent fluid recovered from her abdominal cavity. *Id.* There was

5

no evidence of metastases, indicating that if Honeycutt had undergone surgery to remove the mass and polyps, she would have had a total recovery as she had the most treatable form of colon cancer. *Id.* at ¶¶ 90–91.

On July 14, 2019, Timothy Scott Caramillo, administrator of Honeycutt's estate, filed a complaint against CCS, medical care providers working for CCS at the Norfolk City Jail and HRRJ, Hampton Roads Regional Jail Authority ("HRRJA"), Superintendent David A. Hackworth ("Hackworth"), Sheriff for the City of Norfolk Joseph P. Baron ("Baron"), and Baron's deputies Isureal, Caniff, and Dudley. ECF No. 1.

Pertinent to the pending motions, plaintiff alleges all defendants were negligent under state law (counts I–III); defendants Hackworth, Isureal, Caniff, and Dudley denied, delayed, and withheld medical care from Honeycutt in violation of her constitutional rights (count IV); defendant Hackworth was deliberately indifferent to inmates' constitutional rights, and was aware that his subordinates were engaged in conduct that posed a risk of constitutional injury to inmates like Honeycutt (count V); and, defendant Hackworth acted under color of state law, pursuant to an official custom, policy, pattern, and/or practice to deprive Honeycutt of her constitutional right to adequate medical care (count VI). *Id.* at ¶¶ 166–219.

HRRJA and Hackworth filed the pending motion to dismiss the complaint on September 27, 2019, with a memorandum in support ("HRRJA's Mem."), and defendants Baron, Isureal, Caniff, and Dudley filed the pending motion to dismiss on September 30, 2019, with a memorandum in support ("Norfolk Jail Defs.' Mem."). ECF Nos. 25–26, 29–30. On October 11, 2019, plaintiff filed oppositions to both motions, and defendants replied to the oppositions on October 16, 2019. ECF Nos. 32, 34, 36, 37.

## II.     ANALYSIS

### A.     Rule 12(b)(6) Standard of Review

Rule 12(b)(6) provides for the dismissal of a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "The purpose of a Rule 12(b)(6) motion is to test the sufficiency of a complaint"; it does "not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Edwards v. City of Goldsboro*, 178 F.3d 231, 243–44 (4th Cir. 1999) (quotation and citation omitted). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. While plausibility "is not akin to a 'probability requirement,' . . . it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id*.

When reviewing a motion to dismiss, the Court must "assume all [well-pled facts] to be true" and "draw all reasonable inferences in favor of the plaintiff," but it does not "need [to] accept the legal conclusions drawn from the facts, and [] need not accept as true unwarranted inferences, unreasonable conclusions or arguments." *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 253 (4th Cir. 2009) (citations and internal quotation marks omitted). Accordingly, the Court should only grant a Rule 12(b)(6) motion if, "after accepting all well-pleaded allegations in the plaintiff's complaint as true and drawing all reasonable factual inferences from those facts in the plaintiff's favor, it appears certain that the plaintiff cannot prove *any* set of facts in support of [her] claim entitling [her] to relief." *Edwards*, 178 F.3d at 244 (emphasis added).

7

A motion to dismiss under Rule 12(b)(6) must be considered in light of Federal Rule of Civil Procedure 8(a)(2).  Rule 8(a)(2) requires a complaint to contain only "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).  This statement must "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 555 (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).

**B.**    **HRRJA—No Municipal Corporation Immunity**

Immunity bars state law tort claims against the Commonwealth of Virginia unless it consents to suit or a statute creates such consent. *Niese v. City of Alexandria*, 564 S.E.2d 127, 132 (Va. 2002); *Virginia Electric & Power Co. v. Hampton Redevelopment & Housing Auth.*, 225 S.E.2d 364 (Va. 1976).  This immunity only extends to HRRJA if it is an arm or agency of the state, or if it is a municipal corporation acting in a governmental capacity. *See Heckenlaible v. Va. Reg'l Peninsula Jail Auth.*, No. 4:06cv25, 2006 WL 3196750, at *2 (E.D. Va. Nov. 1, 2006).  The Fourth Circuit has held that regional jail authorities are not arms of the state for purposes of immunity. *See Kitchen v. Upshaw*, 286 F.3d 179, 184 (4th Cir. 2002).

To determine whether HRRJA should be considered a municipal corporation entitled to immunity, the Court considers two factors:  (1) whether HRRJA possesses the six essential "attributes of [a] municipality"; and (2) "in light of this initial consideration, the particular purpose for determining whether a municipal corporation is present." *Heckenlaible*, 2006 WL 3196750, at *2–3 (citing *Hampton Redevelopment*, 225 S.E.2d at 367); *see also Hampton Roads Sanitation Dist. Com'n v. Smith*, 68 S.E.2d 497, 500 (Va. 1952) (establishing the two-factor test used in *Heckenlaible* and *Hampton Redevelopment*).

8

The six attributes of a municipal corporation are as follows:

> (1) Creation as a body corporate and politic and as a political subdivision of the Commonwealth; (2) Creation to serve a public purpose; (3) Power to have a common seal, to sue and be sued, to enter into contracts, to acquire, hold and dispose of its revenues, personal and real property; (4) Possession of the power of eminent domain; (5) Power to borrow money and issue bonds which are tax exempt, with interest on such bonds enjoying the same status under tax laws as the interest on bonds of other political subdivisions of the state; and (6) Management of the corporation vested in a board of directors or a commission.

*City of Richmond v. Richmond Metro. Auth.*, 172 S.E.2d 831, 832 (Va. 1970). Courts are split as to whether an entity must have all six attributes to be considered a municipal corporation.[5] This Court has twice held that a regional jail authority is not a municipal corporation because it is not a political subdivision and because it lacks the power of eminent domain. *See Heywood v. Va. Peninsula Reg'l Jail Auth.*, No. 2:15cv195, 2015 WL 5026188, at *6–8 (Aug. 21, 2015); *Heckenlaible*, 2006 WL 3196750, at *3; *but see Costine v. Correct Care Sols., LLC*, No.

---

[5] Some rulings have required a local entity to have all six attributes to be considered a municipal corporation. *See Heckenlaible*, 2006 WL 3196750, at *3 (holding that VPRJA's lack of all six municipal attributes dictated that it should not be treated as a municipal corporation); *Boren v. Northwestern Reg'l Jail Auth.*, No. 5:13cv13, 2013 WL 5929421, at *5 (W.D. Va. Sept. 30, 2013) (concluding the regional authority "cannot be treated [as] a municipal corporation" because "it does not meet all six essential attributes"); *Hauth v. Southeastern Tidewater Opportunity Project, Inc.*, 420 F. Supp. 171, 174 (E.D. Va. 1976) (holding "the dispositive question is whether [the entity] is vested with the six attributes required of a municipal corporation").

Other rulings have not required that a local entity possess all six attributes to be considered a municipal corporation. *See Costine v. Correct Care Sols., LLC*, No. 2:19cv53, 2019 WL 2775491, at *6 (E.D. Va. July 2, 2019) (finding "HRRJA is the 'functional equivalent' of a municipal corporation"); *Haleem v. Quinones*, No. 5:17cv00003, 2017 WL 4400767, at *2–3 (W.D. Va. Sept. 30, 2017) (finding that "regional jail authorities in Virginia are entitled to sovereign immunity"); *Dowdy v. Pamunkey Reg'l Jail Auth.*, No. 3:14cv3, 2014 WL 2002227, at *2 (E.D. Va. May 15, 2014) ("To have the protection of sovereign immunity, a locally created entity need not have *all* the characteristics of a municipal corporation."); *York Cty. v. Peninsula Airport Comm'n*, 369 S.E.2d 665, 666 (Va. 1988) ("We have identified six attributes *pertinent* to that inquiry." (emphasis added)); *Smith*, 68 S.E.2d at 501 ("While it is true that the more attributes of a municipal corporation an agency has the more likely it is to be treated as a municipal corporation, the final decision rests on the specific issue[s] of each case.").

2:19cv53, 2019 WL 2775491, at \*6 (E.D. Va. July 2, 2019) (holding HRRJA is a municipal corporation). Of the six attributes of a municipal corporation, four were uncontested in *Heywood* and *Heckenlaible*, and the same four attributes remain uncontested in this case.[6] The two attributes HRRJA lacks, designation as a political subdivision and the power of eminent domain, are the "most intrinsic to municipal corporations." *Heywood*, 2015 WL 5026188, at \*6 (citing *Short Pump Town Ctr. Cmty Dev. Auth. v. Hahn*, 554 S.E.2d 441, 446 (Va. 2001)).

Whether a local entity is a political subdivision is determined solely by referring to its enabling legislation.[7] *See Short Pump*, 554 S.E.2d at 447 (opining that "the General Assembly clearly knows how to denominate an authority as a 'political subdivision' when it wishes to do so"). The statute authorizing municipalities within the Commonwealth to create regional jail authorities, such as HRRJA, does not include language designating the jail authorities as political subdivisions. Va. Code Ann. § 53.1-95.7 (1994). "[I]n the absence of any statutory designation of [HRRJA] . . . as [a] 'political subdivision[],'" it is "not such an entity."[8] *Short Pump*, 554 S.E.2d at 447.

HRRJA similarly lacks the power of eminent domain. *See* Va. Code Ann. § 53.1-95.7. In

---

[6] *See Heckenlaible*, 2006 WL 3196750, at \*3 ("[T]he Jail Authority possesses four of the six essential attributes of a municipal corporation. The Jail Authority serves a public purpose, has a common seal, can sue and be sued, can enter into contracts, may borrow money and issue tax exempt bonds, and has corporate management vested in a corporate board.").

[7] Designation as a political subdivision is an attribute of municipal character that is "exclusively vested in, and conferred by Virginia's legislature." *Heywood*, 2015 WL 5026188, at \*7 (citing *State Highway Comm'r of Va. v. Hooker Furniture Corp.*, 198 S.E.2d 649, 650 (Va. 1973)).

[8] The Court finds unpersuasive the argument that a jail authority should be considered a political subdivision because it is created by municipalities that are political subdivisions. *See Dowdy*, 2014 WL 2002227, at \*3 ("While Virginia law does not designate a jail authority as a political subdivision, for all intents an authority runs a jail the same way a city, county, or town would.").

10

*Light v. City of Danville*, the court held that "[t]he power of eminent domain is a most important incident of the power of a sovereign," 190 S.E. 276, 281 (Va. 1937), and should therefore be considered an essential component of a municipal corporation. As with an entity's status as a political subdivision, the power of eminent domain is "exclusively vested in, and conferred by Virginia's legislature." *Heywood*, 2015 WL 5026188, at *7. While it may be true that the localities which make up HRRJA—Chesapeake, Hampton, Portsmouth, Newport News, and Norfolk—can exercise the power of eminent domain, HRRJA as a governing body does not have this power, and therefore lacks the second "intrinsic" attribute of a municipal corporation. *Id.* at *6. HRRJA lacks the two attributes "most intrinsic" to municipal corporations, and is not entitled to immunity under the first prong of the *Heckenlaible* test.

Accordingly, the Court finds that HRRJA is not a municipal corporation and therefore is not entitled to immunity from plaintiff's state law negligence claims. The Court **RECOMMENDS** that HRRJA's motion to dismiss the state law negligence claims, counts I–III, on this basis be **DENIED**.

## C.     State Law Tort Claims for Wrongful Death

### 1.     Count I—Negligence

In count I, plaintiff alleges that Hackworth and HRRJA negligently breached their duty "to obtain or provide prompt medical care for Ms. Honeycutt's acute and open and obvious condition," contributing to, and proximately causing, her death. Compl. ¶¶ 167, 169–171. Hackworth and HRRJA argue plaintiff's allegations are not sufficient to establish ordinary negligence because the complaint "is devoid of any facts that establish that Hackworth saw or interacted with Honeycutt, that any inmate, correctional officer, medical staff member or other person alerted him to Honeycutt's need for medical care, or that Hackworth was personally aware that Honeycutt was

11

receiving deficient medical care." HRRJA's Mem. 9. HRRJA also asserts plaintiff fails to state a claim for liability against HRRJA on the basis of *respondeat superior* because "plaintiff fails to allege plausible negligence claims against Hackworth," and "plaintiff offers only speculative cogitations" regarding the actions of unnamed employees that do not plausibly support claims of negligence against them. *Id.* at 13–14.

In Virginia, a plaintiff establishes a claim of negligence by pleading "the existence of a legal duty, violation of that duty, and proximate causation which results in injury." *Delk v. Columbia/HCA Healthcare Corp.*, 523 S.E.2d 826, 830 (Va. 2000). Simple negligence is the failure to use "that degree of care which an ordinarily prudent person would exercise under the same or similar circumstances to avoid injury to another." *Griffin v. Shively*, 315 S.E.2d 210, 212–13 (Va. 1984). Issues of negligence and proximate cause are factual questions decided by a jury. *See Poliquin v. Daniels*, 486 S.E.2d 530, 534 (Va. 1997) (citing *Brown v. Koulizakis*, 331 S.E.2d 440, 445 (Va. 1985)). These issues are only decided by the Court when "reasonable minds could not differ." *Id.* (citing *Hadeed v. Medic-24, Ltd.*, 377 S.E.2d 589, 593 (Va. 1989)).

Plaintiff alleges Hackworth and HRRJA had a duty to provide adequate medical care, or access to adequate medical care, to Honeycutt pursuant to the Eighth and Fourteenth Amendments to the United States Constitution, state statutes, and regulations promulgated by the Virginia Board of Corrections. Compl. ¶¶ 142–50, 163. As the superintendent of HRRJ, Hackworth "[p]erforms the duties of chief executive officer"; "[p]lans, directs, coordinates, and manages all activities of [HRRJ]"; and "[a]dministers the custody, care, and discipline of the inmate population." *Id.* at ¶ 23 (quoting HRRJ policies and procedures). Plaintiff specifically cites Virginia Code § 53.1-126, which outlines the responsibility of sheriffs and jail superintendents to provide inmates with food, clothing, and medicine, stating "medical treatment shall not be withheld for any communicable

diseases, serious medical needs, or life threatening conditions." Va. Code Ann. § 53.1-126; *see* Compl. ¶ 145.

Plaintiff alleges Hackworth and HRRJA breached these duties when they failed to provide Honeycutt with adequate medical care, or access to adequate medical care, Compl. ¶¶ 160–61, specifically by failing to:

- Take steps to remedy "long-standing, severe, pervasive, systemic problem[s] with providing access to and provision of medical care to inmates/detainees for serious medical needs," including "adequate intake, discharge planning, sick call, chronic care, and emergency care such that prisoners are subjected to an unacceptable risk of harm due to delays or lack of treatment," despite knowledge of such problems;

- Address inadequate staffing and funding at HRRJ, despite knowledge that cities send the sickest inmates to HRRJ;

- Have systems in place to support proper examination, assessment, diagnosis, treatment, monitoring, and care of inmates, including Honeycutt;

- Engage in adequate oversight, auditing, communication, and coordination with CCS; and

- Ensure that correctional officers "elevate clear emergent matters to medical or 911 promptly," and seek medical care beyond CCS, including timely referral of Honeycutt to a hospital.

*Id.* at ¶ 163(j).

Plaintiff further alleges that, as a direct and proximate cause of Hackworth's and HRRJA's actions and omissions, Honeycutt's condition worsened, she suffered great physical pain and mental anguish, and she died. *Id.* at ¶¶ 91, 164.

The complaint adequately alleges that Hackworth and HRRJA owed Honeycutt a duty to provide medical treatment for her life-threatening condition, that the duty was breached, and that Honeycutt's death resulted. *See Keeling v. Correct Care Solutions, LLC*, No. 2:19cv225, ECF No. 64 at 3–4 (E.D. Va. Sept. 23, 2019) (finding similar allegations sufficient to assert a claim of negligence against Hackworth). Plaintiff has sufficiently alleged a plausible negligence claim

13

against Hackworth and HRRJA, and their motion to dismiss plaintiff's negligence claim in count I should be **DENIED**.

### 2. Count II—Gross Negligence

In count II, plaintiff alleges all defendants had a duty to exercise reasonable care with regard to Honeycutt and were grossly negligent in their actions and inactions, showing "such a level of indifference to Ms. Honeycutt so as to constitute an utter disregard of prudence, [and] amount to a complete neglect for Ms. Honeycutt's safety," which contributed to, and was the proximate cause of, her death. Compl. ¶¶ 176, 178–80.

Gross and simple negligence differ in degree, not kind. *See Green v. Ingram*, 608 S.E.2d 917, 923 (Va. 2005). Gross negligence is "that degree of negligence which shows indifference to others as constitutes an utter disregard of prudence amounting to a complete neglect of the safety of [another]." *Koffman v. Garnett*, 574 S.E.2d 258, 260 (Va. 2003). It "must be such a degree of negligence as would shock fair minded [people]." *Green*, 608 S.E.2d at 922. "[A] claim of gross negligence fails as a matter of law where there is no deliberate conduct by the defendant." *Reid v. Newton*, No. 3:13cv572, 2014 WL 1493569, at *7 (E.D. Va. Apr. 14, 2014). There is adequate evidence to support a finding of gross negligence when a defendant is aware of a danger, but fails to take any precautions to guard against that danger. *See Volpe v. City of Lexington*, 708 S.E.2d 824, 829 (Va. 2011); *Chapman v. City of Va. Beach*, 475 S.E.2d 798, 801 (Va. 1996). "[G]ross negligence does not require a finding that a defendant knew of a substantial risk," "[i]t is enough that the defendant *should* have been aware of that risk." *Hixson v. Hutcheson*, No. 5:17cv32, 5:18cv1, 2019 WL 302516, at *7 (W.D. Va. Jan. 23, 2019) (holding that while the standards for deliberate indifference and gross negligence are closely related, "[g]ross negligence is a slightly lower standard, lacking the subjective component of deliberate indifference").

14

### a.    Superintendent Hackworth and HRRJA

Hackworth asserts that "[a]bsent plausible factual allegations evidencing that [he] had knowledge of Honeycutt's presence in the jail, Hackworth cannot be held liable individually for gross negligence." HRRJA's Mem. 11–12 ("plaintiff fails to place Hackworth at the jail on October 5 or 6, when Honeycutt was assessed and treated by medical [personnel] and transported to the hospital, and offers no support for finding that Hackworth had knowledge of or was involved in the purported inadequate medical assessments, cell assignment, observation, supervision, or monitoring.").

In moving to dismiss this count, Hackworth relies on *Reid v. Newton*, 2014 WL 1493569, at *7, where the court dismissed plaintiff's gross negligence claim against a jail superintendent in his individual capacity for failure to state a claim. HRRJA's Mem. 11–12. In *Reid*, the inmate attempted suicide on August 17, 2011, and was transferred to the jail on August 18, 2011. *Reid*, 2014 WL 1493569, at *1–2. The inmate was placed in general population without initiation of the jail's suicide-prevention policies, and committed suicide on August 19, 2011. *Id.* at *2. The court noted that a claim for gross negligence based on a failure to act "necessarily implies actual knowledge of facts that create a choice to act or to abstain." *Id.* at *7. The court held allegations that the superintendent was charged with certain responsibilities along with the "naked assertion that [the superintendent] had actual knowledge of [the decedent's] suicide attempt" did not sufficiently allege gross negligence where there were no allegations the superintendent was present during or after the decedent's transfer, was involved in the intake procedures, or communicated with any other defendant. *Id.* at *6 (the superintendent's "job title alone is insufficient to raise the allegation of actual knowledge above the speculative level").

The Court finds more persuasive the reasoning in *Keeling*, *Thornhill*, and *Brown*. In *Keeling*, the court found plaintiff adequately pleaded a gross negligence claim against Hackworth by alleging facts showing he was aware of "the dangers posed by the allegedly inadequate medical care system" at HRRJ, the death rates at the jail, "the state and federal investigations of the jail's medical conditions, multiple deaths that occurred from preventable conditions in the facility, and medical contractor reports." *Keeling*, No. 2:19cv225, ECF No. 64 at 5–6. The *Keeling* court denied Hackworth and HRRJA's motion to dismiss a claim that their gross negligence caused a diabetic inmate's death due to lack of insulin based on the argument that Hackworth had no knowledge of the inmate's presence in the jail. *Id.* at 1–2, 6; *see also* No. 2:19cv225, ECF No. 37 at 11.

In *Thornhill*, an inmate was transferred to a jail, with notations in his booking report that he would be going through heroin and alcohol withdrawal. *Thornhill v. Aylor*, No. 3:15cv24, 2016 WL 8737358, at *1 (W.D. Va. Feb. 19, 2016). Within two days of his transfer to the jail, the inmate died. *Id.* at *1–2. The plaintiff alleged the defendants did not follow the jail's internal protocols for alcohol and heroin withdrawal in treating the inmate, and that there existed "a pattern and practice of deliberate indifference to inmates' medical needs" at the jail including at least two instances where the defendant superintendent was personally aware of deficient medical care to inmates. *Id.* at *3, *9. The court found the plaintiff had "sufficiently alleged intentional and/or grossly negligent acts by defendants," including the jail authority and the superintendent, and denied defendants' motion to dismiss. *Id.* at *13 n.6.

In *Brown*, an inmate with a compromised immune system died of bacterial meningitis. *Brown v. Mitchell*, 308 F. Supp. 2d 682, 687–88 (E.D. Va. 2004). The plaintiff alleged the sheriff was grossly negligent in maintaining an overcrowded, poorly ventilated, and unsanitary jail, which

16

caused the inmate's death. *Id.* at 690, 696. The sheriff's motion to dismiss the gross negligence claim was denied to the extent the claim was based on conditions brought about due to the day-to-day operation of the jail, for which the sheriff was statutorily responsible as the policymaking decisionmaker. *Id.* at 698–701.

Here, plaintiff alleges Hackworth served as the superintendent at HRRJ for approximately six months prior to Honeycutt's death. Compl. ¶ 23. At the time Hackworth assumed his position, HRRJ was under federal investigation concerning access to, and provision of, medical care at the jail. *Id.* at ¶¶ 92–93. Plaintiff alleges Hackworth knew of the longstanding, severe, pervasive, and systemic problems with providing medical care to inmates, as well as the high death rate and recent preventable deaths and injuries at HRRJ. *Id.* at ¶¶ 92–93, 158, 163(j). Specifically, Hackworth knew correctional officers at HHRJ were preventing inmates like Honeycutt with serious medical conditions from having access to and receiving proper medical care; failed to adequately audit, communicate with, or coordinate with CCS to ensure provision of medical care for serious medical needs; failed to seek medical care for inmates beyond CCS; and failed to take steps to remedy these problems. *Id.*

Similar to the plaintiffs in *Keeling*, *Thornhill*, and *Brown*, plaintiff has alleged Hackworth knew of the systemic problems at HRRJ that put inmates like Honeycutt at risk of injury or death, and failed to take steps to remedy the problems, which ultimately caused Honeycutt's death. The Court finds plaintiff has alleged sufficient facts supporting a claim of gross negligence against Hackworth and HRRJA. Accordingly, Hackworth and HRRJA's motion to dismiss count II, alleging gross negligence, should be **DENIED**.

17

b.      **Sheriff Baron in his official capacity**

Plaintiff sues Baron in his individual and official capacities in counts II and III alleging

gross negligence and willful and wanton negligence, and seeks monetary damages. *Id.* at ¶ 24,

p. 103.  Baron argues that the Eleventh Amendment protects him from being sued in his official

capacity in federal court for allegedly violating state law.  Norfolk Jail Defs.' Mem. 8–9; Norfolk

Sheriff's Office Defs.' Reply Mem. 1–4, ECF No. 37.[9]  Plaintiff responds that, "under Virginia

law, the Sheriff is not immune for acts of gross or wanton and willful negligence."  Pl.'s Mem. in

Opp. to Defs.' Mot. to Dismiss 5–7 (citing Virginia law addressing sovereign immunity), ECF No.

34.

"It is well established that the Eleventh Amendment bars suit in federal court by an

individual citizen against a sovereign state of the Union."  *Roach v. W. Va. Reg'l Jail & Corr.*

*Facility Auth.*, 74 F.3d 46, 48 (4th Cir. 1996) (citing *Edelman v. Jordan*, 415 U.S. 651, 662–63

(1974)).  "This immunity extends to 'arm[s] of the State,' including state agencies and state officers

acting in their official capacity."  *Cromer v. Brown*, 88 F.3d 1315, 1332 (4th Cir. 1996) (internal

citations omitted).  When the state's treasury would be responsible for paying any judgment against

a municipality or other governmental entity for monetary damages, the entity is considered an arm

of the state for purposes of the Eleventh Amendment.  *Bland v. Roberts*, 730 F.3d 368, 390 (4th

---

[9] It is unclear whether a defendant properly asserts Eleventh Amendment immunity through a Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction or a Rule 12(b)(6) motion to dismiss for failure to state a claim upon which relief can be granted. *See Andrews v. Daw*, 201 F.3d 521, 524 n.2 (4th Cir. 2000) ("Our cases have been unclear" on this issue); *Gross v. Morgan State Univ.*, 308 F. Supp. 3d 861, 865 (D. Md. 2018) ("the Fourth Circuit has not definitively ruled" on this issue).  The Fourth Circuit has addressed an assertion of Eleventh Amendment immunity raised in a Rule 12(b)(6) motion, and this report will as well. *See Biggs v. Meadows*, 66 F.3d 56, 58–59 (4th Cir. 1995); *see also Lloyd v. Morgan*, No. 4:14cv107, 2015 WL 1288346, at *5 n.3 (E.D. Va. Mar. 20, 2015) (addressing an Eleventh Amendment immunity argument raised in a Rule 12(b)(6) motion).

Cir. 2013) (citing *Cash v. Granville Cnty. Bd. of Educ.*, 242 F.3d 219, 223 (4th Cir. 2001)).

Sheriffs in Virginia are constitutional officers, state officers whose positions are created by the Virginia constitution. *Vollette v. Watson*, 937 F. Supp. 2d 706, 714 (E.D. Va. 2013) (citing Va. Const. Art. VII, § 4). Therefore, because any judgment against a Virginia sheriff for money damages would be paid out of the state treasury, a sheriff acting in his official capacity is an arm of the state. *Bland*, 730 F.3d at 390; *see also* Norf. Jail Defs.' Mem. 9. Federal district courts have "repeatedly held that Virginia sheriffs . . . are 'state officers' for the purpose of the Eleventh Amendment." *Vollette*, 937 F. Supp. 2d at 714 (collecting cases).

Eleventh Amendment immunity applies to allegations that a state official has violated state law. *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 103–06 (1984); *see also Huang v. Bd. of Governors of Univ. of N.C.*, 902 F.2d 1134, 1138 (4th Cir. 1990) (finding plaintiff "properly concedes that the Eleventh Amendment bars the pendent state monetary damages claims"). Further, "a State's waiver of sovereign immunity in its own courts is not a waiver of the Eleventh Amendment immunity in the federal courts." *Pennhurst*, 465 U.S. at 99 n.9.

Plaintiff is seeking monetary damages from Baron, in his official capacity, for alleged violations of state law. These pendent state claims for monetary damages against a Virginia sheriff are barred by the Eleventh Amendment. Accordingly, the motion to dismiss count II, alleging gross negligence, and count III, alleging willful and wanton negligence, against Baron in his official capacity should be **GRANTED**.

19

c.   **Sheriff Baron in his individual capacity**

In support of the claim for gross negligence in count II, plaintiff asserts Baron breached his

duties to Honeycutt as follows:

- Making the choice to send inmates in his custody, like Honeycutt, to HRRJ despite knowledge of the DOJ's investigation, of insufficient staffing at HRRJ, and the high rate of death at HRRJ;

- Failing to have systems in place to ensure that inmates, like Honeycutt, are medically stabilized prior to transfer to HRRJ; and

- Failing to ensure that, when inmates are in considerable distress, they are taken to a hospital or 911 is called.

Compl. ¶ 163(l).  Plaintiff further alleges Baron is liable under a theory of *respondeat superior* for

the actions and inactions of his deputies, including but not limited to the named defendants, for

ignoring Honeycutt's medical complaints and acute need for medical help.  *Id.*

Baron first asserts he cannot be held liable for Honeycutt's death under a theory that he

knew HHRJ was insufficiently staffed such that inmates were unable to have access to medical

care, and still chose to send inmates in his custody, like Honeycutt, to HRRJ.  Norfolk Jail Defs.'

Mem. 10 (citing Compl. ¶ 85); *see also* Compl. ¶ 159.  Baron argues he has "a right to assume that

everyone else will obey the law (including not only the common law, but also statutes or city

ordinances) and to act upon that belief."  Norfolk Jail Defs.' Mem. 13 (quoting *Richmond & P.E.R.*

*Co. v. Rubin*, 47 S.E. 834 (Va. 1904)).

Next, Baron asserts the actions or inactions of his deputies cannot be the proximate cause

of Honeycutt's death because the negligence of CCS providers at HRRJ was an intervening cause

of her death.  Norfolk Jail Defs.' Mem. 11.  He notes that, after she arrived at HRRJ, Honeycutt

received an intake medical screen where she exhibited the latent symptoms plaintiff asserts were

indicative of peritonitis; she received fluids intravenously; a doctor ordered and reviewed the

results from blood work, a urinalysis, and an abdominal x-ray; and, a doctor ordered a fleets enema and oral laxative to treat Honeycutt. *Id.* at 10 (citing Compl. ¶¶ 63, 65, 66).

Last, Baron argues plaintiff fails to allege Honeycutt was "deprived of access to medical care by Norfolk Jail deputies on any occasion," and the complaint reflects that, "during the relevant period, Honeycutt received attention from the medical department almost daily." Norfolk Jail Defs.' Mem. 17. He further argues there is no basis for imposing liability on a correctional officer for failure to appreciate the clinical significance of Honeycutt's symptoms of tachycardia, high blood pressure, a rigid abdomen, and rebound tenderness, which would be "clinically significant to a trained medical provider [and] were the telltale signs that Honeycutt's vomiting and constipation were a medical emergency." *Id.* at 16.

These arguments are not persuasive. Baron's argument, that he could assume the officials at HRRJ were obeying the law, must be considered in conjunction with allegations in the complaint that Baron knew HRRJ was under investigation regarding the provision of medical and mental health care to inmates, and knew about the high rate of death at HRRJ. Compl. ¶ 163(l).

Baron cites several cases in support of the argument that any action or inaction on the part of the deputies at the Norfolk City Jail could not have proximately caused Honeycutt's death. Norfolk Jail Defs.' Mem. 11–13. With one exception, the cases cited address the issue of proximate cause following the presentation of evidence at trial.[10] *Id.* This case is at the motion to

---

[10] *See Interim. Pers. of Cent. Va., Inc. v. Messer*, 559 S.E.2d 704, 708 (Va. 2002) (discussing proximate cause in relation to the "uncontradicted evidence" presented at trial); *Banks v. Richmond*, 348 S.E.2d 280 (Va. 1986) (discussing proximate cause in relation to a motion to strike at the conclusion of the plaintiff's case); *Kane v. Lewis*, 604 F. App'x 229, 234 (4th Cir. 2015) (discussing proximate cause in relation to a Fed. R. Civ. P. 50(b) motion asserting substantial evidence did not support the jury's findings); *but see Massey v. Ojaniit*, 759 F.3d 342, 353–54 (4th Cir. 2014) (discussing proximate cause in relation to a Fed. R. Civ. P. 12(c) judgment on the pleadings, and finding an officer's alleged fabrication regarding the defendant's hairstyle was not the proximate cause of a criminal conviction).

dismiss stage, prior to the discovery on the issues.  While Virginia law on proximate cause may seem straightforward, "[t]he more difficult problem is to apply the rules relating to proximate cause to the facts of a particular case." *Banks v. City of Richmond*, 348 S.E.2d 280, 283 (Va. 1986). Based on the allegations in the complaint, a reasonable jury could find the actions or inactions of the deputies in the Norfolk City Jail, where Honeycutt was incarcerated until two days prior to her death, proximately caused Honeycutt's death.

Plaintiff alleges Baron and his deputies disregarded requests by Honeycutt, and other inmates on her behalf, for access to medical care for abdominal pain, vomiting, and vomiting of blood; moved her to an isolation cell as punishment, when she explained that she only indicated she wanted to harm herself because she did not feel well and wanted to be alone; ignored Honeycutt's distress on the morning of October 5, 2018, and failed to take her to the hospital or call 911 when she continued to suffer from abdominal pain, nausea, and vomiting throughout the morning, including vomiting "everything" given to her by CCS; and, failed to have systems in place to ensure that inmates like Honeycutt were medically stabilized prior to transfer to HRRJ. Compl. ¶ 163(l)–(m).  These alleged actions constitute complete neglect of Honeycutt's safety.

The complaint sufficiently alleges gross negligence, and the motion to dismiss count II against Baron in his individual capacity should be **DENIED**.

> **d.      Deputies Isureal, Caniff, and Dudley in their individual capacities**

Plaintiff asserts deputies Isureal, Caniff, and Dudley breached their duties to Honeycutt by disregarding her requests, and the requests of other inmates on her behalf, for access to medical care for abdominal pain, vomiting, and vomiting of blood; disregarding Honeycutt's open and obvious acute medical condition; failing to inform a supervisor or the medical department of Honeycutt's medical condition; failing to obtain medical care for Honeycutt; and failing to call

911.  *Id.* at ¶ 163(m).  Isureal, Caniff, and Dudley assert the allegation that they "'disregarded requests for medical care made by Ms. Honeycutt,' without offering a single connective fact showing when these deputies allegedly disregarded these requests or under what circumstances," is insufficient to state a claim for gross negligence.  Norfolk Jail Defs.' Mem. 17.

Plaintiff has alleged that, in "mid-to-late September," Honeycutt began to complain of abdominal pain, lose weight, and have ashen or grey colored skin.  Compl. ¶ 31.  Inmates witnessed Honeycutt throw up a number of times and saw blood in her vomit.  *Id.*  Despite Honeycutt's request, and requests by other inmates on her behalf, for medical help, Isureal, Caniff, and Dudley disregarded the requests.  *Id.* at ¶ 33.  Less than two days after her transfer to HRRJ, Honeycutt died.  *Id.* at ¶¶ 61, 87.  The allegations against these deputies are sufficient to "shock fair minded [people]."  *Green*, 608 S.E.2d at 922.

Plaintiff has alleged facts sufficient to find Isureal, Caniff, and Dudley were grossly negligent in fulfilling their duties to Honeycutt, and the motion to dismiss count II with respect to these deputies should be **DENIED**.

### 3.    Count III—Willful and Wanton Negligence

In count III, plaintiff alleges all defendants breached their duty to exercise reasonable care with regard to Honeycutt, and were willfully and wantonly negligent, which contributed to, and proximately caused her death.  Compl. ¶¶ 185, 187–89.  Specifically, plaintiff asserts defendants acted, or failed to act, "with a reckless indifference to the consequences to Ms. Honeycutt when they were aware of their conduct and also aware, from their knowledge of existing circumstances and conditions, that their conduct would result in injury to Ms. Honeycutt."  *Id.* at ¶ 187.

Hackworth asserts the complaint fails to allege willful and wanton negligence because no facts are presented "to suggest any act or omission by Hackworth or his involvement in

23

Honeycutt's incarceration or medical care," and "no specific allegations that Hackworth had prior knowledge of or notice that Honeycutt's medical needs were not being met." HRRJA's Mem. 13. Baron, Isureal, Caniff, and Dudley also assert the "conclusory" allegations are insufficient to allege willful and wanton negligence. Norfolk Jail Defs.' Mem. 15–17.

The difference between any other form of negligence and willful and wanton negligence is a matter of kind. *Green*, 608 S.E.2d at 923. Willful and wanton negligence is "action taken in conscious disregard of another's rights, or with reckless indifference to consequences that the defendant is aware, from his knowledge of existing circumstances and conditions, would probably result from his conduct and cause injury to another." *Kaltman v. All Am. Pest Control, Inc.*, 706 S.E.2d 864, 871 (Va. 2011) (quoting *Alfonso v. Robinson*, 514 S.E.2d 615, 618 (Va. 1999)). Unlike gross negligence, it "requires an actual or constructive consciousness that injury will result from the act done or omitted." *Alfonso*, 514 S.E.2d at 618; *see also Boren v. Northwestern Reg'l Jail Auth.*, No. 5:13cv13, 2013 WL 5929421, at *5 (W.D. Va. Sept. 30, 2013). "[E]vidence that a defendant had prior knowledge or notice that his actions or omissions would likely cause injury to others is a significant factor in considering issues of willful and wanton negligence." *Alfonso*, 514 S.E.2d at 546.

In *Green*, an officer attempted to open a door during a drug raid by firing frangible rounds into the door of a home. *Green*, 608 S.E.2d at 919–20. The manner in which the rounds were fired was a violation of protocol, and an individual who was standing behind the door was killed. *Id.* The court concluded that although the officer disobeyed protocol, supporting a finding of gross negligence, the same facts did not support a finding of willful and wanton negligence because the officer had no actual or constructive knowledge that someone was behind the door and would probably be harmed. *Id.* at 924.

24

In *Keeling*, even though the complaint alleged Hackworth knew that employees of the jail were failing to follow protocol, it did not allege that Hackworth knew the decedent was in the jail or that the alleged inadequate medical care would probably result in harm to him. *Keeling*, No. 2:19cv225, ECF No. 64 at 6. As a result, the court granted the motion to dismiss the willful and wanton negligence claim against Hackworth. *Id.*

The current complaint does not allege that Hackworth knew Honeycutt was present at HRRJ, that she had a serious medical condition, or that she was not receiving appropriate medical care for her serious condition. *See* Compl. ¶ 163(j). Accordingly, plaintiff has not alleged Hackworth acted or failed to act with conscious disregard that injury to Honeycutt would probably result, and the motion to dismiss count III against Hackworth and HHRJA should be **GRANTED**.

Similarly, the complaint does not allege Baron knew Honeycutt was present at the Norfolk City Jail, that she had a serious medical condition, or that she was not receiving appropriate medical care for her serious condition. *See id.* at ¶ 163(l). Accordingly, plaintiff has not alleged Baron acted or failed to act with conscious disregard that injury to Honeycutt would probably result, and the motion to dismiss count III against Baron should be **GRANTED**.

Lastly, while the allegations in the complaint with regard to Isureal, Caniff, and Dudley are sufficient to support a claim of gross negligence, they are insufficient to support a claim the deputies knew their disregard of Honeycutt's requests for medical help would cause her injury or death. *See id.* at ¶ 163(m). The motion to dismiss count III against Isureal, Caniff, and Dudley should be **GRANTED**.

25

### D.   **Eighth Amendment Deprivation of Civil Rights Claims Pursuant to 42 U.S.C. § 1983**

#### 1.   **Count IV—Denial, Delay, and Withholding of Medical Care**

In count IV, plaintiff alleges defendants Hackworth, Isureal, Caniff, and Dudley, while acting within the scope of their official duties and employment and under color of state law, "failed to provide necessary medical care, and/or access to necessary medical care, in response to obvious, serious medical needs," with deliberate indifference to Honeycutt's health and safety, which resulted in her death. Compl. ¶¶ 195, 197–202. Further, these defendants learned, throughout the course of her detention, "that there was a substantial risk that Ms. Honeycutt had serious medical needs that were not being met," and failed to reasonably respond. *Id.* at ¶ 199.

The United States Supreme Court has held that "deliberate indifference to serious medical needs of prisoners constitutes" a violation of the Eighth Amendment protection against cruel and unusual punishments. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). To prove prison officials violated the Eighth Amendment based on their failure to provide effective medical treatment, plaintiff must satisfy a two-pronged test. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). The first prong is the objective prong, which asks whether the deprivation is "sufficiently serious." *Id.* A medical need is sufficiently serious if it is "so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008) (quoting *Henderson v. Sheahan*, 196 F.3d 839, 846 (7th Cir. 1999)); *see also Cooper v. Dyke*, 814 F.2d 941, 945–46 (4th Cir. 1987) (determining that intense pain from an untreated bullet wound is sufficiently serious); *Brown v. District of Columbia*, 514 F.3d 1279, 1284 (D.C. Cir. 2008) (concluding that the "intense and often relentless pain" associated with untreated gallstones is sufficiently serious); *but see Hall v. Holsmith*, 340 F. App'x 944, 947 n.3 (4th Cir. 2009) (holding that flu-like symptoms did not constitute a serious medical need).

The second prong of the test requires a prison official to have a "sufficiently culpable state of mind." *Farmer*, 511 U.S. at 834 (citing *Wilson v. Seiter*, 501 U.S. 294, 297 (1991)). To establish this subjective component of a deliberate indifference claim, the plaintiff must allege that the defendants were "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists," and also that the defendants drew the inference. *Farmer*, 511 U.S. at 837; *cf. Makdessi v. Fields*, 789 F.3d 126, 133 (4th Cir. 2015) ("Direct evidence of actual knowledge is not required. Accordingly, prison officials may not simply bury their heads in the sand and thereby skirt liability.") (citation omitted). Although this prong is subjective, a deliberately indifferent state of mind can be proven through "inference from circumstantial evidence." *Thompson v. Commonwealth of Va.*, 878 F.3d 89, 108 (4th Cir. 2017) (citing *Farmer*, 511 U.S. at 842).

"A prison official is not liable if he knew the underlying facts but believed (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent." *Johnson v. Quinones*, 145 F.3d 164, 167 (4th Cir. 1998). Accordingly, an official "is not subjectively reckless where, although [the official] is aware of the existence of a general risk, [the official] is unaware that his conduct is inappropriate in light of that risk. True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk." *Rich v. Bruce*, 129 F. 3d 336, 340 n.2 (4th Cir. 1997). Stated another way, "*Farmer* defines deliberate indifference as the *intentional* taking of a risk that the defendant knows *might cause harm* while *lacking any intent to cause such harm*." *Anderson v. Kingsley*, 877 F.3d 539, 545 (4th Cir. 2017).

27

### a.   Superintendent Hackworth

Hackworth does not contest the first prong of the test, but argues as to the second prong that plaintiff "presents no facts to support his bare assertion that Hackworth acted with deliberate indifference in denying, delaying, or withholding medical care from Honeycutt." HRRJA's Mem. 14.   Hackworth notes that plaintiff has not alleged he had any personal involvement with Honeycutt, was present during Honeycutt's stay at HRRJ, had any contact with Honeycutt, had any involvement with Honeycutt's medical care, or directed any act regarding Honeycutt. *Id.*

Two rulings in this district have found that allegations that a superintendent is aware of a jail's poor treatment of inmates' medical issues generally is insufficient to show the requisite knowledge for a finding of deliberate indifference where plaintiff has failed to allege the superintendent was personally aware of the seriousness of the specific inmate's medical condition. *See Keeling*, No. 2:19cv225, ECF No. 64 at 7 ("Hackworth's alleged knowledge of the Jail's inadequate medical care is insufficient to show that he had the requisite knowledge for a finding of deliberate indifference."); *Newbrough v. Piedmont Reg'l Jail Auth.*, 822 F. Supp. 2d 558, 581 (E.D. Va. 2011) (dismissing deliberate indifference claim where plaintiff failed to allege the superintendent was personally aware of the inmate's serious medical condition, although he was aware of the jail's poor medical care system).

Plaintiff has alleged multiple facts indicating Hackworth was aware that poor medical treatment caused injury or death to certain inmates housed at HRRJ, but has not alleged any facts suggesting Hackworth was personally aware of Honeycutt's medical condition or treatment or that she was at risk of serious harm.  Plaintiff has failed to allege the subjective component of deliberate indifference against Hackworth, and Hackworth's motion to dismiss count IV should be **GRANTED**.

28

### b. Deputies Isureal, Caniff, and Dudley[11]

Deputies Isureal, Caniff, and Dudley argue that the only allegations of a personal deprivation of Honeycutt's access to medical care is the assertion that they "disregarded requests" for medical treatment. Norfolk Jail Defs.' Mem. 19. The deputies assert that the allegations in the complaint show that CCS medical providers had "regular and substantial contacts with Honeycutt during the relevant period," and that "the telltale signs of Honeycutt's emergent condition were latent symptoms that would be known only to a medical provider." *Id.* at 20. As a result, they argue they were justified in relying on CCS to provide medical care. *Id.* at 19; *see Iko*, 535 F.3d at 242 ("If a prisoner is under the care of medical experts . . . , a nonmedical prison official will generally be justified in believing that the prisoner is in capable hands.").

The deputies rely on the Fourth Circuit's decision in *Miltier*, finding the defendant wardens were "entitled to rely upon their health care providers' expertise," especially where "everything in the record suggests that the wardens closely monitored [the inmate's] health and ensured that she received medical treatment." *Miltier v. Beorn*, 896 F.2d 848, 854 (4th Cir. 1990). *Miltier* is not controlling here. First, *Miltier* was decided at the summary judgment stage. *Id.* Second, there was no evidence that the jail official defendants in *Miltier* were made aware of any complaints for a year prior to the inmates' death, and evidence showed defendants were closely monitoring the inmate's health. *Id.* at 854–55.

Unlike the jail officials in *Miltier*, plaintiff alleges deputies Isureal, Caniff, and Dudley disregarded Honeycutt's requests for treatment, as well as requests made on Honeycutt's behalf

---

[11] Defendants assert plaintiff "has failed to establish a § 1983 claim against Sheriff Baron or any Norfolk Jail deputy." Norfolk Jail Defs.' Mem. 19. Count IV, alleging a deprivation of civil rights pursuant to section 1983, is alleged against the deputies, and other defendants, but not against Sheriff Baron. Compl. ¶ 195. Accordingly, the Court will address defendants' arguments pertaining to Deputies Isureal, Caniff, and Dudley.

by other inmates, from mid-to-late September until her transfer to HRRJ, two days prior to her death. Compl. ¶¶ 33, 163(m). During this time, Honeycutt appeared to lose weight, had a grey or ashen color to her skin, and was vomiting, including vomiting blood. *Id.* at ¶ 31. While Honeycutt received some care from CCS when housed in the Norfolk City Jail, she was not housed in an infirmary or medical unit during her incarceration there. *See Bost v. Wexford*, No. ELH-15-3278, 2018 WL 3539819, at *41–42, 55 (D. Md. July 23, 2018) (granting summary judgment in favor of custody defendants on deliberate indifference claim where inmate was in the infirmary under the care of the medical defendants during the relevant time period). Further, "consciously withholding medical care can give rise to a plausible claim of deliberate indifference." *Newbrough*, 822 F. Supp. 2d at 578.

Plaintiff has alleged facts sufficient to state a claim for deliberate indifference on the part of Isureal, Caniff, and Dudley, and the motion to dismiss count IV as to these defendants should be **DENIED.**

### 2.   Count V—Superintendent Hackworth's Supervisory Liability

In count V, plaintiff alleges that Hackworth, while acting under color of state law and in his individual capacity, "acted in a manner that was deliberately indifferent to [Honeycutt's] Eighth and Fourteenth Amendment rights," "had actual knowledge that [his] subordinates, including, but not limited to, individual Defendants in this matter, were engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like Ms. Honeycutt," and "were preventing inmates like Ms. Honeycutt with serious medical conditions from having access to and receiving proper medical care." Compl. ¶¶ 206–07. As the superintendent of HRRJ, plaintiff alleges Hackworth "[p]erforms the duties of chief executive officer," and

> [p]lans, directs, coordinates, and manages all activities of [HRRJ].   Ensures
> effective management and operation of the facility . . . . Ensures training,

30

supervision, and performance evaluation[s] of staff are provided . . . . Administers the custody, care, and discipline of the inmate population . . . . Manages the inmate population to ensure compliance with institutional policies and procedures, mandatory State standards, and relevant State and Federal law.

*Id.* at ¶ 23 (quoting HRRJ policies and procedures).

Plaintiff alleges Hackworth had actual knowledge that his subordinates were engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to inmates like Honeycutt, by preventing inmates "with serious medical conditions from having access to and receiving proper medical care," as a result of the following:

- "his duties according to [HRRJ's] policies and procedures";

- "the removal by ICE of its inmates from [HRRJ]";

- "multiple other deaths from preventable conditions that had occurred at [HRRJ] in recent years";

- "multiple state investigations and federal investigation following the deaths of Jamycheal Mitchell and Henry Stewart";

- "the plethora of other complaints describing severe medical conditions that were being ignored at [HRRJ] concerning other inmates before Ms. Honeycutt's death";

- "warnings from former Superintendent Myers and the Department of Justice concerning dangerous insufficient staffing levels";

- "receipt of medical contractor reports per [HRRJ] policy and contract"; and

- his "role in reviewing and approving medical contractor policies and procedures regarding inmate requests for medical treatment."

*Id.* at ¶ 207.

Plaintiff alleges Hackworth's response to this knowledge—failing to act, failing to carry out his obligations to supervise subordinates or intervene on Honeycutt's behalf, and failing to provide her with access to appropriate, timely medical care—was so inadequate "as to show deliberate indifference to or tacit authorization of the alleged offensive practices," causing

31

Honeycutt to "unnecessarily languish[] without appropriate medical intervention, and ultimately die[] a preventable death." *Id.* at ¶¶ 208–09.

Hackworth asserts "plaintiff simply regurgitates general allegations regarding the purported inadequate provision of medical care to other inmates." HRRJA's Mem. 17. Hackworth further argues "[p]laintiff simply conjures that Honeycutt was vomiting and complained to correctional officers ahead of her being brought to medical on the evening of October 6, 2018, based on the allegations that she had been complaining for two weeks prior while at Norfolk City Jail." *Id.* Hackworth concludes that plaintiff has failed to allege fault based on his conduct or another's conduct in the execution of his policies or customs, sufficient to state a claim for supervisory liability. *Id.* at 16–17.

Under certain circumstances, supervisors can be held liable for constitutional injuries inflicted by their subordinates. *Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir. 1994) (citations omitted). Supervisory liability is intended to "pinpoint[] the persons in the decisionmaking chain whose deliberate indifference permitted the constitutional abuses to continue unchecked." *Id.* (quoting *Slakan v. Porter*, 737 F.2d 368, 376 (4th Cir. 1984)) (internal quotation marks omitted). To establish supervisory liability, the Fourth Circuit requires three elements:

> (1) that the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed "a pervasive and unreasonable risk" of constitutional injury to citizens like the plaintiff;
>
> (2) that the supervisor's response to that knowledge was so inadequate as to show "deliberate indifference to or tacit authorization of, the alleged offensive practices,"; and
>
> (3) that there was an "affirmative causal link" between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff.

*Id.* at 799 (citations omitted); *see also Slakan*, 737 F.2d at 373; *Harris v. Northern Neck Reg'l Jail Bd. Auth.*, No. 3:07cv701, 2008 WL 4468080, at *3 (E.D. Va. Oct. 1, 2008).

Demonstrating "a pervasive and unreasonable risk" requires evidence that the conduct is widespread or at least occurred on several occasions. *Slakan*, 737 F.2d at 373. In *Woodson*, "[t]he failure to investigate two instances of heat related deaths [was not] considered to be persistent and widespread." *Woodson v. City of Richmond*, 88 F. Supp. 3d 551, 569 (E.D. Va. 2015). In *Shaw*, knowledge that the officer had used excessive force on three previous occasions was sufficient. *Shaw*, 13 F.3d at 800.

In *Thrower*, this Court denied a motion to dismiss a supervisory liability claim arising from an inmate's death at HRRJ. *Thrower v. Correct Care Sols.*, No. 2:18cv56, ECF No. 125 (E.D. Va. Apr. 3, 2019). Thrower alleged that the sergeant responsible for supervising the work of jail officers and the daily monitoring of inmates by the jail officers "was aware of numerous prior constitutional violations within the jail" including multiple "deaths from preventable conditions that had occurred at the Jail [and] the plethora of other grievances describing severe medical conditions that were being ignored," and failed to intervene on Thrower's behalf or provide him with medical care. *Id.* at 14. The Court held that Thrower was not required to allege that the sergeant's subordinates were involved in the prior deaths from preventable causes described in the complaint to state a plausible claim to relief. *Id.*; *see also Newbrough*, 822 F. Supp. 2d at 583 (holding plaintiff identified "an apparent pattern of deficient medical care at Piedmont, evidenced both by the particular events surrounding Newbrough's death and by separate instances of alleged mistreatment of other detainees").

Regarding the first element, plaintiff has sufficiently alleged that Hackworth is a policymaker. *See Newbrough*, 822 F. Supp. 2d at 586 ("at this stage in the litigation, the Court can reasonably infer that, as the highest-ranking officer at Piedmont, Superintendent Toney's acts and edicts constituted official policy"). Plaintiff has also sufficiently alleged Hackworth had actual

33

or constructive knowledge that his subordinates were engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to inmates like Honeycutt. Compl. ¶¶ 92, 163. Plaintiff alleges that when Hackworth was named interim superintendent in March 2018, Hackworth knew HRRJ was under investigation because DOJ believed there was a risk that inmates were not being provided proper medical care, and he knew of the considerable rate of deaths at the jail due to preventable conditions. Compl. ¶¶ 92–94, 163(j). Plaintiff notes the report prepared following the Department of Justice investigation of HRRJ, which began in December 2016 and was ongoing at the time of Honeycutt's death, found "[o]fficials at the Jail have been aware of the deficiencies in medical care for years and have failed to adequately address these deficiencies," and that "medical care under the Jail's current medical provider, CCS, has not significantly improved." *Id.* at ¶¶ 98–99 (quoting the DOJ report). The allegations are sufficient to show jail officers were engaged in conduct posing a "pervasive unreasonable risk" of constitutional injury to inmates, and Hackworth had knowledge of the conduct. *See Newbrough,* 822 F. Supp. 2d at 586–87 (holding plaintiff sufficiently stated a claim of deliberate indifference by alleging "a pattern of deficient detainee medical care persisted under [the superintendent's] administration" which suggested "deliberate inaction").

With respect to the second element, plaintiff has asserted that despite knowledge of multiple prior constitutional violations related to a lack of medical care offered to inmates at HRRJ, Hackworth, as superintendent, took no action to remedy the violations. Compl. ¶ 163; *see Newbrough,* 822 F. Supp. 2d at 586 ("continued inaction in the face of widespread abuses . . . provides an independent basis for finding [a supervisor was] deliberately indifferent or acquiesced in the constitutionally offensive conduct of his subordinates") (quoting *Slakan,* 737 F.2d at 373). Plaintiff's allegations are sufficient at this stage of the litigation to show Hackworth's deliberate

34

indifference or tacit authorization of the failure to provide inmates at HRRJ with proper medical care.

As for the third element, plaintiff has asserted that Honeycutt's death was caused by the failure of Hackworth's subordinates to provide her with appropriate medical care. Plaintiff alleges Honeycutt was experiencing nausea and vomiting on October 5, 2018, upon intake at HRRJ, in addition to exhibiting multiple symptoms during her intake screening, but was placed in general population. Compl. ¶¶ 63–65. Honeycutt was brought to the medical unit on October 6 because she "[complained of] abdominal pain and . . . was vomiting." *Id.* at ¶ 74. According to the notations of EMS personnel, jail officials knew of Honeycutt's ongoing symptoms and complaints. *Id.* at ¶¶ 76–80 (EMS documented that "[p]er prison guard and nurse [patient] had been complaining of abdominal pain for approximately two weeks" and "guard reported that the [patient] had received a fleet enema approximately two days prior but the [patient] reported she had still not had a bowel movement yet"). Further, upon arrival at HRRJ, EMS noted Honeycutt was "unresponsive with agonal respirations, skin jaundice and mottled, eyes dilated and fixed bilaterally, stomach distended and rigid, [with a] large bruise to her upper inner left arm"; "[t]he prison's medical ward nurse was unable to tell EMS how long [Honeycutt] had been unresponsive and failed to note or treat the airway compromise," and "[t]he prison medical staff had also failed to provide EMS with vitals during the medical ward's time of care due to being unable to obtain them via the automated vitals machine at [Honeycutt's] bedside." *Id.* at ¶¶ 76–77, 79–80. The allegations are sufficient to show a causal link between Hackworth's failure to address serious deficiencies in providing medical care to inmates at HRRJ and Honeycutt's death.

Plaintiff has alleged facts sufficient to state a claim against Hackworth for supervisory liability under section 1983, and Hackworth's motion to dismiss count V should be **DENIED**.

35

### 3.   Count VI—Official Custom Pattern or Practice

Plaintiff sued Hackworth in his individual and official capacities. *Id.* at ¶ 23.  Hackworth argues that the official capacity claim raised against him in count VI is duplicative of the claim against HRRJA.  HRRJA's Mem. 17–18.

Official-capacity suits "generally represent only another way of pleading an action against an entity of which an officer is an agent." *Monell v. New York City Dept. of Social Services,* 436 U.S. 658, 690, n.55 (1978).  Consequently, "[a]s long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity." *Kentucky v. Graham*, 473 U.S. 159, 166 (1985); *see also Newbrough*, 822 F. Supp. 2d at 574 (dismissing official capacity claims against superintendent where the jail authority was also a named defendant).

Plaintiff clarifies that count VI is brought against "Defendant Regional Jail Authority, and its policy makers—either the Authority itself or Defendant Hackworth (in his official capacity)." Compl. ¶ 213.  Plaintiff explains that the complaint "only seeks to establish Defendant Hackworth as the policymaker in his official capacity, it does not seek to bring claims against HRRJA and Defendant Hackworth simultaneously." Pl.'s Mem. in Opp. to Defs.' Mot. to Dismiss 20, ECF No. 32.  Accordingly, Hackworth's motion to dismiss count VI, as pled against him in his official capacity, should be **GRANTED** as duplicative of the claim raised against HRRJA, which incorporates any claim against Hackworth as a policymaker in his official capacity.

### III.   RECOMMENDATION

For the forgoing reasons, the Court **RECOMMENDS** that the motions to dismiss the complaint for failure to state a claim, ECF Nos. 25, 29, be **GRANTED in part and DENIED in part** as follows:

- HRRJA's motion to dismiss the state law claims in counts I–III on the basis that HRRJA is a municipal corporation entitled to immunity be **DENIED**;

- HRRJA and Hackworth's motion to dismiss counts I and II alleging simple negligence and gross negligence, and Hackworth's motion to dismiss count V alleging supervisory liability pursuant to section 1983, be **DENIED**;

- HRRJA and Hackworth's motion to dismiss count III alleging willful and wanton negligence and Hackworth's motion to dismiss count IV alleging deliberate indifference pursuant to section 1983 be **GRANTED**;

- Baron's motion to dismiss counts II and III as alleged against him in his official capacity as barred by the Eleventh Amendment be **GRANTED**;

- Baron's motion to dismiss count II alleging gross negligence against him in his individual capacity be **DENIED**;

- Baron's motion to dismiss count III alleging willful and wanton negligence be **GRANTED**;

- Isureal, Caniff, and Dudley's motion to dismiss count II alleging gross negligence and count IV alleging deliberate indifference pursuant to section 1983 be **DENIED**;

- Isureal, Caniff, and Dudley's motion to dismiss count III alleging willful and wanton negligence be **GRANTED**; and

- Hackworth's motion to dismiss count VI against him in his official capacity be **GRANTED** as duplicative of the count raised against HRRJA.

## IV.     **REVIEW PROCEDURE**

By copy of this report and recommendation, the parties are notified that pursuant to 28 U.S.C. § 636(b)(1)(C):

1.  Any party may serve upon the other party and file with the Clerk written objections to the foregoing findings and recommendations within fourteen (14) days from the date of mailing of this report to the objecting party, *see* 28 U.S.C. § 636(b)(1), computed pursuant to Rule 6(a) of the Federal Rules of Civil Procedure.  Rule 6(d) of the Federal Rules of Civil Procedure permits an extra three (3) days, if service occurs by mail.  A party may respond to any other party's objections within fourteen (14) days after being served with a copy thereof. *See* Fed. R. Civ. P. 72(b)(2) (also computed pursuant to Rule 6(a) and (d) of the Federal Rules of Civil Procedure).

2.  A district judge shall make a *de novo* determination of those portions of this report or specified findings or recommendations to which objection is made.

The parties are further notified that failure to file timely objections to the findings and recommendations set forth above will result in a waiver of appeal from a judgment of this Court based on such findings and recommendations. *Thomas v. Arn*, 474 U.S. 140 (1985); *Carr v. Hutto*, 737 F.2d 433 (4th Cir. 1984); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).

/s/

Robert J. Krask
United States Magistrate Judge

Robert J.  Krask
United States Magistrate Judge

Norfolk, Virginia
February 28, 2020

38